**WADE KILPELA SLADE, LLP**
Gillian L. Wade, State Bar No. 229124
gwade@waykayslay.com
Sara D. Avila, State Bar No. 263213
sara@waykayslay.com
Marc A. Castaneda, State Bar No. 299001
marc@waykayslay.com
Kristin K. Graham, State Bar No. 342529
kkg@waykayslay.com
2450 Colorado Avenue, Suite 100E
Santa Monica, CA 90404
Tel: (310) 667-7273
Fax: (424) 276-0473

**EAST END TRIAL GROUP LLC**
Kevin Tucker (*pro hac vice* application forthcoming)
PA State Bar No. 312144
ktucker@eastendtrialgroup.com
Kevin Abramowicz (*pro hac vice* application forthcoming)
PA State Bar No. 320659
kabramowicz@eastendtrialgroup.com
6901 Lynn Way, Suite 215
Pittsburgh, PA 15208
Tel: (412) 223-5740
Fax: (412) 626-7101

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA
# SAN JOSE DIVISION

| | |
|---|---|
| BRENNAN ORUBO, MICHAEL SIMS, DEMETRICE MATHIS, and CIDNEY LETT individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> ACTIVEHOURS, INC. d/b/a EARNIN <br><br> Defendant. | Case No. <br><br> **CLASS ACTION COMPLAINT** <br><br> DEMAND FOR JURY TRIAL |

## CLASS ACTION COMPLAINT

Brennan Orubo, Michael Sims, Demetrice Mathis, and Cidney Lett ("Plaintiffs"), individually and on behalf of the class defined below, bring this action against Activehours, Inc. d/b/a EarnIn ("Defendant" or "EarnIn"), and allege as follows:

## NATURE OF THE ACTION

1. This action concerns a cash advance product that Defendant offers in Georgia.

2. Defendant charges fees to obtain compensation for offering its product and those fees, on average, yield APRs of 284%. *See* Center for Responsible Lending, Not Free: The Large Hidden Costs of Small-Dollar Loans Made Through Cash Advance Apps, p. 10 (April 2024), *available at*, https://www.responsiblelending.org/sites/default/files/nodes/files/research-publication/crl-not-free-hidden-costs-apr2024.pdf.

3. These types of excessive fees make it difficult for consumers to pay bills, increase the likelihood that they will overdraft a bank account, and make it harder for them to become financially stable. *See id.*, pp. 6-7, 12-13.

4. This is why Georgia law outlaws Defendant's cash advance product.

5. Accordingly, Plaintiffs bring this action, on behalf themselves and the class defined below, under Georgia's Pay Day Lending Act ("PLA") and the Truth In Lending Act (TILA) and seek to recover the principal they paid, along with three times the amount of any interest or other charges they paid, attorneys fees and costs, and all other relief available under the law.

## JURISDICTION AND VENUE

6. The Court has subject matter jurisdiction under 28 U.S.C. § 1331.

7. The Court also has jurisdiction under 28 U.S.C. 1332, as amended by the Class Action Fairness Act of 2005 ("CAFA"), because this is a putative nationwide class action and the matter in controversy exceeds $5,000,000.00 exclusive of interest and costs and some members of the Classes are citizens of state different than Defendant. *See* 28 U.S.C. § 1332(d)(2)(A).

8. The Court has personal jurisdiction because Defendant's principal place of business is located in this district and because it conducts in California substantial business from which the claims in this case arise.

9. Venue is proper under 28 U.S.C. § 1391.

### DIVISIONAL ASSIGNMENT

10. Assignment to this division is appropriate because a substantial part of the omissions or events giving rise to Plaintiffs' claims occurred in this division, as Defendant's principal place of business is located in this division.

### PARTIES

11. Brennan Orubo is a person residing in DeKalb County, Georgia.

12. Michael Sims is a person residing in Cherokee County, Georgia.

13. Demetrice Mathis is a person residing in Lee County, Georgia.

14. Cidney Lett is a person residing in Cobb County, Georgia.

15. EarnIn is a technology company headquartered in Palo Alto, California.

16. EarnIn is not a bank and is not licensed under any Georgia statute.

17. EarnIn offers a cash advance product to Georgia consumers over the internet.

18. Investors have paid EarnIn hundreds of millions of dollars in hopes that EarnIn can evade state law in offering its products. *See* Kate Clark, *Earnin raises $125M to help workers track and cash out wages in real time*, TechCrunch (Dec. 20, 2018), https://techcrunch.com/2018/12/20/earnin-raises-125m-to-help-workers-track-and-cash-out-wages-in-real-time/.

