**WADE KILPELA SLADE, LLP**
Gillian L. Wade, State Bar No. 229124
gwade@waykayslay.com
Sara D. Avila, State Bar No. 263213
sara@waykayslay.com
Marc A. Castaneda, State Bar No. 299001
marc@waykayslay.com
Kristin K. Graham, State Bar No. 342529
kkg@waykayslay.com
2450 Colorado Avenue, Suite 100E
Santa Monica, CA 90404
Tel: (310) 667-7273
Fax: (424) 276-0473

**EAST END TRIAL GROUP LLC**
Kevin Tucker
PA State Bar No. 312144
ktucker@eastendtrialgroup.com
Kevin Abramowicz
PA State Bar No. 320659
kabramowicz@eastendtrialgroup.com
6901 Lynn Way, Suite 503
Pittsburgh, PA 15208
Tel: (412) 223-5740
Fax: (412) 626-7101

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION**

| | |
|---|---|
| BRENNAN ORUBO, MICHAEL SIMS, DEMETRICE MATHIS, and CIDNEY LETT individually and on behalf of all others similarly situated,<br><br>          Plaintiffs,<br><br>    v.<br><br>ACTIVEHOURS, INC. d/b/a EARNIN<br><br>          Defendant. | Case No. 5:24-cv-04702-PCP<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>1. Violation of the Georgia Payday Loan Act O.C.G.A. §§ 16-17-1, *et seq.*<br><br>2. Violation of the Truth-In-Lending Act 15 U.S.C. §§ 1601, *et seq.*<br><br>Judge: Hon. P. Casey Pitts<br><br>Complaint Filed:  August 2, 2024 |

United States District Court
Northern District of California

**FIRST AMENDED CLASS ACTION COMPLAINT**

Brennan Orubo, Michael Sims, Demetrice Mathis, and Cidney Lett ("Plaintiffs"), individually and on behalf of the class defined below, bring this action against Activehours, Inc. d/b/a EarnIn ("Defendant" or "EarnIn"), and allege as follows:

## I.    NATURE OF THE ACTION

1.    Payday lending—the business of making short-term, high-cost loans or cash advances to consumers—is illegal in Georgia.

2.    Despite Georgia outlawing payday lending, Defendant has offered a short-term, high-cost cash-advance product to Georgia consumers, for over a decade.

3.    In violation of Georgia law, Defendant has used this product to extract from Georgia consumers charges that, on average, yield an annual percentage rate ("APR") close to 300%, which is almost thirty times the legal limit.

4.    And, in violation of federal law, Defendant fails to disclose the credit terms on its cash advances to consumers.

5.    Accordingly, Plaintiffs bring this action, on behalf of themselves and the class defined below, under Georgia's Payday Lending Act ("PLA"), O.C.G.A. §16-17.1 *et seq.*, and the Truth In Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.*

6.    Plaintiffs seek to recover the principal they paid in connection with their cash advances from Defendant, along with three times the amount of any interest or other charges they paid, attorneys fees and costs, and all other relief available under the law.

## II.    JURISDICTION AND VENUE

7.    The Court has subject matter jurisdiction under 28 U.S.C. § 1331.

8.    The Court also has jurisdiction under 28 U.S.C. § 1332, as amended by the Class Action Fairness Act of 2005 ("CAFA"), because this is a class action and the matter in controversy exceeds $5,000,000.00 exclusive of interest and costs and some members of the class are citizens of states different than Defendant. *See* 28 U.S.C. § 1332(d)(2)(A).

9. The Court has personal jurisdiction over Defendant because Defendant's principal place of business is located in this judicial district and because Defendant conducts in California substantial business from which the claims in this case arise.

10. This judicial district is the proper venue for this action because Defendant resides in this district and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district. *See* 28 U.S.C. § 1391.

## III. DIVISIONAL ASSIGNMENT

11. Assignment to this division is appropriate because a substantial part of the omissions or events giving rise to Plaintiffs' claims occurred in this division, as Defendant's principal place of business is located in this division.

