**WADE KILPELA SLADE, LLP**
Gillian L. Wade, State Bar No. 229124
gwade@waykayslay.com
Sara D. Avila, State Bar No. 263213
sara@waykayslay.com
Marc A. Castaneda, State Bar No. 299001
marc@waykayslay.com
Kristin K. Graham, State Bar No. 342529
kkg@waykayslay.com
2450 Colorado Avenue, Suite 100E
Santa Monica, CA 90404
Tel: (310) 667-7273
Fax: (424) 276-0473

**EAST END TRIAL GROUP LLC**
Kevin Tucker, PA State Bar No. 312144
ktucker@eastendtrialgroup.com
Kevin Abramowicz, PA State Bar No. 320659
kabramowicz@eastendtrialgroup.com
6901 Lynn Way, Suite 503
Pittsburgh, PA 15208
Tel: (412) 223-5740
Fax: (412) 626-7101

*Counsel for Plaintiffs Brennan Orubo, Michael Sims, Demetrice Mathis, and Cidney Lett*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

| | |
|---|---|
| BRENNAN ORUBO, MICHAEL SIMS, DEMETRICE MATHIS, and CIDNEY LETT, individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>    v.<br><br>ACTIVEHOURS, INC. dba EARNIN,<br><br>    Defendant. | Case No. 5:24-cv-04702-PCP<br><br>**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT**<br><br>Noticed Hearing Date: February 27, 2025<br>Noticed Hearing Time: 10:00 a.m.<br>Courtroom: 8<br>Judge: Hon. Casey Pitts |

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

STATEMENT OF FACTS .................................................................................... 3

LEGAL STANDARD ........................................................................................... 4

ARGUMENT ........................................................................................................ 5

I.     Plaintiffs State a Viable PLA Claim ............................................................ 5

II.    Plaintiffs State a Viable TILA Claim .......................................................... 9

     A.     Defendant's Cash Advances Qualify As "Credit" .................................. 9

     B.     Defendant's Tips and Fees Qualify As "Finance Charges" .................................. 11

CONCLUSION ................................................................................................... 15

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

**_Cases_**

*Anderson Bros. Ford v. Valencia*,
452 U.S. 205 (1981) ................................................................................ 15

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .................................................................................. 4

*BankWest, Inc. v. Oxendine*,
598 S.E.2d 343 (Ga. 2004) ........................................................................ 5

*Bloom v. City of San Diego*, No. 17-cv-02324,
2018 U.S. Dist. LEXIS 243767 (S.D. Cal. June 8, 2018) ......................... 4

*Burnette v. Ala. Moana Pawn Shop*,
3 F.3d 1261 (9th Cir. 1993) ..................................................................... 10

*Cal. Cannabis Coal. v. City of Upland*,
401 P.3d 49 (Cal. 2017) ........................................................................... 12

*Clay v. Oxendine*,
645 S.E.2d 553 (Ga. Ct. App. 2007) .................................................... 5, 8

*Clark v. Rent-It-Corp.*,
685 F.2d 245 (8th Cir. 1982) ................................................................... 10

*City of Royal Oak v. Se. Oakland Cnty. Res. Recovery Auth.*,
669 N.W.2d 322 (Mich. Ct. App. 2003) ............................................. 12, 13

*Cook v. Brewer*,
637 F.3d 1002 (9th Cir. 2011) ................................................................... 4

*Crawford v. Great Am. Cash Advance, Inc.*,
644 S.E.2d 522 (Ga. Ct. App. 2007) .................................................... 5, 8

*Escobedo v. Applebees*,
787 F.3d 1226 (9th Cir. 2015) ................................................................... 4

*Edwards v. Your Credit Inc.*,
148 F.3d 427 (5th Cir. 1998) ................................................................... 10

*Freeman v. Decatur Loan & Fin. Corp.*,
231 S.E.2d 409 (Ga. Ct. App. 1976) ......................................................... 5

*Ford Motor Credit Co. v. Cenance*,
452 U.S. 155 (1981) ................................................................................. 10

*Ga. Cash Am., Inc. v. Greene*,
734 S.E.2d 67 (Ga. Ct. App. 2012) ...................................................... 5, 8

*Golubiewski v. Activehours, Inc.*, No. 22-cv-2078,
2024 U.S. Dist. LEXIS 165790 (M.D. Pa. Sept. 16, 2024) .................... 14

*Gunnels v. Atlanta Bar Ass'n*,
  12 S.E.2d 343 (Ga. 1940) ........................................................................... 5

*Harmon v. Fifth Third Bancorp.*, No. 18-cv-00402,
  2020 U.S. Dist. LEXIS 85771 (S.D. Ohio May 15, 2020) ...................... 11

*Hinton v. Mack Purchasing Co.*,
  155 S.E. 78 (Ga. Ct. App. 1930) ............................................................. 5

*Household Credit Servs., Inc. v. Pfennig*,
  541 U.S. 232 (2004) ................................................................................ 14

*Lyons v. Chase Bank USA, N.A.*,
  656 F.3d 877 (9th Cir. 2011) ................................................................. 15

*Marr v. Marr*,
  20 A. 592 (Pa. 1885) .............................................................................. 13

*Mourning v. Family Publ'ns Serv., Inc.*,
  411 U.S. 356 (1973) ................................................................................ 10

*Oasis Legal Fin. Grp., LLC v. Coffman*,
  361 P.3d 400 (Colo. 2015) ..................................................................... 10

*Pope v. Marshall*,
  4 S.E. 116 (Ga. 1887) ............................................................................... 7

*Republican Party of N.C. v. Martin*,
  980 F.2d 943 (4th Cir. 1992) ................................................................... 4

