UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRENNAN ORUBO, et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>ACTIVEHOURS, INC.,<br><br>    Defendant. | Case No. 5:24-cv-04702-PCP<br><br>**ORDER DENYING MOTION TO DISMISS**<br><br>Re: Dkt. Nos. 30, 39 |

Plaintiffs Brennan Orubo, Michael Sims, Demetrice Mathis, and Cidney Lett bring this putative class action against defendant Activehours, Inc., doing business as EarnIn, for violations of (1) the Georgia Payday Loan Act (GPLA) and (2) the Truth in Lending Act (TILA). Plaintiffs assert that EarnIn attempts to circumvent laws governing payday lending by misleadingly characterizing its product as an "earned wage access service" and structuring fees and repayment in ways that disguise the nature of its loans and the high interest rates that customers pay.[1] EarnIn moves to dismiss pursuant to Rule 12(b)(6). For the following reasons, the motion is denied.

## BACKGROUND

EarnIn is an app that offers cash advances to customers on their paychecks.[2] EarnIn allows users to obtain up to $100 in cash advances at a time and up to $750 in cash advances per pay period.

In order to obtain a cash advance from EarnIn, a customer must: (i) have an employer that pays them regularly; (ii) link the bank account into which their employer directly deposits their

---

[1] EarnIn also moves to submit a statement of recent decision pursuant to Local Civil Rule 7-3(d)(2). The Court grants that motion.

[2] For purposes of this Rule 12(b)(6) motion, the Court assumes the truth of the allegations in the amended complaint.

paycheck to the EarnIn app; and (iii) authorize EarnIn to automatically debit that account immediately after their employer deposits a paycheck on payday in an amount equal to the cash advance plus any additional charges. Additionally, each customer must pass EarnIn's proprietary credit check, which is imposed to ensure that their linked bank account will have sufficient funds to repay EarnIn's automatic account debits on the customer's payday.

Plaintiffs maintain that these requirements ensure that EarnIn obtains repayment on "virtually every cash-advance loan it issues." Plaintiffs also allege that EarnIn leads users to believe that they are required to repay advances because it prominently represents in its advertisements and in the app itself that advances are due "when your paycheck hits" and "due to EarnIn on payday." If customers do not repay an advance, they are prohibited from obtaining further advances from EarnIn until that advance is repaid. EarnIn's Cash Out User Agreement explicitly states, however, that users have no obligation to repay the cash advances they obtain and that EarnIn will have no legal or contractual claims against customers who fail to repay an advance.[3]

According to plaintiffs, the advertised and intended purpose of EarnIn's cash advances is to provide an instant source of money, accessible directly from a mobile phone, that individuals can use to pay time-sensitive obligations. EarnIn's website describes the app as providing "instant access" to cash "within minutes" to allow customers to "cover surprise expenses." Its video

---

[3] Generally, courts cannot consider any material outside the pleadings when deciding a Rule 12(b)(6) motion. *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001). But the doctrine of incorporation by reference permits the Court to treat an extrinsic document as if it were part of the complaint if the pleading "refers extensively to the document" or if "the document forms the basis" of a claim. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018). Plaintiffs argue that the Court should not consider the Cash Out User Agreement that EarnIn cites because it appears to post-date the filing of this case by over a month and it cannot be incorporated by reference because it is not referenced in the first amended complaint. But EarnIn has now submitted the older version of the Cash Out User Agreement that was in effect at the time of the filing of the original complaint. And contrary to plaintiffs' representations, the amended complaint does appear to reference the agreement. Although the amended complaint does not cite the agreement by name, its reference to a "sham provision in [EarnIn's] terms and conditions that purports to disclaim a borrower's obligation to repay cash advances" is a reference to the Cash Out User Agreement. Accordingly, the Cash Out User Agreement is incorporated by reference and will be considered in deciding this motion.

