# EXHIBIT 2



August 30, 2024

Comment Intake—2024 Paycheck Advance Interpretive Rule
c/o Legal Division Docket Manager
Consumer Financial Protection Bureau
1700 G Street NW
Washington, DC 20552

**<u>FTA Comment Letter re: the CFPB Request for Comment on its Earned Wage Access</u>**
**<u>Proposed Interpretive Rule (Docket No. CFPB-2024-0032)</u>**

The Financial Technology Association ("FTA") appreciates the opportunity to respond to the Consumer Financial Protection Bureau's ("CFPB" or "Bureau") Proposed Interpretive Rule (the "Proposal") regarding earned wage access ("EWA") products. FTA is a trade association representing industry leaders shaping the future of finance. We champion the power of technology-centered financial services and advocate for the modernization of financial regulation to support inclusion and responsible innovation. To this end, we encourage the Bureau to work with and defer to Congress in crafting an appropriate and tailored regulatory framework for EWA products given the unintended consequences—including loss of consumer access and impeded innovation—that will result from applying ill-fitting credit laws designed for very different financial products. The Bureau and all policymakers should be guided by a north star principle of ensuring that consumers are able to access responsible products they demand and that enhance their financial health relative to legacy services.

To this end, EWA is an important innovation demanded by a growing number of Americans looking for alternatives to high-cost traditional credit options, such as payday loans. As the CFPB notes in its Proposal, EWA products can help solve the "mismatch of when American workers receive compensation for their labor and when they incur expenses" and, in the CFPB's own words, have "important distinctions" from traditional credit products.[1] As detailed below, we believe these legal distinctions, unique characteristics, and critical benefits to American consumers of EWA products require a holistic, tailored approach to policymaking that affords stakeholders a fair opportunity to inform a final legislative and regulatory framework. When an innovative and low-cost product category like EWA is working well for consumers, it is prudent for a regulator to proceed cautiously before taking measures that may inadvertently impede or alter the well-functioning market.

---

[1] Consumer Financial Protection Bureau (CFPB) (2024) *Proposed Rule: Consumer credit offered to borrowers in advance of expected receipt of compensation for work).* Available at: https://www.consumerfinance.gov/rules-policy/rules-under-development/consumer-credit-offered-to-borrowers-in-advance-of-expected-receipt-of-compensation-for-work/ (Accessed: August 26, 2024).

1

To this end, legislators at the state and federal levels have been actively working to create tailored frameworks that mitigate identifiable risks, facilitate further product development, and foster access. The Proposal's approach, on the other hand, would restrict consumer access to products that improve consumers' financial health by applying ill-fitting credit laws that were not drafted with EWA products in mind and that are accordingly not fit-for-purpose in mitigating risks. Because we share the Bureau's goal of responsibly and safely "promoting competition and innovation in consumer financial products and services," we urge the Bureau to consider the following key takeaways and recommendations:

   A. The Bureau's actions should recognize that EWA products are distinct from traditional credit options, such as payday loans, and offer Americans significant financial health benefits;

   B. Given the consumer benefits of EWA, and existing state and federal efforts to create holistic and tailored legal frameworks for such products, the Bureau should defer to the policymaking function of the legislature;

   C. The Bureau should recognize that most EWA providers believe that the Proposal contradicts CFPB precedent and other governmental actions by imposing, without fair process and analysis, new substantive legal requirements that will restrict access, steer consumers to high-cost payday products, and fail to protect consumers; and

   D. The Bureau should build on its open banking efforts by advancing an open payroll framework that can help expand the benefits of EWA product innovation.