19. EarnIn's investors expect "to be paid back royally" for their investment. Tara Siegel Bernard, *Apps Will Get You Paid Early, for a Price*, N.Y. Times (Oct. 2, 2020), https://www.nytimes.com/2020/10/02/your-money/cash-advance-apps-paychecks.html.

### FACTUAL ALLEGATIONS

***EarnIn Offers Cash Advance Products To Consumers***

20. EarnIn operates a lending app called "EarnIn."

21. The app provides cash advances to consumers.

22. EarnIn advertises this product as a way for people to access wages before payday.

23. EarnIn allows users to receive up to $100 of advances each day, and up to $750 per pay period.

24. EarnIn currently offers a standard advance and an expedited advance.

3

25. The standard advance is deposited into a bank account within a few days, while the expedited advance is deposited within a few minutes.

26. Users cannot obtain an expedited advance without paying a "lightning speed fee," which ranges from $1.99 to $3.99.[1]

27. This fee is intended to compensate EarnIn for lending money; it does not cover the cost of providing other services.

28. Additionally, before users can obtain an advance, they must proceed past a screen that has selected a default "tip."

29. Users must change the default amount to zero to avoid paying a tip.

30. EarnIn represents that tips "pay it forward," "help" people, "support the service," and "keep EarnIn running for the rest of the community."

31. EarnIn also represents that a larger tip will help more people.[2]

32. Contrary to these claims, tips do not go to delivery drivers or workers that are trying to make ends meet.

33. Instead, tips serve as a profit center for EarnIn—a highly capitalized company backed by venture capitalists and institutional investors—and they are solely intended to compensate EarnIn for lending money.

***EarnIn Requires Consumers To Agree To Repay Its Cash Advances***

34. EarnIn requires its advances to be repaid on a consumer's next payday.

35. EarnIn communicates this through its app and advertisements.

36. EarnIn's app states that advances are "[d]ue to EarnIn on payday."

37. EarnIn's advertisements state that advances are due "when your paycheck hits."

38. To ensure it gets repaid, EarnIn requires users to: (i) have an employer that pays them regularly; (ii) link their bank account to the EarnIn app; and (iii) authorize EarnIn to automatically

---

[1] It costs: $1.99 for an advance of up to $24.99; $2.99 for an advance of $25.00-$74.99; and $3.99 for an advance of $75.00 or more. Because Earnin only allows its users to take out up to $100.00 in cash advances each day, users may incur multiple lightning speed fees in a single pay period.

[2] Earnin represents that: a $6.00 tip will help 1 person; a $8.50 will help two people; and a $11.00 tip will help three people.

4

debit the linked bank accounts on payday, in an amount equal to the advance a user receives and the tips and fees a user agrees to repay.

39. Users cannot obtain advances without: (i) verifying their employment; (ii) linking the bank account into which their paychecks are deposited to EarnIn's app; and (iii) allowing EarnIn to automatically debit the linked accounts on payday.

40. Moreover, before issuing advances, EarnIn performs a proprietary credit check on the linked bank account to ensure that the account will have sufficient funds to repay EarnIn's automatic account debits on payday.

41. EarnIn will not issue cash advances unless it believes it will be able to automatically deduct its advances, with any tips or fees, from a consumer's linked bank account immediately after their employer deposits a paycheck on payday.

42. EarnIn's underwriting criteria, the requirement that users link their bank accounts to the EarnIn app, and the requirement that users authorize EarnIn to deduct its advances, tips, and fees from bank accounts on payday, has resulted in EarnIn obtaining repayment on virtually all advances that EarnIn originates. *See* Financial Health Network, Earned Wage Access and Direct-to-Consumer Advance Usage Trends, p. 2 (April 2021), *available at*, https://cfsi-innovation-files-2018.s3.amazonaws.com/wp-content/uploads/2021/04/26190749/EWA_D2C_Advance-_sage_T_rends_FINAL.pdf (studying EarnIn and other cash advance apps, and finding that the apps obtained repayment at least 97% of the time).