## IV. PARTIES

12. Brennan Orubo is a person residing in DeKalb County, Georgia.

13. Michael Sims is a person residing in Cherokee County, Georgia.

14. Demetrice Mathis is a person residing in Lee County, Georgia.

15. Cidney Lett is a person residing in Cobb County, Georgia.

16. EarnIn is a technology company headquartered in Palo Alto, California.

17. EarnIn is not a bank and is not licensed under any Georgia statute.

## V. FACTUAL ALLEGATIONS

### A. EarnIn Offers A Cash-Advance Loan Product To Georgia Consumers

18. EarnIn offers a cash-advance loan product to Georgia consumers over the internet.

19. EarnIn offers this product through a lending app called "EarnIn."

20. The app provides up to $100 in cash advances at a time, and up to $750 per pay period.

21. EarnIn advertises its cash-advance loan product as a way for people to access their earned wages before payday.

22. The advertised and intended purpose of EarnIn's cash-advance loan product is to provide an instant source of money, accessible directly from a mobile phone, that consumers can use to pay time-sensitive obligations or cover surprise expenses.

23. For example, EarnIn's website advertises EarnIn's product as allowing users to access cash "within minutes," as providing "instant access" to cash so users can "cover surprise expenses," and as allowing users to access cash "right when [they] need it."





24.    Similarly, EarnIn's video advertisements show people in situations where they need immediate cash—filling gas tanks, covering surprise vet bills, taking spur of the moment vacations, paying impromptu haircuts, and covering unexpected expenses for children—and advertise the EarnIn app as providing a solution. *See* https://www.youtube.com/watch?v=nTm8iKvAZ04.

**B.    EarnIn Collects Charges from Borrowers In Connection with Borrowers' Cash Advances**

25.    Like every lender, EarnIn offers its cash-advance loan product to generate profits from the pockets of borrowing consumers.

26.    EarnIn achieves this goal through charges that are labeled as "lightning speed fees" and "tips."

27.    EarnIn has structured its cash-advance loan product to ensure that borrowers pay these charges on the vast majority of transactions.

28.    For example, a borrower must pay the lightning speed fee to use EarnIn's product for its intended and advertised purpose—as an instant source of cash.

29.    This charge ranges in amounts of $1.99 to $3.99, depending on the amount of money borrowed.

30.    The lightning speed fee is $1.99 for an advance of up to $24.99; $2.99 for an advance of $25.00-$74.99; and $3.99 for an advance of $75.00 or more.

31.    Because EarnIn only allows borrowers to obtain up to $100.00 in cash advances at a time, borrowers may incur multiple lightning speed fees in a single day or pay period.

32.    If a borrower does not pay the lightning speed fee, they cannot obtain the advertised version of EarnIn's cash-advance product or use the product for its intended purpose.

33.    Instead, a borrower obtains an inferior version of EarnIn's loan product, which provides access to cash days after a request is made, and which cannot be used to pay time sensitive obligations or cover surprise expenses.

34. EarnIn's lightning speed fee does not actually cover the cost of providing a service, as it costs little to nothing to offer cash advances immediately as opposed to days later; instead, this charge is imposed solely to obtain compensation for lending money.[1]

35. Because this fee must be paid to use EarnIn's cash advance product for its intended and advertised purpose, virtually every user pays this charge.

36. Regarding EarnIn's "tip" charge, EarnIn uses a host of deceptive tactics to pressure, fool, coerce, confuse, and/or exhaust its users into agreeing to pay this charge.

37. Indeed, the use of the word "tip" to describe this charge is deceptive in its own right because this charge does not go to delivery drivers, hourly workers, or employees trying to make ends meet; instead, this charge, like EarnIn's lightning speed fee, is solely intended to generate loan profits for EarnIn.

38. In addition to deceptively labeling this charge as a "tip," EarnIn employs a host of deceptive tactics to make payment of this charge difficult to avoid and to mislead borrowers into believing it is a mandatory charge.

39. At times and for some borrowers, EarnIn employed pay-it-forward language on its tip screen to coerce borrowers into paying the tip charge, falsely claiming that a previous borrower had paid the tip to cover the cost of EarnIn's service for the current borrower, and asking the borrower to do the same for a future borrower.