*Ruth v. Cherokee Funding, LLC*,
  820 S.E.2d 704 (Ga. 2018) ............................................................... 5, 7, 8

*Stock v. Meek*,
  221 P.2d 15 (Cal. 1950) .......................................................................... 14

*U.S. v. Ritchie*,
  342 F.3d 903 (9th Cir. 2003) ................................................................... 6

*USA Payday Cash Advance Ctrs. v. Oxendine*,
  585 S.E.2d 924 (Ga. Ct. App. 2003) ................................................... 5, 8

*Veal v. Citibank, F.S.B.*,
  85 F.3d 577 (11th Cir. 1996) ................................................................. 13

*Walton Guano Co. v. Copelan*,
  37 S.E. 411 (Ga. 1900) ........................................................................ 7, 8

*Western Sky Fin., LLC v. State of Ga.*,
  793 S.E.2d 357 (Ga. 2016) ....................................................................... 5

*Wiley v. Earl's Pawn & Jewelry, Inc.*,
  950 F. Supp. 1108 (S.D. Ala. 1997) ....................................................... 9

*Williams v. Chartwell Fin. Servs., Ltd.*,
   204 F.3d 748 (7th Cir. 2000) ................................................................ 10

*Zolly v. City of Oakland*,
   514 P.3d 799 (Cal. 2022) ...................................................................... 13

### ***Statutes and Regulations***

12 C.F.R. § 1026.2 (Comment 2(a)(14)-2 ........................................... 9, 11

12 C.F.R. § 1026.18(d) ................................................................................ 15

15 U.S.C. § 1601(a) ...................................................................................... 15

15 U.S.C. § 1602(f) ......................................................................................... 9

15 U.S.C. § 1602(g)(1) ................................................................................. 11

15 U.S.C. § 1605(a) ...................................................................................... 11

15 U.S.C. § 1605(a)(1) .................................................................................. 13

15 U.S.C. § 1638(a)(1) .................................................................................... 9

15 U.S.C. § 1638(a)(2) .................................................................................... 9

15 U.S.C. § 1638(a)(3) .................................................................................... 9

15 U.S.C. § 1638(a)(4) .................................................................................... 9

15 U.S.C. § 1638(a)(5) .................................................................................... 9

15 U.S.C. § 1638(a)(6) .................................................................................... 9

O.C.G.A. § 16-17-1 ......................................................................................... 5

O.C.G.A. § 16-17-1(a) ........................................................................... 5, 7, 8

O.C.G.A. § 16-17-2(b) ............................................................................... 5, 8

O.C.G.A. § 16-17-2(b)(3) .......................................................................... 7, 8

### ***Other Authorities***

Center for Responsible Lending, *A Loan Shark In Your Pocket: The Perils of Earned
   Wage Advance* (Oct. 2024), https://www.responsiblelending.org/sites/default/files/
   nodes/files/research-publication/crl-ewa-loan-shark-oct2024.pdf ................ 2

*Debt*, Black's Law Dictionary
   (4th ed. 1968) .................................................................................................. 9

*Debt*, Merriam-Webster (last updated Jan. 26, 2025),
   https://www.merriam-webster.com/dictionary/debt .................................... 9

*Interest*, Black's Law Dictionary,
    (7th ed. 1999) ............................................................................................................. 13

Truth in Lending,
    65 Fed. Reg. 17129 (Mar. 31, 2000) ..................................................................... 11

Truth in Lending,
    61 Fed. Reg. 49237 (Sept. 16, 1996) ..................................................................... 15

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# **INTRODUCTION**

Georgia's Payday Lending Act ("PLA"), O.C.G.A., §§ 16-17-1, prohibits the payday lending business, which consists of making short-term, small-dollar, high-cost loans that are typically repaid on a borrower's payday. Georgia outlawed this business because the high cost of payday loans—which impose fees equivalent to a triple-digit annual percentage rate ("APR") loan—depletes the wages of borrowers, which places them in a cycle of reborrowing, where they take out new loans to fill the gaps created by old loans. Trapping borrowers in this cycle is highly profitable to the payday lending industry, as it allows payday lenders to repeatedly harvest costly fees from a borrower's wages. But this cycle does not provide any benefit to borrowers. Instead, it makes them worse off.

Defendant's cash advance loan product is a payday loan, meaning it is unlawful under Georgia law. Like other predatory payday lenders, Defendant traps consumers in reborrowing cycles, whereby Defendant harvests borrowers' wages directly from their bank accounts, paycheck after paycheck. The amounts that Defendant extracts repay the principal loan amount and cover the high cost of the finance charges associated with each loan—charges Defendant self-servingly calls "lightning speed fees" and "tips". Borrowers who fall victim to Defendant's predatory payday lending scheme are far more likely to overdraft their bank accounts (due to the unreasonably high cost of Defendant's loans), and are far more likely to have trouble covering basic living expenses (because Defendant's charges eat into their paychecks every payday). The negative consequences of this reborrowing trap are precisely what has spurred legislation that outlaws the payday loan business, like the PLA. Because Defendant is engaged in the payday lending business, Defendant is violating the PLA.

In addition to flouting Georgia law, Defendant's payday loan business also violates the federal Truth In Lending Act ("TILA"), 15 U.S.C. § 1601. Defendant imposes charges that cost borrowers the equivalent of a triple-digit APR loan. But Defendant does not disclose that these charges are "finance charges." Nor does Defendant disclose the cost of credit in terms of an APR. This prevents borrowers from making informed decisions, and understanding the actual cost of Defendant's loan product. TILA was passed to ensure that these outcomes do not occur.