1  advertisements show people in situations where they need immediate cash—filling gas tanks,
2  paying surprise vet bills, taking spur of the moment vacations, and covering unexpected expenses
3  for children—and suggest that the EarnIn app provides a solution. To access the "instant" cash
4  advance product that EarnIn promotes and that its customers seek, customers must pay a
5  "lightning speed fee" of between $1.99 and $3.99 depending on the size of the advance. Because
6  EarnIn only allows customers to borrow up to $100 per advance, a customer may incur multiple
7  lightning speed fees in a single day or pay period. Plaintiffs allege that this fee does not cover the
8  cost of providing services but rather compensates EarnIn for providing the advance. Customers
9  may obtain a cash advance without paying the lightning speed fee, but that advance will not be
10 available until days after the request is made. Plaintiffs contend that because EarnIn targets and is
11 used by customers who need immediate access to funds, the lightning speed fee is effectively
12 mandatory.
13     In order to obtain an advance, users must proceed past a screen in the app that allows them
14 to pay a "tip." Although the tip is nominally optional, plaintiffs assert that EarnIn utilizes various
15 forms of deception and coercion to ensure that most users pay it, including visual and structural
16 indicators that the charge is mandatory, representations that the charge must be paid to keep
17 EarnIn running, and confusing roadblocks that borrowers have to navigate to avoid paying it. For
18 example, users must proactively change the default amount to zero to avoid paying the tip, but it is
19 not readily apparent on the initial tip screen how they can do so, and even if they do manage to
20 enter zero, the app then takes them to another screen that sets the default amount to $11, which
21 they must reset to zero again, which then leads them back to the initial tip screen where they are
22 confronted with language intended to pressure or guilt them into paying a tip before they can
23 finally confirm that they want to forgo paying it. Plaintiffs argue that even calling the payment a
24 "tip" is misleading because, although EarnIn represents that the tip is a way to "help" people,
25 "support the service," and "keep EarnIn running for the rest of the community," the tip serves
26 solely to generate profits for EarnIn.
27     Plaintiffs allege that EarnIn's tips and fees are costly for users and regularly yield
28 extremely high APRs. They cite a study of 19,561 cash advances issued through EarnIn that found

3

1    the average APR was 284%, which is almost thirty times the legal limit in Georgia. These high
2    costs lead to cycles of reborrowing, where consumers take out new cash advances to fill the gaps
3    created by old advances, getting further and further into debt. This cycle of reborrowing also
4    makes it more likely that EarnIn users will be subject to additional charges and fees, such as bank
5    overdraft fees, which further erode their financial stability. Plaintiffs allege that EarnIn never
6    discloses the cost of its cash advances in terms of APR before, during, or after the transaction,
7    which results in consumers failing to understand the true cost of EarnIn's cash advance product.

8    Plaintiffs all obtained cash advances from EarnIn that they used for personal, family,
9    and/or household purposes. They all paid lightning speed fees and tips, which yielded APRs
10   ranging from 130% to 1,700% that EarnIn failed to disclose. None of the plaintiffs realized that
11   they were paying interest. Plaintiffs seek to represent a class of "[a]ll persons that reside in
12   Georgia, obtained a cash advance or loan from Defendant, and paid a fee, charge, or other amount
13   within the applicable statute of limitations."

14   EarnIn moves to dismiss pursuant to Rule 12(b)(6).

## LEGAL STANDARDS

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include a "short and plain statement of the claim showing that the pleader is entitled to relief." If the complaint fails to state a claim, the defendant may move for dismissal under Federal Rule of Civil Procedure 12(b)(6). Dismissal is required if the plaintiff fails to allege facts allowing the Court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). To survive a Rule 12(b)(6) motion, a plaintiff need only plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

In considering a Rule 12(b)(6) motion, the Court must "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable" to the non-moving party. *Rowe v. Educ. Credit Mgmt. Corp.*, 559 F.3d 1028, 1029–30 (9th Cir. 2009). While legal

1  conclusions "can provide the [complaint's] framework," the Court will not assume they are correct
2  unless adequately "supported by factual allegations." *Iqbal*, 556 U.S. at 679. Courts do not "accept
3  as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable
4  inferences." *In re Gilead Scis. Secs. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (quoting *Sprewell
5  v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001)).

## ANALYSIS

### I.  Plaintiffs state a claim under the GPLA.

The GPLA prohibits "the making of loans of $3,000.00 or less" unless the lender is a bank or otherwise licensed to do so under a Georgia licensing statute. O.C.G.A. § 16-17-2(a). The statute does not expressly define "loan" but "implicitly gives meaning to that term by its provision that it 'shall apply with respect to all transactions in which funds are advanced to be repaid at a later date.'" *Ruth v. Cherokee Funding, LLC*, 820 S.E.2d 704, 710 (Ga. 2018) (quoting O.C.G.A. § 16-17-2(b)). Plaintiffs assert that EarnIn violates the GPLA because its cash advances constitute loans under $3,000.