I.    **EWA Products are Legally Distinct from Traditional Credit Products and are Offering Consumers Significant Benefit.**

EWA is a key area of innovation that offers consumers flexibility through on-demand and earlier access to their earned wages that have not yet been deposited into their account. EWA services help workers smooth out cash flow between payroll cycles, which can be as infrequent as biweekly or monthly. A recent survey revealed that more than sixty-seven percent (67%) of employees believe that the traditional pay period is outdated, further underscoring the growing demand for modern payroll solutions like EWA.[2] Moreover, forty-three percent (43%) of employees whose employers offer EWA services use them, with seventy-five percent (75%) of these users accessing the service at least once a month.[3] This high usage rate indicates that many workers find traditional payroll systems inadequate for their financial needs, particularly as sixty-two percent (62%) of employees reported that their current pay cycle does not align with their financial situation.[4] EWA

---

[2] Beaner, L. (2024) "Is the American work setup stuck in the 20th century?," *SWNS digital*, 18 March. Available at: https://swnsdigital.com/us/2024/03/is-the-american-work-setup-stuck-in-the-20th-century/ (Accessed: August 16, 2024).
[3] Patil, L. B. A. (2023) *Exploring Earned Wage Access as a Liquidity Solution*, *Financial Health Network*. Available at: https://finhealthnetwork.org/wp-content/uploads/2023/12/EWA-Users-Report-2023.pdf (Accessed: June 6, 2024).
[4] Beaner, L., 2024.



accordingly gives consumers a helpful tool to make timely payments on everyday expenses, avoid overdrafting their bank accounts, and manage short-term financial shocks.

In its Proposal, the Bureau asserts that most EWA products should be treated as credit under the Truth in Lending Act ("TILA") and that such products create a "debt" obligation. However, all bona fide EWA products—whether direct-to-consumer or employer-sponsored—give employees access to their *already earned wages*. This aspect matters since the characteristics of EWA products are structurally distinct from those of traditional credit or loan products—which means that rules regarding credit or loan products poorly fit EWA products.

More specifically, unlike a traditional loan product, EWA services are non-recourse and never charge interest. This means that consumers have no legal obligation to repay an advance, and providers cannot take legal action to collect payments. Providers also do not utilize consumer report information or furnish a user's nonpayment to a consumer agency or debt collector, and do not sell or assign a customer's outstanding EWA advance to a third-party debt collector or debt buyer. These characteristics are fundamentally distinct from a traditional loan, where the lender has legal recourse and imposes binding interest and other fees and charges.

On this latter point, with EWA, there is no cost to access wages based on the time-value of money (interest), and consumers can cancel their engagement with an EWA provider at any time. Additionally, non-repayment does not result in the accrual of interest to the consumer, though it usually does limit access to additional EWA advances until the earlier advance is repaid.

Additionally, in suggesting that EWA products create a debt, the Bureau's Proposal states that automatic repayment mechanisms, including "a scheduled payroll deduction or a preauthorized account debit" create an "obligation" to repay. FTA respectfully disagrees with the notion that such automatic repayment mechanisms, which can be canceled by the consumer without recourse prior to the repayment date, creates a *legal* obligation. Indeed, Black's Law Dictionary states that "[a]n obligation is a **legal duty**, by which a person is bound to do or not to do a certain thing."[5] Because a consumer is not legally bound to make a repayment and can cancel the automatic mechanism, this does not create a legal obligation—another key distinction from traditional credit.

While the Bureau does recognize significant distinctions between EWA and traditional loan products, including payday loans, the Proposal in other places draws unsubstantiated parallels between these products—this should be corrected. Key distinctions include the lack of legal recourse, lack of mandatory or late fees, interest, and other charges, lack of credit reporting, and the ability for a consumer to cancel an automatic repayment without recourse beyond potential loss of access to future EWA services. These significant distinctions render EWA a fundamentally different product than payday loans, which helps to explain their popularity with consumers.

---

[5] Black's Law Dictionary, 2nd Ed. (emphasis added).