**EarnIn's Cash Advance Products Are Costly And Harm Consumers**

43. The fees that EarnIn receives for its cash advance products have an unbelievably high cost, and those fees routinely yield triple digit-APRs. *See* Center for Responsible Lending, Not Free: The Large Hidden Costs of Small-Dollar Loans Made Through Cash Advance Apps, p. 10 (April 2024), *available at*, https://www.responsiblelending.org/sites/default/files/nodes/files/research-publication/crl-not-free-hidden-costs-apr2024.pdf (analyzing 19,561 advances issued through EarnIn's app, and finding that the average APR was 284%).[3]

---

[3] Take for example a $25.00 and a $75.00 advance, each with a two-week repayment schedule: a $2.99 "lightning speed fee" yields a 311.81% APR on the $25.00 advance, and a $3.99 "lightning

44. The high cost associated with EarnIn's cash advances leaves holes in the paychecks of borrowers, which leads to a cycle of reborrowing, where consumers take out new cash advances to fill the gaps created by old advances. *See, e.g.*, Center for Responsible Lending, Not Free: The Large Hidden Costs of Small-Dollar Loans Made Through Cash Advance Apps, p. 13 (April 2024), *available at*, https://www.responsiblelending.org/sites/default/files/nodes/files/research-publication/cr_l-not-free-hidden-costs-apr2024.pdf (detailing EarnIn user trapped in cycle of reborrowing who stated it "doesn't help having to forfeit half or more of my check every payday and then borrow it back"); Paulina Cachero, *Popularity of Apps for Early Paydays Masks Added Risks*, Bloomberg (July 29, 2023), https://www.bloomberg.com/news/articles/2023-06-29/know-the-risks-before-using-cash-adva nce-apps-like-earnin-dailypay; (detailing EarnIn user who "found himself trapped in a constant loop or borrowing" and who felt he had "completely lost control of the situation, with no way to work it out"); Cyrus Farivar, *Millions use Earnin to get cash before payday. Critics say the app is taking advantage of them*, NBC News (July 26, 2019), https://www.nbcnews.com/tech/internet/millions-use-earnin-get-cash-payday-critics-say-app-taki ng-n1034071 (detailing EarnIn user who described app as a "vicious cycle" and "had no money" after paying tips and fees); Sidney Fussell, *The New Payday Lender Looks a Lot Like the Old Payday Lender*, The Atlantic (Dec. 18, 2019), https://www.theatlantic.com/technology/archive/2019/12/online-banking-lending-earnin-tip/603304/ (detailing EarnIn user who fell into "cycle of get paid and borrow, get paid and borrow").

45. This cycle of reborrowing erodes the paychecks of borrowers, which prevents them from saving money for their families, and prevents the financially vulnerable from improving their situation or moving out of debt.

46. This cycle of reborrowing also makes it more likely that consumers will be subject to additional charges or fees, like bank overdraft charges and fees, which further erodes the financial stability of EarnIn's userbase.

47. Indeed, a recent study found that users of EarnIn's app, and other similar apps, were

---

speed fee" yields a 138.70% APR on the $75.00 advance; a 10% "tip" yields a 260.71% APR on both advances; and when the fees and tips are combined, they yield a 572.53% APR on the $25.00 advance, and a 399.41% APR on the $75.00 advance.

more likely to have a bank account overdrawn after obtaining cash advances. *See, e.g.*, Center for Responsible Lending, Not Free: The Large Hidden Costs of Small-Dollar Loans Made Through Cash Advance Apps, pp. 6-7 (April 2024), *available at*, https://www.responsiblelending.org/sites/default/files/nodes/files/research-publication/crl-not-free-hidden-costs-apr2024.pdf

48. To make matters worse, EarnIn never discloses the cost of its cash advance product, despite federal law requiring EarnIn to disclose the cost of its fees in terms of an annual percentage rate. *See* 15 U.S.C. § 1638(a)(4).