40. This same screen presented the borrower with a default tip for the borrower to pay, and represented that a greater tip would cover the cost of providing a cash advance for a greater number of borrowers.

---

[1] Before 2022, EarnIn did not charge users to obtain the advertised version of its product, and users could obtain advances immediately, and use them for their advertised and intended purpose without paying an additional charge. Clearly, EarnIn instituted the lightning speed fee to force its users to pay money on virtually every loan transaction.



41.    Other borrowers were confronted with the current language on EarnIn's tip screen, representing that users must pay tips to "keep[] us running," and by presenting consumers with four, non-zero tipping options of $6, $8, $11, and $13.



7

42.    By presenting consumers with non-zero tip options of $6, $8, $11, and $13, EarnIn suggests that borrowers have the option to pick one of the default amounts, but do not otherwise have the option to avoid tipping.

43.    These representations are intended to lead borrowers to believe EarnIn's tip charges are mandatory, or to otherwise guilt or pressure borrowers to pay this charge at a sufficiently high rate to ensure that EarnIn obtains sufficiently high profits.

44.    To avoid paying a tip, a borrower must click the pencil button on the above-shown tip screen, after which they are taken to another screen that defaults to an $11 tip, representing that tips "keep us running for members like you."



45.    If a borrower manages to change the default tip to $0 on the screen shown in the paragraph above, they are taken back to the original tip screen, and asked to confirm that they wish to forgo paying a tip and forgo helping to "support EarnIn."



46.    To avoid paying a tip, borrowers must go through this exhausting and confusing hurdle, and often, do not understand how to navigate the app to avoid doing so.

47.    EarnIn has used other deceptive strategies as well, including representing that tips "help" people,[2] "support the service," and "keep EarnIn running for the rest of the community," while presenting borrowers with a default tip to pay.

48.    EarnIn's deceptive strategy to coerce borrowers into paying additional tip charges works, as most users pay this charge, despite the vast majority being in desperate need of cash.

49.    For example, a 2023 study by a California regulator found that cash advance apps that solicit tip-like charges receive them on 73% of loan transactions. *See* Exhibit A, pp. 1, 7.

50.    The structure of EarnIn's cash-advance loan product has been successful at ensuring that EarnIn's borrowers pay large sums on top of the principal loan amount to receive cash advances, as EarnIn's product yields an average APR of 284%. *See* Exhibit B, p. 10.

---

[2] EarnIn has represented that: a $6.00 tip will help one person; an $8.50 tip will help two people; and an $11.00 tip will help three people.

51. The average APR is so high because the vast majority of loan transactions include the charges described above—a lightning speed fee, tip, or both—in return for obtaining EarnIn's cash-advance loan product.

**C.  EarnIn Obtains Repayment On Virtually All Cash-Advance Loan Transactions**

52. EarnIn requires borrowers to repay their cash-advance loans on their next payday.

53. On its website, EarnIn prominently represents that is cash advances and charges must be repaid "when your paycheck hits."





54. EarnIn's in-app screens similarly state that EarnIn's cash advances are "due to EarnIn on payday."

55.    To ensure it gets repaid, EarnIn requires borrowers to: (i) have an employer that pays them regularly; (ii) link the bank account to which paychecks are deposited to EarnIn's app; and (iii) authorize EarnIn to automatically debit the linked accounts on the borrower's payday in an amount that is equal to the cash advance the borrower receives (the principal loan amount) and the additional charges the borrower paid when taking out their cash-advance loan.

56.    Borrowers cannot obtain cash advances without: (i) verifying their employment; (ii) linking the account to which paychecks are deposited to EarnIn's app; and (iii) allowing EarnIn to automatically debit linked accounts on the borrower's payday.

57.    And before issuing advances, EarnIn performs a proprietary credit check on the borrower's linked bank account to ensure that the account will have sufficient funds to repay EarnIn's automatic account debits on the borrower's payday.