Defendant seeks to dismiss Plaintiffs' First Amended Complaint based on arguments that, at best, amount to factual challenges to Plaintiffs' well-pled allegations. According to Defendant, it offers an "earned wage access service" that does not require repayment, and that consumers can use without paying any charges. *See* Doc. 30, p. 3.[1]

The first assertion—that Defendant does not make loans but, rather, advances funds to cash-strapped consumers without requiring repayment—defies common sense and contradicts the reality of Defendant's business practices, as alleged in the operative complaint. Defendant expects borrowers to repay its loans and has structured its cash advance loan product to ensure that repayment occurs. And Defendant does, in fact, obtain repayment on virtually every loan it issues.

Defendant's second assertion—that the "lightning speed fee" and "tip" charges that borrowers pay when obtaining a cash advance from Defendant are "voluntary"—also runs counter to Plaintiffs' factual allegations. In reality, and as Plaintiffs allege, Defendant has structured its product to force, mislead, and coerce borrowers into paying these charges. And most borrowers, in fact, end up paying Defendant's "lightning speed fee" and "tip" charges, as Defendant's cash advance loans, on average, cost the equivalent of a 284% APR loan.

Defendant's artful attempts to circumvent the law by recharacterizing its payday loan product as a free "earned wage access service" are predictable. For as long as states have sought to outlaw the business of payday lending, payday lenders have attempted to use creative nomenclature and structure their business to evade the law. Courts interpreting the PLA and TILA have been wise to this game for some time. Defendant's attempt to recharacterize its payday lending business as something other than that is the exact type of subterfuge that courts refuse to credit. This Court should not be fooled into overlooking the realities of Defendant's unlawful payday lending business based on the labels Defendant uses to characterize its loans and finance charges, or sham terms in a purported agreement on Defendant's webpage.

Because Plaintiffs have plausibly pled claims for relief, Plaintiffs respectfully request that the Court deny Defendant's motion to dismiss in its entirety.

---

[1] Citations to "Doc. X, p. X" refer to the document and page numbers placed at the top of documents filed via the Court's CM/ECF system.

## STATEMENT OF FACTS

Defendant offers a cash advance loan product to Georgia residents through an online lending app called "EarnIn." Doc. 22, ¶¶ 16-19. Defendant's product allows borrowers to obtain up to $100 in cash advances at a time, and up to $750 in cash advances per pay period. *Id.* at ¶ 20.

Defendant has structured its loan product to ensure borrowers pay money to obtain it. *Id.* at ¶¶ 25-51. Defendant accomplishes this by charging two fees—a "lightning speed fee," and a "tip." *Id.* at ¶ 26. These charges are solely intended to compensate Defendant for lending money, and do not cover any cost of services ancillary to Defendant's loans. *Id.* at ¶¶ 34, 37. A borrower must pay Defendant's "lightning speed fee" to obtain the advertised version of Defendant's product and to use Defendant's loan product for its intended purpose—as an instant source of cash. *Id.* at ¶¶ 28-30. Borrowers who do not pay this fee receive a different, inferior version of Defendant's product. *Id.* at ¶¶ 32-33. That version advances the borrower cash *days after* the funds are requested and, therefore, cannot be used to cover surprise or time-sensitive expenses. *Id.* In addition to the "lightning speed fee," Defendant ensures borrowers pay a separate "tip" charge for each cash advance loan. Defendant accomplishes this through deception and coercion. *Id.* at ¶ 36. This includes suggesting that the "tip" charge is mandatory, representing that the charge must be paid to keep Defendant running, and erecting confusing roadblocks that a borrower would have to navigate to avoid paying the "tip." *Id.* at ¶¶ 37-47.

Borrowers who obtained loans from Defendant have paid an average cost equivalent to a 284% APR loan. *Id.* at ¶ 50. The above-described charges are what make Defendant's loan product so costly to consumers. Virtually all borrowers pay the "lightning speed fee" because it must be paid to obtain the product Defendant advertises; and most borrowers pay the "tip" charge because they are misled or coerced into doing so. *Id.* at ¶¶ 35, 48-49, 51.

Defendant also requires and obtains repayment of its cash advances. *Id.* at ¶¶ 52-63. Borrowers cannot obtain a cash advance loan from Defendant unless they: (i) have an employer that pays them regularly; (ii) link the bank account into which their employer directly deposits their paycheck to Defendant's app; and (iii) authorize Defendant to automatically debit that account in an amount equal to the advance *plus* additional charges immediately after their employer deposits a paycheck on

payday. *Id.* at ¶¶ 55-56. There is nothing voluntary about the repayment process. Defendant enforces its automatic bank account debit rights on *every* cash advance it issues. *Id.* at ¶ 82. Borrowers also cannot obtain a cash advance unless they pass Defendant's proprietary credit check, which is imposed to ensure linked bank accounts will have sufficient funds to satisfy Defendant's automatic account debits, the entire purpose of which is to guard against the risk of non-payment. *Id.* at ¶¶ 57-59. These requirements have resulted in Defendant obtaining repayment on virtually all of the cash advance loans that Defendant issues. *Id.* at ¶¶ 60, 82.

Plaintiffs obtained cash advances from Defendant, and paid charges that cost the equivalent of a triple-digit APR loan. *Id.* at ¶¶ 93-100.

Defendant's cash advance loan product is a payday loan, and results in the same cycle of repeat borrowing, where borrowers take out new loans to cover the exorbitant costs of previous loans. *Id.* at ¶¶ 50, 68-69.[2] Georgia explicitly prohibits short-term, high-cost loans, like those offered by Defendant, and obtained by Plaintiffs, for this very reason. *Id.* at ¶¶ 64-83.