EarnIn argues that plaintiffs' GPLA claim should be dismissed because EarnIn's cash advances are not loans since they are not "to be repaid at a later date." It claims that its advances are not "to be repaid at a later date" because customers have no legal obligation to repay them. EarnIn cites its Cash Out User Agreement, which states, "You do not have an obligation to repay any of the Cash Out Services, and EarnIn will have no legal or contractual claim or remedy against you based on your failure to repay any of the Cash Out Services." EarnIn maintains that if a customer does not repay an advance, EarnIn has no recourse to recover those funds.

EarnIn's argument is unpersuasive. Plaintiffs' allegations clearly show that EarnIn extends cash advances to customers with the "real intent and understanding" that those advances are to be repaid, *Pope v. Marshall*, 4 S.E. 116, 118 (Ga. 1887), and that borrowers can only obtain advances after EarnIn takes thorough steps to ensure repayment. In fact, the circumstances under which repayment would not occur are extremely narrow—such as a borrower obtaining an advance then closing their account or changing their direct deposit instructions before payday, or managing to withdraw their paycheck on payday before EarnIn accesses it. Although the Cash Out User

Agreement disavows customers' legal obligation to repay advances, that is not determinative. That the GPLA applies only to funds advanced "to be repaid at a later date" does not mean that it applies only to funds *legally required to be repaid at a later date*. Instead, whether funds are advanced to be repaid at a later date is determined by the shared expectations of the parties involved. "[W]hether a given transaction is a … loan … depends, not upon the form of words used in contracting, but upon the real intent and understanding of the parties." *Pope v. Marshall*, 4 S.E. 116, 118 (Ga. 1887). The Georgia Supreme Court has cautioned that "[i]t is easy to imagine an agreement with a sham contingent repayment provision that reflects an attempt to evade the usury laws. And a court properly presented with a claim that a contingent repayment provision is a sham should look beyond the text of the agreement to penetrate to the substance and perhaps find an unlawful loan, notwithstanding the contingency." *Ruth*, 820 S.E.2d at 710–11 (cleaned up).

The phrase "to be repaid" must be interpreted in light of the Georgia General Assembly's express concern about payday lending schemes designed to evade the GPLA. *See* O.C.G.A. § 16-17-1(c) ("The General Assembly has determined that various payday lenders have created certain schemes and methods in order to attempt to disguise these transactions."); O.C.G.A. § 16-17-2(b)(3) (providing that the GPLA shall apply notwithstanding that the transaction includes "[a]ny other element introduced to disguise the true nature of the transaction as an extension of credit"). The principle that lending practices must be scrutinized based on their substance rather than their form is deeply rooted in Georgia law. *See, e.g.*, *Ruth*, 820 S.E.2d at 711 (quoting *Pope*, 4 S.E. at 118) (emphasis added) (cleaned up) ("No disguise of language can avail for covering up usury, or glossing over a usurious contract. The theory that a contract will be usurious or not, according to the kind of paper-bag it is put up in, or according to the more or less ingenious phrases made use of in negotiating it, is altogether erroneous. The law intends that *a search for usury shall penetrate to the substance*.").

Plaintiffs plead facts showing that the intent and understanding of EarnIn and its customers is that EarnIn's payments are advanced to be repaid at a later date—specifically, upon an employer's deposit of a user's paycheck in their bank account on payday. Plaintiffs' allegations that EarnIn only provides cash advances to customers who pass a credit check, who are employed,

6

whose employers directly deposit their pay into their bank account, and who authorize EarnIn to automatically debit their bank account strongly suggest that EarnIn intends that its advances will be repaid. Plaintiffs' also plead facts suggesting that EarnIn leads customers to believe that they are required to repay its cash advances, despite the language in the Cash Out User Agreement. For example, the amended complaint includes screenshots from EarnIn's website stating that "[e]arnings are repaid when your paycheck hits" and alleges that in-app screens similarly state that that cash advances are "due to EarnIn on payday." These allegations are sufficient to plead that EarnIn's cash advances are loans for the purposes of the GPLA.

In arguing to the contrary, EarnIn cites the Georgia Supreme Court's holding in *Ruth v. Cherokee Funding, LLC*, 820 S.E.2d 704 (Ga. 2018). But contrary to EarnIn's representations, *Ruth* did not hold that "where there is no absolute obligation to repay, there is no viable claim under the Payday Lending Act." Rather, it held that the plaintiffs in that case had not adequately pleaded that a litigation financing arrangement that made the obligation to repay contingent on the success of a personal injury lawsuit was a loan under the GPLA because "the complaint [did] not allege that the contingencies contained in the financing agreement were illusory" or that "there was no chance that they would be unsuccessful in their underlying lawsuits." *Ruth*, 820 S.E.2d at 711. The advance in *Ruth* was not covered by the GPLA because the obligation to repay was entirely contingent on future events that might never occur, not because the obligation to repay was not "absolute." Here, plaintiffs allege that both EarnIn and its users understand that users are expected to repay any advances, that EarnIn implements several requirements to ensure that repayment will occur in nearly all circumstances, and that EarnIn's disclaimer of any *legal* repayment obligation is therefore a sham, illusory, or at the very least lacking in any real-world significance.