Indeed, it is not surprising that EWA products demonstrate extremely high customer success metrics.[6] A recent survey of nearly 5,000 national EWA customers found that ninety-three percent (93%) said they had a greater sense of financial control after using EWA and ninety-one percent (91%) said they understand how the service works.[7] This sense of control is crucial, as it not only empowers users to manage their finances more effectively, but also helps them avoid costly alternatives like payday loans or overdraft fees. Additionally, eighty-two percent (82%) of users reported feeling less stressed about their financial situation, and seventy-seven percent (77%) noticed improvements in their mental health, further underscoring the positive impact of EWA on overall well-being.[8]

Unfortunately, the Proposal would have a significant and negative impact on the marketplace and result in harm to consumers through reduced access to a demanded product. By squeezing a square peg (EWA products) into a round hole (credit laws), the Proposal could have the perverse result of steering EWA providers into the mold of traditional lenders, potentially along with many of the negative characteristics of traditional loans that consumers are seeking to avoid in the first place. More specifically, EWA providers currently bear the risk of loss if a consumer does not repay; credit extended by a lender, on the other hand, has a legal obligation of repayment and is subject to a range of recourse, including negative credit reporting, debt collection, and legally binding late fees, charges or compounding interest. Given the Bureau's mandate to promote innovation and competition—a mandate supported by promulgation of an open banking framework that can unlock product innovation—applying inapplicable credit laws to EWA would cut the other direction by forcing the new to look and behave like the old.

There are a number of additional negative consequences that will likely result from applying ill-fitting credit laws to EWA products. For example, pricing metrics and related requirements under TILA may not capture or fully present the nature of costs associated with EWA products—this could cause consumer confusion. Indeed, the legislative history of TILA itself makes clear that forcing all disclosures "into one pattern" can cause "serious inaccuracies and inequities."[9] For this reason, tailored consideration of pricing disclosures and costs to be captured should be pursued through a comprehensive policymaking effort led by Congress.

Additionally, certain fair lending and underwriting requirements applicable to traditional credit may create friction with EWA products. An EWA provider simply estimates a consumer's wages,

[6] See, e.g., Newsom, G. and Hewlett, C. V. (2021) *PRO 01-21 Initial Statement of Reasons*, *California Department of financial protection and innovation*. Available at: https://dfpi.ca.gov/wp-content/uploads/sites/337/2023/03/PRO-01-21-ISOR.pdf (citing the 97% repayment rate found in the following research: Financial Health Network, *Earned Wage Access and Direct-to-Consumer Advance Usage Trends*, at p. 2).

[7] FTI Consulting (2021) *Re: Direct to Consumer Earned Wage Access User Survey Key Findings*. Available at: https://www.earnin.com/assets/pdf/FTI-Earned-wage-access-memo.pdf (Accessed: June 6, 2024).

[8] FTI Consulting, 2021.

[9] Committee on Banking and Currency (1967) *Truth in Lending-1967 Report*, p. 23. United States Senate. Available at: https://www.llsdc.org/assets/TILAdocs/tila-lh_s-rep-90-392.pdf (Accessed: August 27, 2024).



while a lender will engage in a broader review of an individual's creditworthiness—this distinction matters as lenders may have a greater number of eligibility requirements, exclude those with poor credit, and report non-payment to credit bureaus; all of these consequences will result in a loss of access for many Americans.

Finally, although the Bureau is silent on application of Reg B, an EWA provider who is deemed a lender may be required to consider government benefits as a source of income for a consumer even though it is not an earned wage. In this way, the very nature of EWA products will be transformed into something they are not—extending funds based on expected benefits is distinct from giving an individual early access to his or her already earned and accrued wages.

II.     **Given the Consumer Benefits of EWA Products, and Existing State and Federal Efforts to Create Holistic and Tailored Legal Frameworks, the Bureau Should Defer to the Policymaking Function of Congress.**

Congress should create tailored regulatory frameworks for EWA products given their innovative structure, benefits to consumers, and ill-fit for traditional credit laws and regulations. As demonstrated by the states, the legislature can appropriately create policy based on a deliberative approach, broad stakeholder engagement, and its ability to consider holistically the impact of requirements and related trade-offs. For this reason, with respect to the Bureau, it should work with and defer to Congress so that it can make policy determinations related to EWA.