49. This results in users failing to understand the true cost of EarnIn's advance products. *See, e.g.*, Cyrus Farivar, *Millions use Earnin to get cash before payday. Critics say the app is taking advantage of them*, NBC News (July 26, 2019), https://www.nbcnews.com/tech/internet/millions-use-earnin-get-cash-payday-critics-say-app-taking-n1034071 (detailing EarnIn user that was unaware of the cost of EarnIn's cash advance product); Laurence Dermiento, *His app lends money for free. But it will probably cost you*, LA Times (May 18, 2022), https://www.latimes.com/business/story/2022-05-18/dave-inc-jason-wilk-cash-advance-app (same for other cash advance app).

50. It also incentives EarnIn's userbase to become dependent on EarnIn's cash advance product on the false belief that EarnIn's product has no cost, when EarnIn's product is actually one of the most expensive forms of credit.

51. At base, EarnIn's cash advance product is no different than, and just expensive as, a payday loan. *See* Center for Responsible Lending, Not Free: The Large Hidden Costs of Small-Dollar Loans Made Through Cash Advance Apps, pp. 10-12 (April 2024), *available at*, https://www.responsiblelending.org/sites/default/files/nodes/files/research-publication/crl-not-free-hidden-costs-apr2024.pdf (analyzing EarnIn's app, and three similar apps, and finding that APRs for these apps were "nearly as much as the APR on a typical payday loan"); California Department of Financial Protection and Innovation, *Initial Statement of Reasons for the Proposed Adoption of Regulations*, p. 62 (Mar. 15, 2023), *available at*, https://dfpi.ca.gov/wp-content/uploads/sites/337/2023/03/PRO-01-21-ISOR.pdf?emrc=e1ffd2 (stating that "APRs for companies [offering advances through cash advances apps] are generally similar to the average APRs for licensed payday lenders in California"); Paulina Cachero, *Popularity of Apps for Early Paydays Masks Added Risks*, Bloomberg (July 29, 2023),

https://www.bloomberg.com/news/articles/2023-06-29/know-the-risks-before-using-cash-advance-apps-like-earnin-dailypay (comparing cost of payday loans and cash advance apps); Grace Gedye, *The new payday loans? California moves to regulate cash advance apps*, Cal Matters (June 5, 2023), https://calmatters.org/economy/2023/06/earned-wage-access/ (similar).

52. In fact, EarnIn's cash advance product is worse than a payday loan because EarnIn obtains payment on its cash advance product at a rate that "significantly exceeds" that of a payday lender. California Department of Financial Protection and Innovation, *Initial Statement of Reasons for the Proposed Adoption of Regulations*, p. 62 (Mar. 15, 2023), *available at*, https://dfpi.ca.gov/wp-content/uploads/sites/337/2023/03/PRO-01-21-ISOR.pdf?emrc=e1ffd2.

53. In other words, EarnIn's users are far more likely to have costs that yield triple digit APRs deducted from their accounts than users of traditional payday lenders, which means EarnIn's users are far more likely to have their paychecks eroded, and be unable to improve their financial situation, than users of traditional payday loans.

***EarnIn's Cash Advance Product Is Unlawful***

54. Under Georgia law, it is illegal to engage in the business of making loans of $3,000 or less, unless the entity doing so is a bank, or is otherwise licensed to engage in such conduct under a Georgia licensing statute. *See* O.C.G.A. § 16-7-2(a).

55. EarnIn is not a bank and is not licensed to make loans under any Georgia law.

56. That means the loan transactions at issue in this case were void *ab initio*. *See id.* § 16-17-3.

57. EarnIn attempts to dodge the PLA and other Georgia lending laws with warranties contained in EarnIn's terms and conditions: which: (i) limits EarnIn's right to obtain payment on its cash advances by automatically debiting user bank accounts once employers deposit paychecks; and (ii) disclaims EarnIn's ability to: (a) file lawsuits to obtain repayment; (b) selling defaulted cash advances to debt buyers to obtain payment; or (c) report defaulted cash advances to consumer reporting agencies to obtain payment.

58. Importantly, EarnIn's warranties do not state that there is no obligation to repay.

59. Instead, they merely limit the recourse that EarnIn can use to reobtain repayment.

60. And EarnIn's preferred method of recourse—automatic bank account debits timed to a consumer's payday—allows EarnIn to obtain repayment on its advances virtually every time.