58.    The sole purpose of this credit check is to guard against the risk of non-payment.

59.    EarnIn does not issue a cash-advance loan unless it believes it will be able to automatically deduct the sum of the cash-advance loan amount (the loan principal), plus any additional charges (including lightning speed fees and tips), from the linked account as soon as the borrower's employer deposits the borrower's next paycheck.

60.    The requirements that EarnIn imposes on borrowers ensure that EarnIn obtains repayment on virtually every cash-advance loan it issues.

61.    Furthermore, borrowers do not agree to pay EarnIn's tips or lightning speed fees after they obtain or receive a cash advance; instead, they are required to agree to pay these charges before advances are issued or received.

62.    That agreement becomes part of the loan contract, with any lightning speed fees or tips a borrower has paid being incorporated into the automatic account debit rights that EarnIn obtains as part of the loan contract.

63.    As explained, EarnIn structures its cash-advance loans so that borrowers are required to repay them on their next payday. This remains true despite EarnIn's recent addition of a sham provision in its terms and conditions that purports to disclaim a borrower's obligation to repay cash advances.

11

**D.    EarnIn's Cash-Advance Loans Violate Georgia Law**

64.    Payday lending refers to a short-term, high-cost form of lending, requiring consumers to repay small dollar loans on their next payday.

65.    This form of lending has been around for more than a century, with its defining feature being the varying attempts that lenders have created to evade the law.

66.    Historically, payday lending took the form of "salary" or "wage buying," where lenders would claim that they were purchasing earned wages, even though they were really loaning money at excessive rates.

67.    Georgia enacted the Industrial Loan Act ("ILA") to regulate payday lending, and stop the various evasions that lenders used to circumvent the law.

68.    Georgia sought to stop payday lending because short-term, high-cost loans can create a cycle of debt.

69.    This occurs because the high fees charged on this form of credit eat into paychecks, which reduces the amount borrowers receive on payday, requiring borrowers to take out new loans to fill the gap created by original loans.

70.    This cycle of reborrowing is well documented in the cash advance arena, as various studies show that the typical cash advance app user takes out at least one advance each pay period and continues to borrow even after the first loan is repaid. *See* Exhibit B, pp. 7-9; Exhibit A, p. 11.

71.    It also is well documented for EarnIn's specific cash-advance loan product. *See* Paulina Cachero, Popularity of Apps for Early Paydays Masks Added Risks, Bloomberg (June 29, 2023), https://www.bloomberg.com/news/articles/2023-06-29/know-the-risks-before-using-cash-advance-apps-like-earnin-dailypay (user found himself trapped in "a constant loop of borrowing," and felt he had "completely lost control of the situation, with no way to work it out"); Cyrus Farivar, Millions use Earnin to get cash before payday. Critics say the app is taking advantage of them, NBC News (July 26, 2019), https://www.nbcnews.com/tech/internet/millions-use-earnin-get-cash-payday-critics-say-app-taking-n1034071 (user "had no money" after paying fees, describing app as a "vicious cycle"); Sidney Fussell, The New Payday Lender Looks a Lot Like the Old Payday Lender, The Atlantic (Dec.

18, 2019), https://www.t heatlantic.com/technology/archive/2019/12/online-banking-lending-earnin-tip/603304/ (user fell into a "cycle of get paid and borrow, get paid and borrow").

72.    Unfortunately, the ILA proved insufficient to stop payday lending in Georgia.

73.    In the 1990s and early 2000s, payday lending resurfaced in other forms.

74.    Some lenders used banks to issue loans, after which the lenders repurchased the loans for themselves, attempting to hide under the banks' charter to charge excessive interest.

75.    Other lenders described their transactions as "sale/leasebacks," whereby consumers purportedly sold personal property and leased it back for a fee.

76.    And yet other lenders described their transactions as "deferred presentments," whereby lenders would advance cash to borrowers in return for a post-dated check for the amount of the advance and a fee, which the borrower agreed the lender could cash on payday.

77.    Recognizing that the ILA did not provide sufficient deterrence to stop these evasions, Georgia enacted the PLA to cease payday lending in the state.