## **LEGAL STANDARD**

A Rule 12(b)(6) motion may be granted only if a complaint does not contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Cook v. Brewer*, 637 F.3d 1002, 1004 (9th Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim may be dismissed only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.* (quotation omitted). When assessing the sufficiency of a complaint, courts draw all reasonable inferences in favor of the plaintiff, *Escobedo v. Applebees*, 787 F.3d 1226, 1229 n.3 (9th Cir. 2015), and should not "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses," *Bloom v. City of San Diego*, No. 17-cv-02324, 2018 U.S. Dist. LEXIS 243767, at *14 (S.D. Cal. June 8, 2018) (quoting *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992)).

---

[2] A recent study found Defendant profits off borrowers by trapping them in reborrowing cycles, and using their wages to harvest expensive charges associated with its cash advance loans. *See* Center for Responsible Lending, *A Loan Shark In Your Pocket: The Perils of Earned Wage Advance*, pp. 7-9 (Oct. 2024), https://www.responsiblelending.org/sites/default/files/nodes/files/research-publication/crl-ewa-loan-shark-oct2024.pdf.

**ARGUMENT**

### I. Plaintiffs State a Viable PLA Claim.

The PLA is the product of a decades-long effort to eliminate the payday lending industry in Georgia. This industry arose in the early 1900s in the form of "wage buying," where lenders would claim they were not loaning money, but buying a borrower's wages. *See USA Payday Cash Advance Ctrs. v. Oxendine*, 585 S.E.2d 924, 926 (Ga. Ct. App. 2003) (citing *Gunnels v. Atlanta Bar Ass'n*, 12 S.E.2d 602, 610 (Ga. 1940) and *Hinton v. Mack Purchasing Co.*, 155 S.E. 78, 80 (Ga. Ct. App. 1930)). Georgia enacted the Industrial Loan Act ("ILA") to outlaw this industry. *See BankWest, Inc. v. Oxendine*, 598 S.E.2d 343, 346 (Ga. 2004) (quoting *Freeman v. Decatur Loan & Fin. Corp.*, 231 S.E.2d 409, 412 (Ga. Ct. App. 1976)) ("[ILA] was enacted to provide a source of regulated loans 'for those who had been borrowing at usurious [interest] rates from loan sharks, street shylocks and wage-buyers.'"). But the ILA proved ineffective in ending payday lending because payday lenders found ways to evade it. *See, e.g.*, *Ga. Cash Am., Inc. v. Greene*, 734 S.E. 2d 67 (Ga. Ct. App. 2012) (lender attempted to evade the ILA by using a bank to issue loans then repurchasing the loans from the bank); *Clay v. Oxendine*, 645 S.E.2d 553 (Ga. Ct. App. 2007) (lender attempted to evade the ILA by characterizing its loans as a "sale/leaseback" transaction, whereby borrowers purportedly sold personal property and leased it back for a fee); *Crawford v. Great Am. Cash Advance, Inc.*, 644 S.E.2d 522 (Ga. Ct. App. 2007) (lender attempted to evade the ILA via a "deferred presentment" scheme, whereby the lender would advance cash to borrowers in return for a post-dated check in the amount of the advance plus a fee, which the borrower agreed the lender could cash on payday). Recognizing the ILA did not provide sufficient deterrence to stop these evasions, Georgia enacted the PLA to cease payday lending in the state. *See Western Sky Fin., LLC v. State of Ga.*, 793 S.E.2d 357, 363 (Ga. 2016).

The PLA specifically prohibits "payday lending." *See* O.C.G.A. § 16-17-1. The PLA defines "payday lending" as any "transaction[] in which funds are advanced to be repaid[.]" *Id.* at § 16-17-1(a); *see also id.* at § 16-17-2(b). The Georgia Supreme Court has interpreted this provision (and the PLA as a whole) to apply to any "agreement that imposes an obligation to repay." *Ruth v. Cherokee Funding, LLC*, 820 S.E.2d 704, 710 (Ga. 2018).

Defendant's cash advance loans are illegal payday loans under the PLA because they involve a transaction in which cash is advanced to be repaid. First, Defendant expects repayment on each loan it issues, as Defendant runs a proprietary credit check to guard against non-payment, and only issues loans if it believes it will obtain repayment. Doc. 22, ¶¶ 57-59. Second, Defendant requires borrowers to authorize Defendant to unilaterally seek repayment on each loan it issues, as borrowers must link the bank account into which their employer directly deposits paychecks to Defendant's app, and must authorize Defendant to automatically debit that account—in an amount equal to the principal of a loan, and any additional charges—immediately after the borrower's employer deposits their paycheck on payday. *Id.* at ¶¶ 55-56. Third, Defendant enforces its automatic bank account debit rights on *every* loan it issues. *Id.* at ¶ 82. Because Defendant expects repayment for every loan, requires borrowers to authorize Defendant to obtain repayment for every loan, and does, in fact, obtain repayment on virtually every loan it issues, Defendant's cash advance loans involve a transaction in which money is advance to be repaid. Accordingly, Defendant's cash advance product is an illegal payday loan under the PLA.

In arguing to the contrary, Defendant points to a single clause in a "Cash Out User Agreement," which characterizes Defendant's cash advance loan product as "non-recourse," and which purports to disclaim a borrower's obligation to repay. *See* Doc. 30, pp. 7-8.

To start, the document in which this provision appears post-dates the filing of this case by over a month, *compare* Doc. 30-2, *with* Doc. 1, is not included in, attached to, or referenced in the First Amended Complaint, and is not subject to judicial notice. *See U.S. v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). Additionally, Defendant does not claim this document was ever presented to Plaintiffs, that Plaintiffs knew of or agreed to this document, or that this document appeared on Defendant's website during the time periods in which Plaintiffs obtained each of their loans. The Court should not consider Defendant's purported webpage "agreement" until the Court has an opportunity to determine whether this document even appeared on Defendant's website during the relevant time period, or whether prior versions of this document included the clause Defendant relies on (or, instead, included contradictory language that stated or suggested a repayment obligation exists).