Under these circumstances, plaintiffs adequately plead that the money provided by EarnIn to its users is "advanced to be paid a later date"—namely, the date on which users' paychecks are deposited into their bank accounts by their employers. Because this is sufficient to plead that the advances are loans subject to the GPLA, EarnIn's motion to dismiss plaintiffs' GPLA claim is denied.

7

## II. Plaintiffs state a claim under TILA.

"Congress enacted TILA to promote 'the informed use of credit' by consumers." *Davenport v. Litton Loan Servicing, LP*, 725 F. Supp. 3d 862, 872 (N.D. Cal. 2010) (quoting 15 U.S.C. § 1601(a)). TILA seeks to "assure a meaningful disclosure of credit terms" in order to assist consumers in making informed decisions and protect them from unfair credit practices. *Beach v. Ocwen Fed. Bank*, 523 U.S. 410, 412 (1998) (quoting 15 U.S.C. § 1601(a)). Under TILA, creditors must disclose the: (1) identity of the creditor; (2) amount financed; (3) finance charge; (4) annual percentage rate; (5) sum of the amount financed and the finance charge, or total of payments; and (6) number, amount, and due dates or period of payments scheduled. 15 U.S.C. § 1638(a)(1)-(6). TILA's disclosure requirements apply to any creditor that regularly extends credit for which the payment of a "finance charge" is required. 15 U.S.C. § 1602(g)(1).

EarnIn contends that it is not subject to TILA's disclosure requirements because it (1) does not advance credit and (2) is not a creditor. Both arguments fail because plaintiffs have alleged facts showing that EarnIn's cash advances are "credit" under TILA and that EarnIn is a creditor because the fees it charges are finances charges.

### A. Plaintiffs plead that EarnIn advances "credit" under TILA.

Making arguments similar to those it raised under the GPLA, EarnIn claims that its cash advances are not "credit" under TILA because customers have no legal obligation to repay them. Its argument, however, is contrary to both longstanding regulations implementing TILA and the parties' alleged expectations.

TILA defines credit as "the right … to defer payment of debt or to incur debt and defer its payment." 15 U.S.C. § 1602(f). Regulation Z, which implements TILA, clarifies that "[c]redit includes a transaction in which a cash advance is made to a consumer … in exchange for the consumer's authorization to debit the consumer's deposit account, and where the parties agree … that the … deposit account will not be debited[] until a designated future date." 12 C.F.R. pt. 1026, Supp. I, Paragraph 2(a)(14) Credit, ¶ 2 ("Payday loans; deferred presentment"). EarnIn's advances involve the precise type of deferred presentment scheme that Regulation Z characterizes as credit. EarnIn advances cash in exchange for authorization to debit a borrower's bank account

8

immediately after their employer deposits their paycheck on payday. This practice squarely falls within the definition of credit under TILA, whether or not customers have an obligation to repay. Nowhere does the statute or the regulation implementing it indicate that courts should interpret "credit" to require a legal obligation to repay.

Where, as here, a statute empowers an agency "to fill up the details of a statutory scheme [or] to regulate subject to the limits imposed by a term or phrase that leaves agencies with flexibility," the agency's reasoned interpretation, within the constitutional bounds of its delegated authority, is entitled to deference. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394–95, 404 (2024) (cleaned up); *see Pfennig*, 541 U.S. at 244–45 (quoting 15 U.S.C. § 1604(a)) ("Congress has authorized the Board to make 'such classifications, differentiations, or other provisions, and [to] provide for such adjustments and exceptions for any class of transactions, as in the judgment of the Board are necessary or proper to effectuate the purposes of [TILA], to prevent circumvention or evasion thereof, or to facilitate compliance therewith.'"). For the reasons explained above, plaintiffs adequately plead that EarnIn customers have an obligation to repay EarnIn's cash advances via pre-authorized debits from the accounts into which their pay is deposited by their employer, and EarnIn's disavowal of any *legal* repayment obligation is no more determinative in interpreting TILA than in the context of the GPLA given the steps EarnIn takes to ensure it will be repaid by its customers notwithstanding the absence of legal recourse.[4] EarnIn's contrary construction would insert into the statutory text language found nowhere therein, disregarding Regulation Z entirely, and contradict TILA's very purpose, which properly informs the construction of its terms.[5]

---

[4] It is entirely possible that EarnIn's system is in fact *more* effective in guaranteeing repayment than one that depended on pursuing legal debt collection remedies.