This deference to Congress is appropriate given the example of successful legislative efforts at the state level that have recently been completed or that are currently underway. For example, last year, Missouri and Nevada passed comprehensive legislation, whereby EWA products are specifically exempted from lending laws in favor of a framework tailored to EWA products—an approach that protects consumers while fostering this important area of innovation.[10] These legislative efforts recognize that applying traditional credit laws to EWA results in negative unintended consequences, and instead pursue tailored requirements that contemplate the terminology and structure of EWA offerings. In this way, disclosure requirements create clarity for consumers and providers are required not to engage in certain activities common with lenders that can cause consumer harm, including pursuing legal recourse in the event of non-payment. Three additional states, Kansas, South Carolina and Wisconsin, have followed suit this year with their own similar legislative efforts.[11]

---

[10] Cannizzaro, N. and Lange, R. (2023) *Missouri Senate Bill 103*. Available at: https://www.leg.state.nv.us/App/NELIS/REL/82nd2023/Bill/10146/Overview.

[11] Marek, L. (2024) *EWA providers seek to steer state legislation*, *Payments Dive*. Available at: https://www.paymentsdive.com/news/ewa-providers-seek-steer-state-legislation/712882/ (Accessed: August 27, 2024).



Additionally, in-line with our recommendation to the Bureau, Congress has been pursuing EWA-tailored legislation at the federal level. The House Financial Services Committee recently passed H.R. 7428, the Earned Wage Access Consumer Protection Act. The legislation defines earned wage access as a non-credit product and proposes specific consumer disclosures and protections for the first time at the federal level. Similar to the state efforts noted above, the protections provided by this proposed framework are tailored to create clarity for consumers and provide appropriate safeguards. Additionally, the proposed legislation would help consumers differentiate EWA from forms of legacy payday products that may otherwise cloak themselves in marketing intended to confuse a consumer about the true nature of the product. For these reasons, it is appropriate for the Bureau to work with and defer to Congress, especially when it is already actively engaged in the lawmaking process.

### III.    The Proposal Contradicts CFPB Precedent and Other Governmental Determinations by Imposing New Legal Requirements that Undermine Consumer Interests and Product Innovation.

The Administrative Procedure Act (APA) requires a deliberative process, inclusive of notice and comment and a proper cost-benefit analysis, before imposition of new substantive, legal requirements. Additionally, as noted above, because policymaking is the proper domain of the legislature, we urge the Bureau to defer such efforts to Congress and state legislatures. Notwithstanding this recommendation, most of our members are concerned that the Proposal introduces new substantive requirements without proper process that contradict prior Bureau and government action, which will only reduce EWA product development and access, while steering innovators and consumers alike to higher-cost legacy credit products.

More specifically, in previously finalizing the payday lending rule, the Bureau created "specific exclusions and conditional exemptions" for certain EWA products that do "not require the consumer to pay any fees or finance charges" and where the provider "has no legal or contractual claim or remedy against the consumer based on the consumer's failure to repay in the event the amount advanced is not repaid in full."[12] The Bureau further stated that "[c]ertain of these [EWA] services do not require the consumer to pay any fees or finance charges, relying instead on voluntary 'tips' to sustain the business, while others are compensated through electronic fund transfers from the consumer's account."[13] In this way, the payday rule clearly differentiated EWA from payday loans. The Proposal, however, without any specific reasoning or explanation, contradicts this approach by failing to recognize the import of products lacking recourse in the event of nonpayment and that do not involve mandatory fees or finance charges.