61. In other words, EarnIn's disclaimer of other more common methods of recourse does not actually place EarnIn's ability to obtain repayment at risk, and is simply a cover to hide usury.

62. Regardless, consumers are clearly obligated to repay EarnIn's advances because they cannot obtain a cash advance without linking a bank account to EarnIn's app, or without authorizing EarnIn to automatically deduct its advances, and any fees, immediately after a consumer's employer initiates a direct deposit to their linked bank account on payday.

63. Moreover, EarnIn clearly leads users to believe they have a repayment obligation, as EarnIn prominently represents that its cash advances are due on payday.

64. In short, EarnIn's disclaimer of recourse methods that it does not need to rely on to ensure repayment is nothing more than an element that EarnIn introduced to "disguise the true nature of the transaction as an extension of credit." O.C.G.A. § 16-17-2(b)(3).

**Facts Relevant to Plaintiffs**

65. Plaintiffs obtained cash advances from EarnIn.

66. Plaintiffs used those advances for personal, family, and/or household purposes.

67. Plaintiffs paid EarnIn's tips and express fees.

68. In doing so, Plaintiffs did not know they were paying interest.

69. EarnIn's fees yielded triple-digit APRs.

70. For example: one of Orobu's most recent advances was for $100, was to be repaid in ten days or less, and included a $3.99 express fee, which yielded an APR over 145%; one of Sims's most recent advances was for $100, was to be repaid in three or less days, and included a $3.99 express fee and a $0.50 tip, which yielded an APR over 546%; one of Mathis's most recent advances was for $100.00, was to be repaid in two weeks or less, and included a $3.00 express fee and a $1 tip, which yielded an APR over 130%; and one of Lett's most recent advances was for $100, was to be repaid in three days or less, and included a $3.00 express fee and an $11.00 tip, which yielded an APR over 1,700%.

71. Plaintiffs were unaware that the amounts they paid yielded triple-digit APRs.

72. EarnIn failed to disclose that the amounts Plaintiff paid yielded triple-digit APRs.

## CLASS ACTION ALLEGATIONS

73. Plaintiffs bring this action individually and on behalf of all others similarly situated under Fed. R. Civ. P. 23.

74. Plaintiff seeks to certify the following class: "All persons that reside in Georgia, obtained a cash advance or loan from Defendant, and paid a fee, charge, or other amount within the applicable statute of limitations."

75. Fed. R. Civ. P. 23(a)(1): On information and belief, there are tens of thousands of class members, making joinder of those persons impracticable. Additionally, the members of the class are identifiable through Defendant's records, Defendant's third-party service providers, and the banks through which the class members hold accounts.

76. Fed. R. Civ. P. 23(a)(2), 23(b)(3): Plaintiffs and the class members share numerous common questions of law and fact that will drive the resolution of the litigation and predominate over any individual issues. For example, there is a single common answer to whether Defendant's advances qualify as "loans" under the relevant laws and whether the "tips" or "fees" Plaintiffs paid qualify as "interest" or other amounts under the laws at issue. These common questions, and other common questions of law and fact, will predominate over individual questions, to the extent any individual questions exist.

77. Fed. R. Civ. P. 23(a)(3): Plaintiff's claims are typical of the claims of the members of the class because the claims of Plaintiffs and the class are based on the same legal theories and arise from the same conduct.

78. Fed. R. Civ. P. 23(a)(4): Plaintiffs are adequate representatives of the class because the interests of Plaintiffs and class align. Plaintiffs will fairly, adequately, and vigorously represent and protect the interests of the class and have no interest antagonistic to the class. Plaintiffs retained counsel who are competent and experienced in the prosecution of class action litigation generally and consumer finance litigation specifically.

79. Fed. R. Civ. P. 23(b)(3): Given the complexity and nature of the issues presented and

the relief requested, the expense and time necessary to obtain such relief, and the anticipated recovery and relief Plaintiffs and the classes may obtain, the class action mechanism is by far the preferred and most efficient litigation mechanism to adjudicate the claims of Plaintiffs and the class members. Additionally, requiring Plaintiffs and the class members to file individual actions would impose a crushing burden on the court system and almost certainly lead to inconsistent judgments. Class treatment presents far fewer management difficulties and provides benefits of a single adjudication and economies of scale.