78.    The PLA "encompasses all transactions in which funds are advanced to be repaid at a later date, notwithstanding the fact that the transaction contains one or more other elements," O.C.G.A. § 16-17-1(a), prohibits payday lenders from collecting any amounts on payday loans, deems payday loans void and unenforceable, and makes payday lenders liable to borrowers for damages in an amount equal to three times any charges made on an illegal payday loan, *id.* § 16-17-3.

79.    Despite the PLA, payday lending has resurfaced yet again in Georgia—this time in the form of EarnIn's cash-advance loan product, which offers cash to borrowers in return for the authorization to debit the borrower's bank account on their payday in an amount equal to the principal cash-advance loan amount and any additional charges.

80.    EarnIn's cash advance product falls within the scope of the PLA because EarnIn's cash advance product is a "transaction[] in which funds are advanced to be repaid at a later date." O.C.G.A. § 16-17-1(a).

81.    EarnIn explicitly represents that its product advances money that is "repaid when your paycheck hits."

82.    Additionally, the receipt of EarnIn's product is conditioned on consumers linking their bank account to EarnIn's app, and authorizing EarnIn to debit the linked account immediately after an employer directly deposits a paycheck on payday, EarnIn seeks repayment on every advance it issues by enforcing its automatic debit rights, and EarnIn obtains repayment on virtually every advance by timing its automatic account debits to coincide with the date that employers directly deposit paychecks into the bank accounts that are linked to EarnIn's app.

83.    EarnIn's cash advance-loan product is the newest form of payday lending, which means it is prohibited under Georgia law.

**E.    EarnIn's Cash-Advance Loan Product Does Not Include Disclosures Mandated by TILA**

84.    Congress passed TILA to ensure "a meaningful disclosure of credit terms" and to avoid "the uninformed use of credit." 15 U.S.C. § 1601(a).

85.    To that end, TILA requires lenders to disclose the cost of credit beforehand, including the disclosure of the cost of credit as a "finance charge," and as an "annual percentage rate" or "APR," depending on the amount of the advance and its cost. *Id.* § 1638.

86.    EarnIn's cash-advance loan product is within the purview of TILA.

87.    EarnIn's lightning speed fees and tips are charges that add to a borrower's cost of credit when taking out a cash-advance loan from EarnIn,

88.    Specifically, cash-advance borrowers must pay EarnIn's "lightning speed fee" to use EarnIn's product for its advertised and intended purpose, and EarnIn misleads borrowers into believing that "tips" are mandatory and makes it difficult for borrowers to avoid paying this additional charge in connection with their cash-advance loan.

89.    Even though EarnIn's product falls under TILA's purview, EarnIn does not disclose *any* of the information that TILA requires.

90.    The Consumer Financial Protection Bureau ("CFPB") agrees that TILA applies to EarnIn's loan product, and the CFPB recently proposed an Interpretive Rule that treats the "tip" and "lighting speed fee" charges that EarnIn collects as "finance charges" within the meaning of TILA. *See* Exhibit C.

14

91.     Regarding EarnIn's "lightning speed fee," the proposed Interpretive Rule states:

> [T]he speed with which earned wage credit provides liquidity . . . is an integral feature of such credit, which is why consumers tend to opt for faster delivery when it is available. Thus, when the consumer pays for that faster delivery, the associated fee is immediately and directly connected to the particular extension of credit. That substantial connection makes this "a fee imposed as an incident to that particular extension of credit," and accordingly one that must be disclosed as part of the finance charge.

*See id.*, p. 16.

92.      Regarding EarnIn's "tip" charge, the proposed Rule recognizes that this charge is not a "tip[] or gratuit[y] in any traditional sense," but is a central component of the revenue model of cash advance providers, like EarnIn, and is solely intended to "finance" the extension of credit, meaning it is a "finance charge" within the meaning of TILA. *See id.*, pp. 17-18.

F.     **Plaintiffs' Experiences with Cash Advances from EarnIn**

93.     From at least 2018 to present, each Plaintiff has obtained more than one cash-advance loan from EarnIn. The amount of each cash advance was less than or equal to $100.00. Each Plaintiff was required to authorize EarnIn to debit their account for repayment, and EarnIn initiated those debits on the following payday.