Even if the Court were to consider the Cash Out User Agreement, and the clause upon which Defendant relies, that clause is clearly "a sham . . . that reflects an attempt to evade the [PLA]" because it contradicts the substance of Defendant's loan product. *Ruth*, 820 S.E.2d at 711; *Pope v. Marshall*, 4 S.E. 116, 118 (Ga. 1887) ("Whether a given transaction is a . . . loan . . ., depends not upon the form of words used in contracting, but upon the real intent and understanding of the parties."). As explained above, Defendant expects repayment of every loan it issues, requires borrowers to authorize Defendant to seek repayment of every loan it issues, and seeks repayment on every loan it issues. Doc. 22, ¶¶ 55-59, 82. That is the definition of a "transaction in which funds are advanced to be repaid at a later date." O.C.G.A. § 16-17-1(a). Defendant cannot use language in a Cash Out User Agreement on its webpage to hide this fact. *Ruth*, 820 S.E.2d at 711 (quoting *Pope*, 4 S.E. at 118) ("The theory that a [loan] will be usurious or not according to the kind of paper-bag it is put up in, or according to the more or less ingenious phrases made use of in negotiating it, is altogether erroneous."); *see also* O.C.G.A. § 16-17-2(b)(3) (stating loans are subject to PLA even if an "element [is] introduced to disguise the true nature of the transaction as an extension of credit").

Notably, Defendant cites only to the *Ruth* case in support of its dismissal bid. *See* Doc. 30, p. 8. *Ruth* dealt with a litigation funding agreement, where the obligation to repay was contingent on the success of a personal injury lawsuit. *Ruth,* 820 S.E.2d at 707. The agreement clearly placed the loan principal in jeopardy because there was a real, *bona fide* risk that the lawsuit could be unsuccessful, and there was no allegation that this risk was merely a pretext to hide an illegal lending operation. *Id.* at 710-11. In fact, the Court noted it was "unclear whether the outcome of yet-to-be resolved litigation ever can be certain enough to render a contingency based on the result of pending litigation illusory." *Id.* at 711 n.16.

If anything, *Ruth* confirms the viability of Plaintiffs' claim. The obligation-to-repay disclaimer in this case, unlike the contingent repayment provision in *Ruth*, is illusory because it does not place the principal of Defendant's loans at any real, *bona fide* risk. *See Walton Guano Co. v. Copelan*, 37 S.E. 411, 413-14 (Ga. 1900) ("There is no usury where the principal is placed in jeopardy by the terms of the agreement. To carry the case beyond the usury statute, however, the hazard or contingency must be *bona fide* and not a mere color of a risk or such possibilities of unexpected loss as might occur in

the ordinary course of the borrowing and lending of money."). Despite the existence of that disclaimer, Defendant knows it will be able to obtain repayment on almost every loan it issues because Defendant: (1) requires borrowers to link bank accounts to Defendant's app; (2) requires borrowers to authorize Defendant to debit its loans and charges from linked bank accounts on payday; (3) times those debits to occur immediately after employers directly deposit paychecks; and (4) runs a credit check on linked bank accounts to ensure they will have sufficient funds to repay Defendant's loans. Doc. 22, ¶¶ 55-59, 82. Of course, it is possible Defendant might be unable to obtain repayment on some loans—because its underwriting procedures incorrectly predicted a bank account would have sufficient funds to satisfy an automatic account debit—but the "possibilit[y] of unexpected loss as might occur in the ordinary course of borrowing and lending money" is not enough to "carry this case beyond the [PLA]." *Walton Guano Co.*, 37 S.E. at 413-14. The disclaimer in Defendant's Cash Out User Agreement is the exact type of "sham" provision that reflects an attempt to evade the PLA. *See Ruth*, 820 S.E.2d at 711. As a result, the PLA applies, notwithstanding that provision, which obviously was "introduced to disguise the true nature" of Defendant's transactions. O.C.G.A. § 16-17-2(b)(3).

Defendant's motion for dismissal is nothing more than the newest attempt (in a considerably long line of attempts) by the payday loan industry to evade the law. This industry first sought to evade usury laws by claiming they were purchasing earned wages, rather than advancing money. *See USA Payday Cash Advance Ctrs.*, 585 S.E.2d at 926. The industry then sought to evade the law by claiming loans were issued by banks, by characterizing loans as "leases" or "sales," and by structuring their loans as "deferred presentment" transactions. *See Ga. Cash Am., Inc.*, 734 S.E. 2d 67; *Clay*, 645 S.E.2d 553; *Crawford*, 644 S.E.2d 522. Now that all of those attempts to evade the law have failed, the payday loan industry is characterizing loans as "earned wage advance services" in hopes of fooling legislatures and courts into allowing excessive charges. Doc. 30, p. 3. This Court should not be fooled. Defendant's cash advance loan product is a transaction "in which funds are advanced to be repaid." O.C.G.A. § 16-17-1(a); *see also id.*, § 16-17-2(b). That means the product is a "payday loan," which means that product is unlawful under the PLA.

**II.     Plaintiffs State a Viable TILA Claim.**

TILA requires creditors to disclose the: (1) identity of the creditor; (2) amount financed; (3) finance charge; (4) annual percentage rate; (5) sum of the amount financed and the finance charge, or total of payments; and (6) number, amount, and due dates or period of payments scheduled. 15 U.S.C. § 1638(a)(1)-(6). Defendant failed to comply with these disclosure requirements. *See* Doc. 22, ¶¶ 84-92, 116-122. In response, Defendant argues it is not a "creditor" because it does not extend "credit," and because its charges are not "finance charges." *See* Doc. 30, pp. 10-12. The Court should reject Defendant's arguments for the reasons explained below.