[5] "[T]he Truth in Lending Act is liberally construed to protect consumers." *Burnett v. Ala Moana Pawn Shop*, 3 F.3d 1261, 1262 (9th Cir. 1993). Therefore, courts must "look[] past the form of the transactions to their economic substance in deciding whether the Act applie[s]." *Burnett v. Ala Moana Pawn Shop*, 3 F.3d 1261, 1262 (9th Cir. 1993); *Gilliam , Tr. of Lou Easter Ross Revocable Tr. v. Levine, Tr. of Joel Sherman Revocable Tr.*, 955 F.3d 1117 (9th Cir. 2020); *see also Foster v. Equitykey Real Est. Invs. L.P.*, No. 17-CV-00067-HRL, 2017 WL 1862527 (N.D. Cal. May 9, 2017) ("To determine whether TILA applies to the agreement here, the court must examine its nature"); *David Oas v. Rama Cap. Partners, LLC*, No. 820CV01634, 2020 WL 7089826 (C.D. Cal. Oct. 21, 2020); *Williams v. Chartwell Fin. Servs., Ltd.*, 204 F.3d 748, 753 (7th Cir. 2000)

Plaintiffs thus adequately plead that EarnIn advances credit.

**B.     Plaintiffs plead that EarnIn is a "creditor" under TILA.**

TILA's disclosure requirements only apply to creditors. Regulation Z defines a creditor as "[a] person who regularly extends consumer credit *that is subject to a finance charge* or is payable by written agreement in more than four installments (not including a down payment), and to whom the obligation is initially payable, either on the face of the note or contract, or by agreement when there is no note or contract." 12 § CFR 1026.2(17)(i) (emphasis added). A finance charge is "the sum of all charges, payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor *as an incident to the extension of credit*." 15 USC § 1605(a) (emphasis added).

EarnIn contends that it is not a creditor because it does not extend consumer credit that is "subject to a finance charge." EarnIn argues that the phrase "incident to" means "necessary for," and that its lightning speed fees and tip charges are not "incident to the extension of credit" because they are not mandatory.

 EarnIn's argument in unavailing. A charge need not be mandatory to be "incident to the extension of credit" and thus constitute a "finance charge" under TILA. All that is required is a connection between the imposition of the charge and the extension of credit. At the time TILA was enacted, Black's Law Dictionary defined "incident" as "anything which is usually connected with another, or connected for some purposes, though not inseparably." *Incident*, Black's Law Dictionary (4th ed. 1968). In *Household Credit Servs., Inc. v. Pfennig*, 541 U.S. 232 (2004), the Supreme Court explained that

> [T]he phrase "incident to or in conjunction with" implies some *necessary* connection between the antecedent and its object, although it "does not place beyond rational debate the nature or extent of the required connection." In other words, the phrase "incident to" does

---

("[C]ourts are to focus on the economic substance of the transaction in determining whether TILA has been violated."); *Edwards v. Your Credit Inc*, 148 F.3d 427, 436 (5th Cir. 1998) ("[T]he substance-over-form doctrine provides the proper framework for analyzing [TILA]."); *Clark v. Rent-It Corp.*, 685 F.2d 245, 248 (8th Cir. 1982) (cleaned up) ("The legislative history of the TILA shows that Congress was aware that some creditors would attempt to characterize their transactions so as to fall one step outside whatever boundary Congress attempted to establish.").

10

>not make clear whether a substantial (as opposed to a remote) connection is required.

*Pfennig*, 541 U.S. at 240–41 (citation omitted). Although *Pfennig* did not determine how substantial the connection between a charge and the extension of credit needs to be in order to make the former "incident to" the latter, it confirmed that "incident to" means "connected to."