---

[12] *Final Rule: Payday, Vehicle Title, and Certain High-Cost Installment Loans* (2017) *82 FR 54472*. Available at: https://files.consumerfinance.gov/f/documents/201710_cfpb_final-rule_payday-loans-rule.pdf (Accessed: August 27, 2024).
[13] Final Rule: Payday, Vehicle Title, and Certain High-Cost Installment Loan, 2017, p. 216.

The Proposal also contradicts other federal government determinations related to EWA products or products with similar options and characteristics. For example, the U.S. Treasury Department recommended in its 2023 Greenbook that Congress "clarify that on-demand pay arrangements are not loans."[14] This recommendation recognizes clear distinctions between a product that provides early access to already-earned wages as compared to traditional credit, which involves an extension of funds based on an assessment of a consumer's ability to repay.[15]

Additionally, as acknowledged by the Bureau, but contrary to the Proposal's treatment of expedited payment fees related to EWA, the Board of Governors of the Federal Reserve System has previously determined—following a rulemaking and notice and comment period—that optional charges for expediting certain physical credit card and payment delivery are not finance charges.[16] The Fed noted that "a fee for expedited delivery of a credit card is not incidental to the extension of credit and thus is not a finance charge where the consumer requests the service and the card is also available by standard mail service (or another means that is at least as fast) without a fee."[17]

The Bureau seeks to differentiate the Fed's conclusion in a footnote to the Proposal and without detailed analysis.[18] FTA urges proper consideration of the Fed's conclusion as most EWA providers offer consumers no cost access to services and face separate and unique costs associated with expedited payments—these costs are distinct from those associated with providing EWA. As is the case with providers referenced by the Fed, EWA providers must recoup additional costs related to expedited payment service. Importantly, such expedited payment options are voluntary and not a condition of accessing the EWA product. The Proposal's conclusion would upend common commercial practice related to expedited payments and likely reduce consumer access to such services. As such, FTA urges the Bureau to reconsider its conclusions related to expedited payment fees.

Beyond inconsistencies in the Proposal from past Bureau action and broader government actions, the Proposal does not engage in a cost-benefit analysis, nor consider the unintended consequences of applying credit laws to EWA products. The lack of a deliberative process and proper notice-and-comment opportunity compound these concerns. For example, while the

---

[14] U.S. Department of the Treasury (2022) *General Explanations of the Administration's Fiscal Year 2023 Revenue Proposals*. Available at: https://home.treasury.gov/system/files/131/General-Explanations-FY2023.pdf (Accessed: August 27, 2024).

[15] Brnovich, M. (2022) Re: Earned Wage Access Products, Opinion No. I22-005 (R22-011). Available at: https://www.azag.gov/opinions/i22-005-r22-011 (Accessed: August 27, 2024). The Arizona Attorney General recently issued an opinion stating that an "EWA product that is offered as a no-interest and non-recourse product does not fall within [the Arizona] definition of 'consumer loan.'"

[16] *See* Federal Reserve System (2003) 'Regulation Z', Rule, Docket No. R-1136, 12 CFR 226. *Federal Register* 68 FR 16185, pp. 16185-16190. Available at: https://www.federalregister.gov/documents/2003/04/03/03-8022/truth-in-lending (Accessed: August 27, 2024).

[17] Federal Reserve System, 2003.

[18] *See* footnote 42 in Consumer Financial Protection Bureau (CFPB), 2024.



Bureau includes and cites to its recent market research, that research is narrow and applies only to a particular form of EWA offerings. Additionally, the Bureau does not consider whether application of TILA will help consumers understand EWA products or potentially cause increased consumer confusion. The Proposal further lacks assessment of the burden providers will face and potential limitations it will impose on product or service offerings.

The lack of such considerations, and a proper deliberative process, reinforces the appropriateness of a legislative body holistically considering application of requirements to EWA products and any impact of such requirements on product development and availability. To this end, FTA supports development of tailored and fit-for-purpose regulatory frameworks that can safeguard consumers and facilitate EWA product innovation, as has been demonstrated at the state level. These frameworks, however, should be developed through proper deliberative and consultative processes capable of crafting appropriate substantive rules for such products.