**COUNT I**
**Violation of the Georgia Payday Loan Act**
**O.C.G.A. §§ 16-17-1, *et seq.***

80. This claim is brought individually and on behalf of the class.

81. Defendant engaged in the business of making, offering, arranging, or acting as an agent in the making of loans of $3,000.00 or less.

82. Defendant is not a bank or credit union, and is not licensed under any Georgia law to engage in that business.

83. Plaintiffs and the class obtained loans from Defendant and paid interest and other charges in doing so.

84. Defendant's conduct described herein violated and continues to violate O.C.G.A. § 16-17-2, which means that the loans of Plaintiffs and the class were void *ab initio*, that Defendant is barred from collecting any amounts on those loans, and that Defendant is additionally liable to Plaintiffs and the members of the class for three times the amount of any interest or other charges, and attorneys' fees and costs. *See* O.C.G.A. § 16-17-3.

85. Accordingly, Plaintiffs, individually and on behalf of the class, request: (i) payment of all principal of any loans repaid in the last 20 years; (ii) payment of triple the amount of any tips, fees, or other amounts repaid in the last 20 years; (iii) a declaration that Plaintiffs' and the class members' loans were or are void *ab initio*; (iv) and an order prohibiting Defendant from attempting to debit Plaintiffs' or the class members' bank accounts to repay any cash advances.

//

//

**COUNT II**
**Violation of the Truth-In-Lending Act**
**15 U.S.C. §§ 1601,** *et seq.*

86. This claim is brought individually and on behalf of the class.

87. Defendant is a "creditor," Plaintiffs' and the class's cash advances are "consumer credit transactions," and Plaintiffs, Defendant, and the class members are "persons" within the meaning of TILA. 15 U.S.C. §§ 1602(e), (f), (g), (i).

88. TILA required Defendant to disclose the: "amount financed"; "finance charge"; "annual percentage rate"; and "total of payments." *Id.* §§ 1638(a)(2), (3), (4), (5); *see also* Notice, No. CFPB-2024-0032, *available at*, https://files.consumerfinance.gov/f/documents/cfpb_paycheck-advance-marketplace_proposed-interpretive-rule_2024-07.pdf.

89. The purpose of these disclosure requirements is to ensure a meaningful disclosure of credit terms to protect consumers against unfair credit practices and to ensure consumers avoid the uninformed use of credit. *Id.* § 1601(a).

90. Defendant failed to disclose, among other things, the "finance charge," "amount financed," "annual percentage rate," "total of payments," and schedule of payments to Plaintiffs and the class members.

91. Indeed, at no time before, during, or after Plaintiffs or any class member obtained a loan or advance did Defendant disclose any of the above terms.

92. Because Defendant failed to comply with TILA's requirements, Defendant is liable to Plaintiffs and the class members in an amount equal to actual damages, statutory damages, costs, reasonable attorneys' fees, and all other available relief. *Id.* § 1640(a).

**JURY TRIAL DEMANDED**

Plaintiffs request a jury trial on all claims so triable.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for the following relief:

a. An order certifying the proposed class, appointing Plaintiffs as representative of the proposed class, and appointing undersigned counsel as counsel for the proposed class;

b. An order awarding the members of the class actual, statutory, treble, and all other damages available by law, with pre- and post-judgment interest;

c. An order providing Plaintiffs and the members of the class restitution for any principal, interest, fees, or other charges paid to Defendant;

d. An order declaring the cash advances that Plaintiffs and the class members obtained were or are void *ab initio*;

e. And order preventing Defendant from attempting to collect its cash advances from Plaintiffs and the class members;

f. An order awarding attorneys' fees and costs;

g. An order awarding all other relief that is just, equitable, and appropriate.

Dated: August 2, 2024

**WADE KILPELA SLADE, LLP**

_____
Gillian L. Wade
Sara D. Avila
Marc A. Castaneda
Kristin K. Graham
2450 Colorado Avenue, Suite 100E
Santa Monica, CA 90404

**EAST END TRIAL GROUP LLC**
Kevin Tucker
Kevin Abramowicz
6901 Lynn Way, Suite 215
Pittsburgh, PA 15208
*Attorneys for Plaintiffs*