94.     Plaintiffs used those loans for personal, family, and/or household purposes.

95.     Plaintiffs paid EarnIn's finance charges, in the form of lightning speed fees and tips, to obtain cash-advance loans from EarnIn, and those charges yielded triple-digit APRs.

96.     Below are illustrations of some of the loans Plaintiffs obtained and some of the charges that Plaintiffs paid.

97.     Plaintiff Orobu obtained a $100.00 loan, which was to be repaid in ten days or less, and paid a $3.99 express fee, which yielded an APR over 145%.

98.     Plaintiff Sims obtained a $100.00 loan, which was to be repaid in three or less days, and paid a $3.99 express fee and a $0.50 tip, which yielded an APR over 546%.

99.     Plaintiff Mathis obtained a $100.00 loan, which was to be repaid in two weeks or less, and paid a $3.00 express fee and a $1.00 tip, which yielded an APR over 130%.

100.     Plaintiff Lett obtained a $100.00 loan, which was to be repaid in three days or less, and paid a $3.00 express fee and an $11.00 tip, which yielded an APR over 1,700%.

## VI.   CLASS ALLEGATIONS

101.   Plaintiffs bring this action individually and on behalf of all others similarly situated under Fed. R. Civ. P. 23.

102.   Plaintiffs seek to certify the following class: "All Georgia borrowers who obtained a cash advance or loan from Defendant, and paid a fee, charge, or other amount within the applicable statute of limitations."

103.   Fed. R. Civ. P. 23(a)(1): On information and belief, there are tens of thousands of class members, making joinder of those persons impracticable. Additionally, the members of the class are identifiable through Defendant's records, Defendant's third-party service providers, and the banks through which the class members hold accounts.

104.   Fed. R. Civ. P. 23(a)(2), 23(b)(3): Plaintiffs and the class members share numerous common questions of law and fact that will drive the resolution of the litigation and predominate over any individual issues. For example, there is a single common answer to whether Defendant's cash advances qualify as "loans" under the relevant laws and whether the "tips" or "fees" Plaintiffs paid qualify as "finance charges," "interest" or other amounts under the laws at issue. These common questions, and other common questions of law and fact, will predominate over individual questions, to the extent any individual questions exist.

105.   Fed. R. Civ. P. 23(a)(3): Plaintiff's claims are typical of the claims of the members of the class because the claims of Plaintiffs and the class are based on the same legal theories and arise from the same conduct.

106.   Fed. R. Civ. P. 23(a)(4): Plaintiffs are adequate representatives of the class because the interests of Plaintiffs and class align. Plaintiffs will fairly, adequately, and vigorously represent and protect the interests of the class and have no interest antagonistic to the class. Plaintiffs retained counsel who are competent and experienced in the prosecution of class action litigation generally and consumer finance litigation specifically.

107.   Fed. R. Civ. P. 23(b)(3): Given the complexity and nature of the issues presented and the relief requested, the expense and time necessary to obtain such relief, and the anticipated recovery and relief Plaintiffs and the classes may obtain, the class action mechanism is by far the preferred and

most efficient litigation mechanism to adjudicate the claims of Plaintiffs and the class members. Additionally, requiring Plaintiffs and the class members to file individual actions would impose a crushing burden on the court system and almost certainly lead to inconsistent judgments. Class treatment presents far fewer management difficulties and provides benefits of a single adjudication and economies of scale.

## VII.    CAUSES OF ACTION

**COUNT I**
**Violation of the Georgia Payday Loan Act**
**O.C.G.A. §§ 16-17-1, *et seq.***

108.    Plaintiffs bring this claim individually and on behalf of the class.

109.    Defendant engaged in the business of making, offering, arranging, or acting as an agent in the making of loans of $3,000.00 or less. O.C.G.A. § 16-17-2(a), (b).

110.    Defendant is not a bank or credit union and is not licensed under any Georgia law to engage in that business.

111.    Defendant does not meet any of the statutory exceptions to the general prohibition against the making of loans of $3,000.00 or less. *See* O.C.G.A. § 16-17-2(a)(1)-(4).