**A.     Defendant's Cash Advances Qualify As "Credit."**

TILA's disclosure requirements apply to "credit," which is defined as "the right granted by a creditor . . . to defer payment of debt or to incur debt and defer its payment." 15 U.S.C. § 1602(f). The ordinary meaning of "debt" refers to an obligation to repay, regardless of how that obligation may be enforced. *See Debt*, Merriam-Webster (last updated Jan. 26, 2025), https://www.merriam-webster.com/dictionary/debt (defining "debt" as "something owed," without limitation); *Debt*, Black's Law Dictionary (4th ed. 1968) (defining "debt" as a "sum of money due by certain and express agreement," without regard to the enforcement mechanism that a lender may contract for to obtain repayment from the debtor); *Wiley v. Earl's Pawn & Jewelry, Inc.*, 950 F. Supp. 1108, 1113 (S.D. Ala. 1997) ("[The] lack of a legally enforceable obligation to repay does not transform a pawn transaction into something other than credit."). As a result, "credit" refers to any transaction that creates an "obligation to repay," regardless of how that obligation is enforced.

Here, Defendant's cash advance product falls squarely within TILA's definition of "credit" because Defendant advances cash in exchange for the authorization to debit a borrower's bank account immediately after their employer deposits their paycheck on payday. Doc. 22, ¶¶ 55-56. This type of "deferred presentment" transaction—where money is exchanged for the right to debit a bank account on some future date—is "credit." *See* 12 C.F.R. § 1026.2 (Comment 2(a)(14)-2) ("Credit includes a transaction in which a cash advance is made . . . in exchange for the consumer's authorization to debit the consumer's deposit account, and where the parties agree . . . that the . . . deposit account will not be debited[] until a designated future date.").

In arguing to the contrary, Defendant claims its advances do not create "debt" and, therefore, do not constitute "credit," because borrowers do not have an obligation to repay Defendant's advances. *See* Doc. 30, p. 10.

Defendant again relies on the current version of its Cash Out User Agreement to make this claim, *id.*, p. 4, but the Court should reject Defendant's reliance on the September 2024 version of that document for the reasons discussed in Argument, § I, *supra*.

Even if the Court considers Defendant's Cash Out User Agreement, the language included in that document does not determine whether TILA applies. To the contrary, and just like the PLA, courts should look "past the form of . . . transactions to their economic substance in deciding whether [TILA] applie[s]." *Burnett v. Ala. Moana Pawn Shop*, 3 F.3d 1261, 1262 (9th Cir. 1993) (citing *Ford Motor Credit Co. v. Cenance*, 452 U.S. 155, 157-58 (1981)); *see also Williams v. Chartwell Fin. Servs., Ltd.*, 204 F.3d 748, 753 (7th Cir. 2000) ("[C]ourts are to focus on the economic substance of the transaction in determining whether TILA has been violated."); *Edwards v. Your Credit Inc*, 148 F.3d 427, 436 (5th Cir. 1998) ("[T]he substance-over-form doctrine provides the proper framework for analyzing [TILA]."); *Clark v. Rent-It Corp.*, 685 F.2d 245, 248 (8th Cir. 1982) (quoting *Mourning v. Family Publ'ns Serv., Inc.*, 411 U.S. 356, 365 (1973)) ("The legislative history of the TILA shows that Congress was aware that 'some creditors would attempt to characterize their transactions so as to fall one step outside whatever boundary Congress attempted to establish[.]'").

Regardless of what Defendant's Cash Out User Agreement might say, the actual substance of Defendant's loan transaction is "characterized by the creation and repayment of debt," which means the transaction is "credit" for purposes of TILA. *See Oasis Legal Fin. Grp., LLC v. Coffman*, 361 P.3d 400, 408 (Colo. 2015). This is made clear from the fact that: Defendant performs a proprietary credit check to guard against the risk of non-payment; obligates borrowers to repay by requiring borrowers to authorize Defendant to debit its loans from their linked bank accounts on payday; and enforces this repayment obligation on *every* loan it issues. Doc. 22, ¶¶ 55-59, 82. Based on these allegations, it is reasonable to infer that Defendant "advance[s] money and expect[s] full repayment . . ., and normally that is what happens." *Coffman*, 361 P.3d at 408. As a result, Defendant's loans are "credit," regardless of what the current version of Defendant's Cash Out User Agreement says.

In addition to contradicting the actual substance of Defendant's cash advance loan transaction, Defendant's Cash Out User Agreement contradicts the representations Defendant makes to borrowers. For example, Defendant's website represents that loans are repaid "when your paycheck hits." Doc. 22, ¶ 53. Similarly, Defendant's in-app screens represent that loans are "due to EarnIn on payday."[3] *Id.*, ¶ 54. These representations control over the contradictory disclaimer that is included in the current version of Defendant's Cash Out User Agreement, a document which may not even be presented to or seen by borrowers, and which may not have even existed at the time Plaintiffs obtained all or most of their loans from Defendant.

In arguing to the contrary, Defendant cites a single case. *See Harmon v. Fifth Third Bancorp*, No. 18-cv-00402, 2020 U.S. Dist. LEXIS 85771 (S.D. Ohio May 15, 2020). But that case concerned a plaintiff who paid a fee to cash a check. *Id.* at *22. That is known as a "[c]ontemporaneous check-cashing transaction," which is not "credit." *See* Truth in Lending, 65 Fed. Reg. 17129, 17130 (Mar. 31, 2000). As explained above, this case involves a deferred presentment transaction, which is "credit." *See* 12 C.F.R. § 1026.2 (Comment 2(a)(14)-2).