EarnIn relies on *Golubiewski v. Activehours, Inc.*, No. 3:22-CV-02078, 2024 WL 4204272 (M.D. Pa. Sept. 16, 2024), in which a district court dismissed a similar TILA claim against EarnIn after determining that EarnIn's "tips and fees are not a condition to credit." *Golubiewski*, 2024 WL 4204272, at *6. But the *Golubiewski* order seems to misread *Pfennig*. The order concludes that "optional tips and fees are not finance charges under TILA" because *Pfennig* had held that TILA "requires that the fees be a *necessary* condition for credit." *Golubiewski*, 2024 WL 4204272, at *6. But *Pfennig* held that all that is required is "some necessary connection" between the fee and the extension of credit. *Pfennig*, 541 U.S. at 240–41. A necessary *connection* is not the same as a necessary *condition*.[6]

*Pfenning*'s holding that "incident to" means "connected to" is consistent with how the agencies charged with implementing TILA have understood its requirements. For example, in 1996, the Federal Reserve System Board, which previously implemented TILA, explained that even though a particular loan feature *may not be required*, it "may become a term of the credit if it is included" in the loan contract. See Truth in Lending, 61 Fed. Reg. 49237, 49239 (Sept. 19, 1996). The Consumer Financial Protection Bureau, which now implements TILA, recently issued a proposed interpretive rule explaining that "express fee" and "tip" charges are "finance charges" because "the connection between each type of payment and that extension [of credit] is close and clear." Credit Offered to Borrowers in Advance of Expected Receipt of Compensation for Work, 89 Fed. Reg. 61358, 61362 (proposed July 31, 2024). The enacting Congress's concern with ensuring creditors could not evade TILA by "characteriz[ing] their transactions so as to fall one

---

[6] Indeed, *Pfennig* did not offer any determinative ruling on the meaning of "incident to the extension of credit" because the only issue before the Court was whether the Federal Reserve Board's interpretation of that ambiguous statutory language as excluding the fees at issue was reasonable, and the Supreme Court held that it was.

11

step outside whatever boundary Congress attempted to establish," *Clark*, 685 F.2d at 248, which supports "liberally constru[ing] [TILA] to protect consumers," *Burnett*, 3 F.3d at 1262, strongly cautions against construing "incident to" so narrowly as to exclude all but absolutely necessary conditions.

Here, plaintiffs plead at least a close connection between payment of the tip and the lightning fee, on the one hand, and EarnIn's extension of a same-day cash advance, on the other. It is a would-be borrower's effort to obtain a cash advance that triggers EarnIn's solicitation of a tip; EarnIn users are solicited for a tip, sometimes multiple times, before they can obtain a cash advance; the design of the EarnIn app makes it difficult for users to obtain an advance without paying a tip; and EarnIn's representations imply that the tip is necessary for EarnIn to continue offering cash advances. Users may not be strictly required to pay a tip, but paying a tip is inextricably intertwined with obtaining a cash advance.

Even if "incident to" did mean mandatory, plaintiffs plead facts showing that the lightning speed fee was effectively mandatory. The time at which funds are received is a material term of credit. Thus, payment of the lightning fee is a necessary condition to the extension of credit on the terms being offered, which include receipt of the credit "within minutes." *See* Credit Offered to Borrowers in Advance of Expected Receipt of Compensation for Work, 89 Fed. Reg. at 61362 ("Though consumers may not have to opt for faster funds, when they do so, the resulting speed is a feature of the credit extended, so the resulting fee is part of the cost of credit."); Truth in Lending, 61 Fed. Reg. 49237, 49239 (Sept. 19, 1996) ("[E]ven though a lender may not require a particular loan feature, the feature may become a term of the credit if it is included."). EarnIn argues that the lightning fee is voluntary because customers can choose not to pay it and instead receive their cash advance at a later date. But just as a home loan that makes funds available before the close of escrow is a fundamentally different product than one in which funds are only accessible several months later, a cash advance accessible "within minutes," providing "instant access" to cash a borrower can use to "cover surprise expenses," is a different product than cash a borrower can only access days later. *See* Credit Offered to Borrowers in Advance of Expected Receipt of Compensation for Work, 89 Fed. Reg. at 61362 ("Availability of a slower speed does

not control the cost of credit for the faster form of credit."). Because EarnIn's immediate cash advance product is contingent on the payment of the lightning fee, the lightning fee is a necessary condition of EarnIn's extension of credit on the terms offered.

Accordingly, plaintiffs adequately plead that EarnIn is a creditor under TILA.

## CONCLUSION

For the foregoing reasons, the Court denies EarnIn's motion to dismiss.

**IT IS SO ORDERED.**

Dated: April 30, 2025

P. Casey Pitts
United States District Judge