**IV.     In Support of its Mandate to Promote Competition and Innovation, the Bureau Should Build on its Open Banking Efforts by Advancing an Open Payroll Framework that Can Help Expand the Benefits of EWA Products.**

FTA has long supported the Bureau in its effort to implement a Dodd Frank Section 1033 open banking framework and believes more can be done to expand the benefits consumers enjoy when they can seamlessly share their personal financial data. Unlocking data fosters product innovation and can drive competition with legacy providers—a benefit the Proposal should take care not to undermine by forcing EWA to look more like traditional credit. Indeed, EWA product innovation has developed in large part because consumers can share their data, including their employment and payroll data, to gain early access to their earnings. Instead of taking steps that can restrict consumer access to such products, the Bureau should look for ways to promote open finance and facilitate further EWA product development.

More specifically, the Bureau's proposed Section 1033 implementation does not currently include consumer employment and payroll data. If such data were subject to the open banking framework, however, it would enhance a consumer's ability to share more accurate and timely data regarding employment and earnings with providers, which would improve EWA offerings. This would improve the quality of earnings estimates and ensure that consumers are receiving access to their already earned wages. The Kansas City Fed underscored this point by noting that payroll data is crucial in determining the amount of earned wages employees can access early through EWA services.[19]

---

[19] Bradford, T. (2024) "Payments System Research Briefing: As Earned Wage Access Grows, Oversight Tries to Catch Up," *Federal Reserve Bank of Kansas City*, 15 May. Available at: https://www.kansascityfed.org/research/payments-system-research-briefings/as-earned-wage-access-grows-oversight-tries-to-catch-up/ (Accessed: August 13, 2024).

To this end, the CFPB's Section 1033 Final Report of the Small Business Review Panel emphasized the importance of comprehensive payroll data in developing products that can better demonstrate consumer creditworthiness and facilitate access to financial services.[20] By including payroll providers in an open banking framework, consumers could more readily access their payroll data.[21] This aligns with the National Consumer Law Center's (NCLC) advocacy for including payroll processors under the CFPB's open banking rule to ensure payroll data is both accessible and protected.[22] Given these benefits, FTA urges the Bureau to consider phased expansion of the Section 1033 framework to include this data and use its position today to encourage API-based, consumer-permissioned access.

*         *         *

EWA products are proving to be an essential product for a growing number of Americans often stuck between lagging paychecks and immediate expenses. As the Bureau notes, EWA products differ substantially from traditional credit and are accordingly preferred relative to legacy high-cost products, such as payday loans. State and federal legislatures are developing tailored regulatory frameworks that properly consider and accommodate unique characteristics of EWA—a process the Bureau should support. We accordingly urge the Bureau to work with and defer to Congress in the development of a substantive legal framework for EWA through a fair, holistic, and deliberative process. A failure to do so will result in application of ill-fitting laws and a reduction in access to EWA products that are helping so many Americans meet their financial needs.

Sincerely,

Penny Lee
President and Chief Executive Officer
Financial Technology Association

---

[20] Consumer Financial Protection Bureau (CFPB) (2023) *Final Report of the Small Business Review Panel on the CFPB's Proposals and Alternatives Under Consideration for the Required Rulemaking on Personal Financial Data Rights*. Available at: https://files.consumerfinance.gov/f/documents/cfpb_1033-data-rights-rule-sbrefa-panel-report_2023-03.pdf (Accessed: August 19, 2024).

[21] Consumer Financial Protection Bureau (CFPB), 2023.

[22] National Consumer Law Center (NCLC) (2023) NCLC Comments to Section 1033 NPRM, National Consumer Law Center (NCLC). Available at: https://www.nclc.org/wp-content/uploads/2024/01/NCLC-comments-to-Section-1033-NPRM.pdf (Accessed: August 19, 2024).