112.    Plaintiffs are borrowers who obtained cash-advance loans from Defendant and paid interest and other charges in connection with those loans.

113.    Defendant advanced funds to Plaintiffs to be repaid at a later date.

114.    Defendant's conduct described herein violated and continues to violate the PLA, which means that the loans of Plaintiffs and the class were void *ab initio*, that Defendant is barred from collecting any amounts on those loans, and that Defendant is additionally liable to Plaintiffs and the members of the class for three times the amount of any interest or other charges, and attorneys' fees and costs. *See* O.C.G.A. § 16-17-3.

115.    Accordingly, Plaintiffs, individually and on behalf of the class, request: (i) payment of all principal of any loans repaid in the last 20 years; (ii) payment of triple the amount of any tips, fees, or other amounts repaid in the last 20 years; (iii) a declaration that Plaintiffs' and the class members' loans are void *ab initio*; (iv) and an order prohibiting Defendant from attempting to debit Plaintiffs' or the class members' bank accounts to repay any cash advances.

17

## COUNT II
### Violation of the Truth-In-Lending Act
### 15 U.S.C. §§ 1601, *et seq.*

116.   Plaintiffs bring this claim individually and on behalf of the class.

117.   Through its cash-advance loan product, Defendant advances money to borrowers, and borrowers, in return, authorize Defendant to debit their bank accounts on their following payday, in an amount equal to the money advanced and any additional charges or fees borrowers paid upon obtaining their cash advance.

118.   These types of transactions meet the definition of "credit," as defined by TILA, as Defendant grants consumers the right to defer payment of debt or incur debt and defer its payment. 15 U.S.C. § 1605(f).

119.   And because Defendant's cash advances are "credit" transactions, Defendant is a "creditor," Plaintiffs' and the class's advances are "consumer credit transactions," and Plaintiffs, Defendant, and the class members are "persons" within the meaning of TILA. *Id.* §§ 1602(e), (f), (g), (i).

120.   TILA requires "creditors," like Defendant, to disclose, among other things, the "amount financed," "finance charge," "annual percentage rate," and "total of payments." *Id.* §§ 1638(a)(2), (3), (4), (5).

121.   Defendant fails to disclose *any* of the information required to be disclosed by TILA.

122.   As a result of Defendant's refusal to comply with TILA and its systematic violation of the various disclosure required in each of its numerous cash advance transactions, Defendant is liable to Plaintiffs and the class members in an amount equal to actual damages, statutory damages, costs, reasonable attorneys' fees, and all other available relief. 15 U.S.C. § 1640(a), (e).

## VIII.   JURY TRIAL DEMANDED

Plaintiffs request a jury trial on all claims so triable.

## IX.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

a.   An order certifying the proposed class, appointing Plaintiffs as

representative of the proposed class, and appointing undersigned counsel as counsel for the proposed class;

b.    An order awarding the members of the class actual, statutory, treble, and all other damages available by law, with pre- and post-judgment interest;

c.    An order providing Plaintiffs and the members of the class restitution for any principal, interest, fees, or other charges paid to Defendant;

d.    An order declaring the cash advances that Plaintiffs and the class members obtained were or are void *ab initio*;

e.    And order preventing Defendant from attempting to collect its cash advances from Plaintiffs and the class members;

f.    An order awarding attorneys' fees and costs;

g.    An order awarding all other relief that is just, equitable, and appropriate.

                              Respectfully Submitted,

Dated: November 12, 2024                  **WADE KILPELA SLADE, LLP**

                              /s/ Gillian L. Wade
                              Gillian L. Wade
                              Sara D. Avila
                              Marc A. Castaneda
                              Kristin K. Graham
                              2450 Colorado Avenue, Suite 100E
                              Santa Monica, CA 90404

                              **EAST END TRIAL GROUP LLC**
                              Kevin Tucker
                              Kevin Abramowicz
                              6901 Lynn Way, Suite 503
                              Pittsburgh, PA 15208

                              *Attorneys for Plaintiffs*