While Defendant's argument is supported by a single factually distinguishable case, Plaintiffs' argument is not only supported by the authorities and cases cited above, but by the Consumer Financial Protection Bureau ("CFPB")—TILA's principal regulator. The CPFB proposed an interpretive rule stating that consumers "incur[] an obligation to pay money" when they use products like Defendant's. Doc. 22-3, p. 11. That rule purports to apply TILA to cash advance products, like the one Defendant offers here. *Id.*, pp. 8-13. For this reason, and those explained herein, Defendant is a "creditor", and Defendant's cash advance loan product is "credit."

**B.    Defendant's Tips and Fees Qualify As "Finance Charges."**

TILA's disclosure requirements apply to any creditor that regularly extends credit for which a "finance charge" is required. 15 U.S.C. § 1602(g)(1). TILA broadly defines "finance charge" as "the sum of all charges, payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit." *Id.* at § 1605(a).

---

[3] To the extent this Court wishes to consider them, the webpages attached to Defendant's motion make similar representations. *See* Doc. 30-3, p. 5.

"Impose" means "to establish." *Cal. Cannabis Coal. v. City of Upland*, 401 P.3d 49, 62 (Cal. 2017). "Incident to" means "closely related to." *City of Royal Oak v. Se. Oakland Cnty. Res. Recovery Auth.*, 669 N.W.2d 322, 324 (Mich. Ct. App. 2003). Accordingly, "finance charge" simply refers to a charge that is established in close relation to the extension of credit.

Here, Defendant's "lightning speed fee" and "tip" charges fall squarely under the definition of "finance charge" because each charge is established in close relation to the extension of credit. These charges are established in the act of extending credit because they are incorporated in the loan contract and their negotiation occurs before credit is extended. Doc. 22, ¶¶ 61-63. These charges also have a substantial relation with the extension of credit because their sole purpose is to provide compensation to Defendant for the act of extending credit. *Id.* at ¶¶ 25-26, 34, 37.

Defendant contends that its charges cannot be "finance charges" because they are "voluntary," and thus, are not imposed "as an incident to the extension of credit." Doc. 30, p. 11. Even if this were true (it is not), it would make no difference because TILA applies to purportedly "voluntary" charges.

To start, there is nothing "voluntary" about Defendant's charges. Defendant has strategically structured its cash advance loan product to force, coerce, and mislead borrowers into paying these charges. Doc. 22, ¶ 27. Regarding Defendant's "lightning speed fee," borrowers must pay this charge to use Defendant's product for its advertised and intended purpose—an instant source of money. *Id.* at ¶¶ 28-32. Borrowers that do not pay this charge receive an inferior product, which cannot be used to cover time-sensitive obligations or pay surprise expenses. *Id.* at ¶ 33. This structure forces borrowers to pay money to obtain loans, as virtually every borrower ends up paying this charge. *Id.* at ¶¶ 34-35. Regarding Defendant's "tip" charge, borrowers are pressured, misled, and coerced into paying. *Id.*, ¶ 36. For example, Defendant represents that payment of this charge is necessary to give Defendant the ability to continue extending credit, and Defendant created complex procedures borrowers must understand and effectively navigate to avoid paying this charge. *Id.* at ¶¶ 37-47. This effectively forces borrowers to pay money to obtain credit, as the "tip" charge is paid on most transactions. *Id.* at ¶¶ 48-50. If these charges were truly "voluntary," most borrowers, who already are cash-strapped to begin with, would not pay them. But virtually every borrower does, which means borrowers believe these charges are mandatory, or at least feel compelled to pay them.

Even assuming Defendant's charges are "voluntary," TILA still applies. As explained above, a "finance charge" is nothing more than a charge that is established in close relation to the extension of credit. This simply requires that a charge: (i) be established in the act of extending credit; and (ii) have a close connection to that act. A charge can be established in the act of extending credit, even if that charge results "from contractual [or] voluntary negotiations[.]" *See Zolly v. City of Oakland*, 514 P.3d 799, 806 (Cal. 2022). And a charge can have a close connection to the act of extending credit, even if that charge is not a necessary condition to that act. *See City of Royal Oak*, 669 N.W.2d at 324 (recognizing an antecedent could be "incident to" the object, even if the antecedent was not necessary for the object's implementation). Whether a charge is voluntary is irrelevant. If a charge is established in the act of extending credit, and has a close relation to that act, it is a "finance charge."

In arguing to the contrary, Defendant relies on *Veale v. Citibank, F.S.B.*, 85 F.3d 577 (11th Cir. 1996), *see* Doc. 30, p. 11, but *Veale* failed to analyze the words used to define "finance charge." *See* 85 F.3d at 579. Had *Veale* done so, the court likely would have been more measured in its holding, and likely would have refrained from implying that voluntary charges cannot qualify "finance charges" in any instance.

In any event, the charge in *Veale* does not resemble Defendant's charges. While the charge in *Veale* was established in the act of extending credit, it was *unrelated* to that act because it was imposed to cover the actual cost of sending the proceeds of an already distributed loan to third parties. *See* 85 F.3d at 579. That contrasts with Defendant's charges, which were established in the act of extending credit, *and* directly relate to that act. Unlike the charge in *Veale*, Defendant's charges are imposed to compensate Defendant for lending money. Doc. 22, ¶¶ 25-26, 34, 37. These types of charges have a direct relation to the extension of credit, which is why TILA identifies these types of charges—which are called "interest"—as a "finance charge." *See* 15 U.S.C. § 1605(a)(1). Defendant's charges plainly qualify as "interest." That term is defined as "compensation fixed by agreement . . . for the use . . . of money." *Interest,* Black's Law Dictionary (7th ed. 1999). Defendant's charges satisfy this definition because those charges are imposed for the sole purpose of compensating Defendant for lending money. Doc. 22, ¶¶ 25-26, 34, 37. Courts have consistently recognized that the payment of "interest is usually voluntary." *Marr v. Marr*, 20 A. 592, 593 (Pa. 1885). Consequently, the alleged "'voluntary' payments

of interest" that occurred in this case cannot "waive the rights of the payors." *Stock v. Meek*, 221 P.2d 15, 20 (Cal. 1950).

Further, *Veale* is distinguishable because the lender in *Veale* did not structure its loans in a way that was intended to force, coerce, or mislead borrowers to pay the at-issue fee. For example, there is no indication that the lender in *Veale* advertised its loan product as a solution for short-term liquidity needs, but then charged the fee to borrowers that sought to obtain the advertised product and use it for its intended purpose. Nor is there any indication that the lender in *Veale* charged the fee for the sole purpose of obtaining compensation for lending money, that the lender misled borrowers into believing that the fee was mandatory, that the lender placed roadblocks in front of borrowers that sought to avoid paying the fee, or that the lender made it difficult for borrowers to avoid doing so. Each of those facts is present here. Defendant wants borrowers to pay money to obtain cash advance loans, and Defendant structured its product to accomplish just that. This scheme has worked, as Defendant's cash advance loans, on average, cost the equivalent of a 284% APR loan. Doc. 22, ¶¶ 50-51. Defendant intends for borrowers to pay costly charges to obtain its cash advance product, which means Defendant has an obligation to disclose the costs it forces and misleads borrowers to pay.

Defendant also relies on *Golubiewski v. Activehours, Inc.*, No. 22-cv-02078, 2024 U.S. Dist. LEXIS 165790 (M.D. Pa. Sept. 16, 2024), *see* Doc. 30, p. 11, but that unpublished, out-of-circuit case mistakenly read *Household Credit Servs., Inc. v. Pfennig*, 541 U.S. 232 (2004). *Golubiewski* read the *Pfennig* case as imposing a requirement that a charge must be a necessary *condition* for the extension of credit for TILA to apply, even though *Pfennig* clearly held that TILA applies so long as there is a necessary *connection* between a charge and the extension of credit. *Compare Golubiewski*, 2024 U.S. Dist. LEXIS 165790, at *18-19, *with Pfennig*, 541 U.S. at 240-41. The "necessary connection" test identified in *Pfennig* ensures that a charge is connected to the act of extending credit, rather than connected to some other act. *See id.* (finding that overlimit fees could lack a necessary connection to the extension of credit and may instead be connected to the separate act of violating an underlying credit agreement). That test is satisfied here because there is no question that Defendant's charges are connected to the act of extending credit, since the "lightning speed fees" and "tips" are established in the act of extending credit, and the sole purpose of those charges is to compensate Defendant for

extending credit. Respectfully, *Golubiewski* misread binding precedent and should not be followed for this reason.

On this point, the Board of Governors of the Federal Reserve System ("FRB") (which used to implement TILA), and the CFPB (which now implements TILA) agree. In 1996, the FRB recognized that even though a particular loan feature may not be required, it "may become a term of the credit if it is included" in the loan contract. *See* Truth in Lending, 61 Fed. Reg. 49237, 49239 (Sept. 19, 1996). Accordingly, although Defendant may not technically require payment of a "tip" or a "lightning speed fee," those charges become a cost of credit when users agree to pay them and when those obligations are incorporated into the loan contract. *See* Doc. 22, ¶¶ 61-63. The CFPB recently issued a proposed interpretive rule that agrees with the FRB, stating that "express fee" and "tip" charges are "finance charges." *See* Doc. 22-3, pp. 14-20. For these reasons, and those explained herein, the Court should find that Defendant's "lightning speed fee" and "tip" charges are "finance charges," and the Court should reject Defendant's contrary arguments.

Defendant also argues that TILA's finance charge provision is part of a disclosure statute, not a fair pricing law, and because the existence of the "lightning speed fee" and "tip" charge are disclosed to borrowers, Plaintiffs cannot allege that "finance charges" are not disclosed. Doc. 30, pp. 11-12. This claim misunderstands TILA's purpose. TILA was enacted to protect borrowers against unfair credit practices and provide a meaningful disclosure of credit terms. *See* 15 U.S.C. § 1601(a); *see also Lyons v. Chase Bank USA, N.A.*, 656 F.3d 877, 887 (9th Cir. 2011) (quoting *Anderson Bros. Ford v. Valencia*, 452 U.S. 205, 219 (1981)). Also, it is not merely the amount or existence of a charge that must be disclosed, but specifically the "the dollar amount the credit will cost [the consumer]" while using the term "finance charge." 12 C.F.R. § 1026.18(d). Defendant did not disclose the amount that Plaintiffs' cash advance loans would cost in terms of an APR or otherwise, and also failed to correctly label those charges as "finance charges."

## CONCLUSION

For the foregoing reasons, the Court should deny Defendant's motion to dismiss in its entirety and should allow this case to proceed. In the alternative, Plaintiffs respectfully request leave to amend.

Respectfully Submitted,

Dated: January 31, 2025            By:

**WADE KILPELA SLADE, LLP**

Gillian L. Wade
Sara D. Avila
Marc A. Castaneda
Kristin K. Graham
2450 Colorado Avenue, Suite 100E
Santa Monica, CA 90404

*/s/ Kevin Abramowicz*
**EAST END TRIAL GROUP LLC**
Kevin Tucker
Kevin Abramowicz
6901 Lynn Way, Suite 503
Pittsburgh, PA 15208

*Counsel for Plaintiffs*