# EXHIBIT 3



August 29, 2024

The Honorable Rohit Chopra
Director
Consumer Financial Protection Bureau
1700 G Street NW
Washington, DC 20552

       **Re:**    **2024 Paycheck Advance Interpretive Rule**
              **Docket No. CFPB-2024-0032**

Dear Director Chopra:

On behalf of the American Fintech Council (AFC), we submit this comment letter in response to the July 18, 2024 notice of proposed interpretive rule by the Consumer Financial Protection Bureau (CFPB or the Bureau) concerning paycheck advance and earned wage access (EWA) products.

AFC is a trade association with members that include EWA providers of all sizes across the United States, including employer-partnered and direct-to-consumer providers. AFC's mission is to promote an innovative, transparent, inclusive, and customer-centric financial system by supporting the responsible growth of financial technology (Fintech), fostering innovation in the Fintech industry, and encouraging sound public policy. By increasing the availability of EWA products, AFC members have assisted millions of consumers in accessing their earned but unpaid wages before receiving their next paycheck.

AFC is committed to offering its insight and support in service of developing responsible regulations in the EWA space. On February 7, 2024, AFC wrote the CFPB to propose that the Bureau adopt a formal rulemaking process to develop a pragmatic framework for regulation of EWA products that would ensure adequate consumer financial protections and preserve the distinct characteristics of EWA products that make them a valued option for consumers. Instead, the CFPB has announced a "proposed interpretive rule" (Proposed Rule or the Rule) that would eliminate the unique aspects of EWA products that have helped drive benefits for the millions of consumers who use them.

The AFC submits this comment letter to lodge its objection to the Proposed Rule. The Bureau should withdraw the Proposed Rule for at least three reasons that are detailed below. First, the Proposed Rule would wrongly overturn and replace the Bureau's November 2020 Advisory Opinion finding that some EWA products are not credit. For years, businesses relied on that opinion to develop innovative EWA products, which consumers want and have used as an alternative to products such as payday loans and credit card debt. The Proposed Rule erroneously

1

purports to extend the definition of credit to include all EWA products, but it does so by misstating and mischaracterizing them and ignoring their key differences from loans.

Second, the Proposed Rule is procedurally improper because it is not the "interpretive rule" it purports to be. Instead, the Proposed Rule effectively is a new legislative rule that imposes a host of new obligations and the threat of new enforcement action on EWA providers, all without the CFPB having undertaken standard and legally required processes in order to do so. If it were to adopt the Proposed Rule as an "interpretive rule," the CFPB would be acting in contravention of well-established separation of powers principles.

Third, the Proposed Rule would harm consumers, employers, and EWA providers by causing consumer confusion and market dislocation; limiting consumer choice; pushing consumers into more expensive or inaccessible alternatives in which they are subject to credit checks and consumer reporting; and undermining consumer access to liquidity.

We urge the CFPB to withdraw its Proposed Rule and to instead defer to the ongoing, robust considerations of the appropriate regulation of EWA products that are already underway in legislative branches of government at both the state and federal levels. Recognizing that existing statutory schemes for credit products do not fit EWA products, numerous state legislatures have adopted or considered legislation concerning EWA products. In addition, the House Financial Services Committee, too, has been considering consumer protection legislation addressing EWA products on the federal level. To the extent a new approach is needed to address the innovative products introduced by EWA providers, that approach should come from these bodies of elected representatives and not the CFPB. The Bureau should work with Congress and with other stakeholders on appropriate EWA legislation. The CFPB should not attempt to usurp that process by pushing to adopt the Proposed Rule. To do so would be imprudent and incongruent with the distinct roles bestowed upon agencies and Congress in addressing policy questions.

## I.      The Proposed Rule Upends Longstanding Expectations About EWA Products

Recent advances in technology have made it possible for workers to access their earned wages in advance of their regular, often bi-weekly pay cycles (referred to here as "EWA products"). Innovative companies in the Fintech space, including AFC members, have developed technology solutions for employees and employers that solve the problem of the paycheck cycle and provide access to the funds a worker has already earned—avoiding the need of having to take out a loan. Consistent with the CFPB's prior guidance, most consumers recognize EWA as a product category distinct from lending.

### A.      EWA Products Do Not Involve Lending Money

For over a century, payroll processes have been trapped in legacy batch-payment cycles, where workers incur a right to payment weeks to a month before they are actually paid. Various surveys have shown that the number of U.S. workers living paycheck-to-paycheck has been growing due to a rising cost of living—whether increased inflation (*e.g.*, rising cost of transportation, groceries,

and other necessities), higher interest rates leading to higher minimum payments, or otherwise.[1] The realities of inflation, wage stagnation, and increasing costs of living, combined with the benefits of modern technology, have led many of today's workers to seek out products that offer "short-term liquidity"—cash in the immediate or near term—including by obtaining their pay in between pay dates. This trend will only continue, as studies show that most millennial and Gen-Z workers increasingly want their pay as soon as it is earned, and are more likely to work at a job where they are paid daily.[2]

EWA products use payroll data to accurately provide a portion of the employee's wages between employer pay dates. The data may come from integration with the employer's payroll system or bank information. It may also come from consumer-provided pay stubs or other data points like geolocation data, timesheets, payroll API, email verification, and automated financial account data. EWA is, therefore, a modern solution to a payroll problem that leverages technology to enable short-term liquidity for consumers by allowing them to access their own earned wages. This provision of funds is not an advance on future earnings—it is an assessment of what the employee has already earned based on real data.

Innovation in the EWA space has led to a variety of product structures now present in the market. Two primary models in the market are (1) the employer-sponsored or employer-partnered model (often referred to as employer-integrated in state and federal laws and legislative frameworks) and (2) the direct-to-consumer model. In the employer-sponsored model, employers choose to partner with EWA providers to offer EWA as an employee benefit. The EWA service is integrated into the employer's payroll system, based on employer-verified wages. Direct-to-consumer models operate independently of employers, allowing consumers to access their earned but unpaid wages through an app or platform. While the employer-based model is often seamless, the direct-to-consumer approach offers broader accessibility to workers whose employers do not participate in an EWA program. Regardless of the model, EWA providers, including AFC's members, offer crucial services to consumers, giving them access to their earned but unpaid wages and to a non-lending option that can fit their needs. Consumers have access to these services without having to suffer the potential negative impacts of a credit check, or the risks of interest rates, predatory debt cycles, recourse, negative credit reporting of unrepaid funds, and aggressive debt collection activities.

An EWA transaction begins with an individual having a current right to payment of a sum certain on a certain date in the future. The individual has already done the work, and they are entitled to payment for that work by their employer. In turn, the EWA provider makes a certain amount of the already earned wages available to the individual. When the earned wages are later paid by the employer, the amount previously liquidated is sent to the provider. The worker may be provided earned wage access for free, for a flat fee, or for a fee in connection with a subscription for a group of services including EWA. Workers may have the option to pay a fee to expedite the transfer. A

---

[1] *See, e.g.*, Emily Batdorf, *Living Paycheck to Paycheck Statistics 2024*, Forbes (Apr. 2, 2024), https://www.forbes.com/advisor/banking/living-paycheck-to-paycheck-statistics-2024/.
[2] *See Wages and Wellbeing: Analyzing the Impact of Same-Day Pay*, Instant, https://www.instant.co/whitepaper/wages-wellness-study/; Josh Bersin, *On-Demand Pay: Real-Time Pay to Make Workers Happy*, DailyPay, https://www.dailypay.com/wp-content/uploads/OnDemandPay_Josh-Bersin.pdf.

small number of providers also allow consumers to voluntarily provide a tip. Any fees or opportunities to tip are clearly disclosed prior to completion of the EWA transaction.

EWA transactions involve no interest and no obligation to repay. No fee is variable or dependent on the time between the EWA provider paying the employee their earned wages and receiving payment. In other words, *there is no interest component*. If the employer does not pay the wages and the worker does not receive the wages, no amounts are owed by the worker to the EWA provider—meaning that the worker has *no obligation to pay*. The EWA provider taking a loss may preclude the worker's use of the service in the future, but the provider has no recourse to seek payment from the employee if an employer fails to pay the wages.

      B.      *Preexisting Guidance Recognized the Distinction Between EWA Products and Loans*

Before the CFPB's July 18, 2024 notice of the Proposed Rule, legal authorities had recognized the distinction between EWA products and loans. Indeed, for almost a decade, government agencies, including the Bureau and state legislatures, have recognized that some or all EWA transactions are not "credit" for purposes of the Truth in Lending Act (TILA). For example, in its 2017 Payday Lending Rule, the CFPB excluded "programs that provide innovative access to consumers' wages," noting that some wage access programs were likely not credit, and others that arguably were would be excluded from the Proposed Rule if they met certain conditions, including a lack of recourse for an employee's failure to repay the transaction amount.[3] The CFPB determined that programs that provide consumers access to their earned wages "do not seem to pose the kinds of risks and harms presented by covered loans."[4]

Approximately three years later, the CFPB reiterated and expanded upon this view in a 2020 Advisory Opinion on EWA products. In concluding that EWA programs are not "credit," the CFPB stated that "debt" is a "liability on a claim," and "no such liability of the employee arises" in EWA transactions.[5] The CFPB explicitly noted that the substance of EWA transactions is more like an employer paying an employee early than a lender making a loan.[6] The Treasury Department has echoed this approach, proposing in 2022, 2023, and 2024 to amend the Internal Revenue Code to clarify that EWA products are not loans and to define them as "an arrangement that allows employees to withdraw earned wages before their regularly scheduled pay dates."[7]

---

[3] *See* CFPB, *Payday, Vehicle Title, and Certain High-Cost Installment Loans*, https://www.regulations.gov/document/CFPB-2016-0025-211926.

[4] *Id.*

[5] *See* Truth in Lending (Regulation Z); Earned Wage Access Programs, 85 Fed. Reg. 79404, 79406 (Dec. 10, 2020) (to be codified at 12 C.F.R. PT. 1026) (hereinafter the "Advisory Opinion").

[6] *See id.* ("[T]he Bureau believes that a Covered EWA Program facilitates employees' access to wages they have already earned, and to which they are already entitled, and thus functionally operates like an employer that pays its employees earlier than the scheduled payday.").

[7] Dep't of Treasury, *General Explanations of the Administration's Fiscal Year 2023 Revenue Proposals* 107 (2022); Dep't of Treasury, *General Explanations of the Administration's Fiscal Year 2024 Revenue Proposals* 208 (2023); Dep't of Treasury, *General Explanations of the Administration's Fiscal Year 2025 Revenue Proposals* 233 (2024).

Further, several state legislatures have passed legislation, with broad bipartisan support, that confirms that EWA products are not credit.[8] The state attorneys general of Arizona and Montana have issued opinions concluding that certain EWA products are not credit.[9] In addition, EWA-focused legislation has been introduced in more than a dozen states, most of which explicitly state that EWA products are not credit or loans.[10] In addition, Congress is currently considering a bill that would impose specific requirements on EWA providers and would define EWA as *not* consumer credit under TILA.[11]

The understanding that EWA products are not credit is further confirmed by case law. A key distinction between EWA products, on the one hand, and credit or loans on the other, is that EWA products are non-recourse transactions where the EWA consumer has no legal obligation to repay—features that have been recognized by various courts as indicative of whether a transaction is a loan.[12] If the EWA provider is unable to recoup its payment to the consumer through payroll deductions or other agreed upon methods, the provider has no recourse and accepts the loss. However, with EWA products, the consumer transfers to the provider the risk of nonpayment of a future payment, so the transaction cannot be a loan or credit.

To be sure, given the recent development of EWA as a consumer product category, thought should be given to solidify an appropriate consumer protection regime for EWA products. However, such a regime should be developed by Congress, not by the CFPB. Moreover, AFC has in the past supported state-level legislative frameworks that impose licensure and other consumer protective requirements but also recognize the non-credit characteristics of EWA products. AFC recognized that such nuanced treatment and consumer protections are warranted in its February 7, 2024 Letter to Director Chopra. The CFPB has rejected AFC's efforts to engage about appropriate regulation, and Congress has since implicitly recognized, through introduction of the Earned Wage Access

---

[8] *See, e.g.*, Nev. Rev. Stat. Ann. § 604D.190(1); Mo. Ann. Stat. § 361.749(6); S.C. Code Ann. § 39-5-860; Kan. Stat. Ann., Ch. 64 § 44.

[9] 2022 Op. Ariz. Att'y Gen. No. I22-005; 2023 Op. Mont. Att'y Gen. Vol. 59, No. 2.

[10] *See, e.g.*, H.B. 4456, 193rd Gen. Ct. (Mass. 2024); S.B. 1273, 56th Leg., 2nd Reg. Sess. (Ariz. 2024); H.B. 5140, 2024 Gen. Assemb., Feb. Sess. (Conn. 2024); S.B. 1146, 2024 Gen. Assemb., Reg. Sess. (Fla. 2024); S.B. 2648, 2023 Leg., Reg. Session (Miss. 2023); S.B. 442, 2023 Gen. Assemb., Reg. Sess. (N.C. 2023); S.B. 2245, 88th Leg., Reg. Sess. (Tex. 2023); H.B. 370, 2021 Leg., Reg. Sess. (Utah 2021); H.B. 87, 2023 Leg., Reg. Sess. (Vt. 2023); H.B. 1921, 2-23 Leg., Reg. Sess. (Va. 2023). In Connecticut, a bill was introduced in response to guidance published by the Connecticut Banking Commissioner in September 2023 that sought to require EWA products to comply with laws and regulations designed for small loans. *See* Conn. Banking Comm'r, *Department of Banking Issues Industry Guidance Regarding Public Act 23-126* (Sept. 11, 2023). Other states have also considered legislation on this topic. *E.g.*, S.B. 2397, 220th Leg., Reg. Sess. (N.J. 2022); H.B. 332, 2024 Gen. Assemb., Reg. Sess. (Ky. 2024). In Hawaii, where the legislature desired for the product to be regulated as credit, it explicitly acknowledged that existing credit statutes do not reach EWA and amended the credit-based statutes to cover it. *See* S.B. 2664, 32nd Leg., Reg. Sess. (Haw. 2024).

[11] Earned Wage Access Consumer Protection Act, H.R. 7428, 118th Cong., 2d Sess. (2024).

[12] *See S & H Packing & Sales Co. v. Tanimura Distrib., Inc.*, 883 F.3d 797, 808 (9th Cir. 2018) (agreeing with the Second, Fourth, and Fifth Circuits that the risk of nonpayment is a key factor in determining whether a transaction is a loan or a sale); *see also Haymount Urgent Care PC v. GoFund Advance, LLC*, 609 F. Supp. 3d 237, 247 (S.D.N.Y. 2022), *motion to certify appeal denied*, No. 22-CV-1245 (JSR), 2022 WL 3677931 (S.D.N.Y. Aug. 25, 2022).

Consumer Protection Act, that the CFPB does not currently have adequate statutory authority to regulate EWA.[13] The absence of a specific statutory regime authorizing regulation of EWA products does not mean the CFPB is free to simply reclassify EWA products as loans.

### C.    The Market Has Relied on the Difference Between EWA Products and Loans

Consumers generally understand that EWA products are distinct from loan products, as research shows. For example, in a November 2023 research study on EWA users, the Financial Health Network found that "nearly all participants" saw EWA products as "fundamentally different from a loan."[14] One participant explained, "A loan gives me access to something I need to earn in the future. EWA gives me access to something I've already earned."[15] Moreover, participants preferred EWA products to other short-term liquidity options.[16] In another study published by the Mossavar-Rahmani Center for Business and Government at the Harvard Kennedy School, about 70% of EWA users stated that EWA helped them stop or reduce reliance on these alternative financial services.[17]

In the wake of the pandemic—when costs for essential items skyrocketed and healthcare costs increased for many—consumers came to know and rely on the EWA industry, based on the premise that EWA products were an alternative to borrowing. Healthcare and other hourly workers increasingly requested EWA as an employee benefit, and given labor shortages during the pandemic, employers began offering EWA as a benefit to attract and retain workers. According to the CFPB's Data Spotlight, in 2022, approximately 10 million users accessed EWA products for a total of $31.9 billion.[18] This represents 7.2 million workers who used employer-sponsored EWA products to access $22.8 billion and approximately 3 million consumers using direct-to-consumer EWA products to access $9.1 billion.[19] This builds on the pre-pandemic growth of the EWA market, which, according to one study, tripled from $3.2 billion in 2018 to $9.5 billion in 2020.[20] About 80% of employers with 1,000 or more employees now offer EWA as an employee benefit.[21] Use of EWA products has further accelerated during the recent periods of high inflation, where it is harder for workers to pay bills and make ends meet between pay periods.

---

[13] H.R. 7428, 118th Cong., 2d Sess. (2024) (stating that EWA is not consumer credit and granting authority to the CFPB to regulate EWA).

[14] *See* Lisa Berdie & Riya Patil, *Exploring Earned Wage Access as a Liquidity Solution*, Financial Health Network 14 (2023), https://finhealthnetwork.org/wp-content/uploads/2023/12/EWA-Users-Report-2023.pdf.

[15] *Id.*

[16] *Id.* at 13-14.

[17] Marshall Lux & Cherie Chung, *Earned Wage Access: An Innovation in Financial Inclusion?*, Harvard Kennedy School 25 (2023), https://www.hks.harvard.edu/sites/default/files/centers/mrcbg/214_AWP_final_2.pdf.

[18] CFPB, *Data Spotlight: Developments in the Paycheck Advance Market* (July 15, 2024).

[19] *Id*.

[20] *See* Terri Bradford, *As Earned Wage Access Grows, Oversight Tries to Catch Up*, Federal Reserve Bank of Kansas City 3 (May 15, 2024), https://www.kansascityfed.org/Payments%20Systems%20-Research%20Briefings/documents/10170/PaymentsSystemResearchBriefing24Bradford0515.pdf.

[21] ADP, *Earned Wage Access: Tapping Into the Potential of Flexible Pay for Today's World of Work* 6 (2022), https://www.adp.com/-/media/adp/resourcehub/pdf/adp_ewa_study_whitepaper.pdf.

As the use of EWA products has increased, EWA providers have relied in part on the CFPB's 2020 Advisory Opinion in building and growing their businesses. Some EWA providers structured their offerings to the preexisting state of the law—*e.g.*, so as to constitute a "Covered EWA Program" as defined in the 2020 opinion. Providers who did so contract with employers to offer EWA to employees free of charge and recover the amount of the EWA transaction only through employer-facilitated payroll deductions. Other EWA providers developed their offerings to more broadly align with the characteristics of EWA transactions contemplated in the 2020 opinion. For example, all EWA providers—whether employer-sponsored or direct-to-consumer—limit the amount of EWA transactions so as to not exceed the estimated or actual value of the employee's earned wages up to the date and time of the transaction. In general, EWA providers retain no legal or contractual claims against consumers in the event of an incomplete deduction, and they do not assess the credit risk of consumers. These core features, which have shaped the development of the EWA industry, are drawn directly from the CFPB's guidelines as expressed in the 2020 opinion.

Consumers have come to rely on the ease and affordability of EWA products as compared to other short-term liquidity alternatives. In an internal study commissioned by an EWA provider, 81% of its customers who had used payday loans stopped using them after using EWA.[22] An analysis commissioned by another EWA provider found that nearly one-third of its customers used payday loans before using EWA, and only 9% used payday loans after. Similarly, many EWA customers reported having incurred overdraft fees to access money between paychecks, and substantially fewer reported incurring overdraft fees after beginning to use EWA products. One consumer said, "If I did not have access to [EWA provider], I'd probably be losing money with overdraft fees." Consumers intentionally choose EWA over costlier alternatives, and they understand the benefits EWA programs provide. For example, more than 70% of one EWA provider's customers said not having access to EWA would have a negative effect on their household, and that EWA helped them cope with the pressures of inflation.

###### D.    *The Proposed Rule Wrongly Reclassifies EWA Products as Loans*

The CFPB now proposes to adopt an inaccurate and expansive definition of "debt" as "any obligation by a consumer to pay another party," in a dramatic reversal of its narrower interpretation of the same word in 2020.[23] The CFPB reasons that EWA transactions are covered by TILA merely because consumers incur debt (under the Proposed Rule's new definition), with an obligation to repay the EWA provider, when they engage in EWA transactions. Specifically, the Proposed Rule incorrectly states that "in an earned wage transaction, the consumer incurs an obligation to pay money at a future date," and suggests all EWA transactions are "contingent obligations" like those covered by TILA.[24] The CFPB seems to suggest this is the case even where EWA transactions explicitly provide that they are non-recourse and that the worker has no obligation to repay the provider. The Proposed Rule then explains that TILA requires disclosures by providers that extend consumer credit subject to a finance charge, and concludes that EWA providers that earn any fees,

---

[22] The information provided in this paragraph was obtained through confidential studies and surveys commissioned by EWA provider members of AFC.

[23] *See* Truth in Lending (Regulation Z); Consumer Credit Offered to Borrowers in Advance of Expected Receipt of Compensation for Work, 89 Fed. Reg. 61358, 61360 (proposed July 31, 2024) (to be codified at 12 C.F.R. pt. 1026) (hereinafter the "Proposed Rule").

[24] *See id.*

gratuities, or other charges (regardless of the optional nature of any such charges), would be required to make such disclosures, because the fees are "finance charge[s] . . . incident to the extension of credit."[25]

At each step of its analysis, the CFPB employs a one-size-fits-all approach to a class of products that are distinct from loans, leading to broad and harmful consequences as discussed below in Section IV. The CFPB's new definition of "debt" as "any obligation by a consumer to pay another party" would encompass a whole host of transactions that are not "debt" under the commonsense understanding of that term. Further, the CFPB—based on the vague assertion that "some" EWA transactions have "an element of contingency"—groups all EWA transactions together with "contingent obligations" covered by TILA by reasoning that such transactions all bring about the consumer's "obligation to repay."[26] But in EWA transactions, the consumer has no obligation to repay the provider the amount provided. Having decided that EWA transactions are "credit" based on sparse analysis, the CFPB then determines that TILA disclosure rules apply because fees and other charges paid by EWA program users are "finance charge[s] . . . incident to the extension of credit."[27]

Nowhere does the Proposed Rule adequately explain either the CFPB's reversal from its prior guidance, nor the agency's basis for treating all EWA products as one homogenous group despite recognizing the diversity of offerings on the market. The Proposed Rule ignores the varying features and benefits of EWA offerings compared to each other and compared to costlier alternatives for short-term liquidity.

The Proposed Rule is *not* merely a disclosure rule that would increase transparency. It would effectively eliminate the EWA product category *as a distinct product offering* by classifying it as a loan, despite significant and—to consumers and workers—meaningful differences built into EWA products by design. Some such differences are identified above: Consumers have access to EWA services without having to suffer the potential negative impacts of a credit check, or the risks of interest rates, predatory debt cycles, recourse, negative credit reporting of unrepaid funds, and aggressive debt collection activities. There are other differences explained below: The amount of each EWA transaction is no more than the accrued cash value of the wages the employee has earned; and there is no interest and no costs or fees imposed based on the time between transfer of earned wages and payment by the employer. By homogenizing distinctly different products and lumping EWA products in with credit:

- The Proposed Rule would impose an entire compliance regime, currently targeted at loan products, upon EWA providers. EWA providers would need to restructure their businesses around that new regime or close.

- The Proposed Rule would most likely lead EWA providers to rearrange their offerings to mirror traditional loans to ensure compliance with inapposite regulations that were designed for credit products. In attempting to ensure compliance with obligations for credit products, EWA companies may be forced

---

[25] *Id.* at 61360-61.

[26] *Id.* at 61360.

[27] *Id.* at 61361-62.

to begin behaving more like lenders, including by, among other things, adding interest rates or running credit checks or adding other kinds of fees that banks are able to charge—creating the very "race-to-the-bottom"[28] scenario the CFPB said it was trying to avoid in proposing the Rule.

- Without reason or the ability for providers to offer EWA products in the manner they do, the features that draw consumers to most EWA providers currently—including the lack of a credit check, credit impact, and interest rate—are likely to disappear.

The Proposed Rule would harm consumers and force all EWA providers who do not offer bank-issued loans to convert their offerings into credit offerings, with all the attendant changes that would eliminate the reasons most consumers seek out—and EWA providers offer—EWA products in the first place. In short, the Proposed Rule would re-design EWA products in a manner never intended by the industry to the detriment of consumers and the EWA providers.

Finally, new compliance programs would increase costs and risk putting many smaller EWA providers out of business. Many members of AFC are small businesses for whom dramatic increases in compliance costs or in researching and restructuring business models to ensure compliance will be too large to bear. The market for responsible short-term liquidity will shrink—and consumers will lose an important choice, leaving them with fewer options to ease the demands of inflation and inconvenience of delayed pay.

## II.    TILA Does Not Apply to EWA Products

The CFPB cannot use the Proposed Rule to transform EWA products into lending products and then subject them to regulation as loans. As a definitional matter, EWA products are not credit or debt. The CFPB's actions are contrary to law.

### A.    Liquidating a Right to Future Payment Is Not Credit

EWA products are the monetization of an existing right to payment of earned wages. This is a clear and established concept that is substantively distinct from concepts of credit and debt. Shoehorning a product category that is the epitome of a non-credit liquidity solution into a statute and regulation specifically limited to credit products is irrational, lawless, and should be abandoned.

There is a well-established track record that transactions structured like EWA products are not credit. For instance, in personal finance, there has long been a practice of monetizing a stream of payments—such as an annuity, structured settlement, or periodic lottery payout for a cash sum—without the need for credit.[29] Similarly, in commercial finance, rights to single payment amounts

---

[28] Press Release, CFPB, *CFPB Proposes Interpretive Rule to Ensure Workers Know the Costs and Fees of Paycheck Advance Products* (July 18, 2024), https://consumerfinance.gov/about-us/newsroom/cfpb-proposes-interpretive-rule-to-ensure-workers-know-the-costs-and-fees-of-paycheck-advance-products/.
[29] *See Capela v. J.G. Wentworth, LLC*, No. 09-cv-00882, 2009 WL 3128003, at *10 (E.D.N.Y. Sept. 24, 2009) (considering structured settlement rights in connection with TILA).

are monetized through factoring, and such transactions are not considered a loan or debt.[30] Further, annuity factoring companies convert all or part of an annuity payment stream to cash; that right to cash is not considered a loan or debt, and the CFPB has recognized that the protections of Regulation Z are not necessary for these products.[31] Caselaw recognizes this category of products as distinct from debt and credit.[32]

Here, technological innovation has allowed EWA companies, like AFC's members, to offer products turning an existing right to payments into cash for individuals in relatively small amounts. The nature of the transaction for individuals remains the same as those described above: the liquidation of an asset for cash. In short, EWA transactions are not credit transactions; instead, the EWA provider is focused on the existing right of already earned wages paid in the future by a third party. At the beginning of the transaction, the worker has a right to earned funds, and the transaction converts that right in whole or in part into cash. The foundational characteristics of the EWA transaction are completely inconsistent with credit and debt:

- The amount of each EWA transaction is no more than the accrued cash value of the wages the employee has earned up to the date and time of the transaction.

- No credit check is conducted because credit is not being issued and the only issue is the right to payment of earned wages.

- There is no interest calculation, including no costs or fees imposed based on the time between transfer of earned wages and payment by the employer.

- There are no debt collection activities or recourse to the consumer.

Finally, and as relevant to consumer disclosures, consumers are informed they have no affirmative obligation to repay the amount, they are not required to pay fees for access to earned wages, that there will be no collection activities, and the provider will have no claim against the employee if the funds are insufficient at the time of withdrawal to cover the full amount of the transaction.

B.      *EWA Products Do Not Fit the Legal Definition of Credit or Debt*

As the above discussion makes clear, EWA transactions lack characteristics of credit or debt, as those terms are commonly used. Specifically, this is because:

---

[30] *See* Linda Lorber, *How to Use Factoring for Cash Flow*, Wall Street Journal (Sept. 11, 2008), https://www.wsj.com/articles/BL-HOWTOSBB-20 (noting ways in which factoring is distinct from loans).
[31] *See* 12 C.F.R. § 1026.2, cmt. 2(a)(14)(1)(iii) (noting that insurance premium plans that involve installment payments are not considered credit); *see also* Terry Turner, *Selling Annuity FAQs*, Annuity.org (May 8, 2024), https://www.annuity.org/selling-payments/faqs/ (explaining the offerings of annuity factoring companies).
[32] *E.g.*, *Quantum Cap. Funding Corp. v. PDI Grp., Inc.*, No. 18-CV-03279, 2022 WL 2974693, at *4 n.3 (E.D. Cal. July 27, 2022), *report and recommendation adopted*, No. 18-CV-03279, 2022 WL 3371654 (E.D. Cal. Aug. 16, 2022) (noting that "factoring . . . is not per se a loan" (alterations omitted)).

- A lending relationship requires an absolute deferred payment obligation of the amount at issue.[33] In EWA transactions, the individual has no future obligation, including no obligation to make a payment from the individual's other funds.

- A credit or debt transaction entails the creditor having recourse for nonpayment, including the pursuit of collection and other remedies to seek repayment.[34] With EWA products, the risk of non-payment is transferred to the EWA provider, meaning that the provider may incur a loss without recourse to the consumer.

- A credit or loan transaction requires an obligation to repay.[35] With EWA products, there is no such obligation.

TILA's definition of credit is not broader than common usage, so EWA products do not meet TILA's definition. TILA and Regulation Z apply to "credit" which is defined as "the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment."[36] "Debt" is not defined. To be sure, Congress recognized that not all credit products need the disclosure requirements of TILA [37] and empowered the CFPB to exclude credit products from the requirements if it deems the disclosures unnecessary.[38] But the CFPB was explicitly limited to and cannot go beyond credit products when applying TILA disclosure requirements. And that is what the CFPB is trying to do here: go beyond credit products to apply TILA to a non-credit product. AFC and its members believe that the agency should not attempt this endeavor.

The CFPB's reverse-course of suddenly deciding that EWA falls within the existing definition of credit in TILA is not only unmoored from the reality of how EWA transactions work, but also inconsistent with fundamental principles of separation of powers. TILA has not been amended by Congress, and the CFPB has no authority to legislate through the Proposed Rule.

---

[33] *See CFPB v. Snap Fin., LLC*, No. 23-cv-00462, 2024 WL 3625007, at *7 (D. Utah Aug. 1, 2024) (rejecting CFPB's argument that lease-to-own agreement was a *de facto* credit agreement under TILA because, *inter alia*, there was no absolute obligation to pay the entire lease amount); *cf. Laramore v. Ritchie Realty Mgmt. Co.*, 397 F.3d 544, 545 (7th Cir. 2005) (focusing on whether an obligation to pay an amount under all circumstances is the key inquiry as to whether a lease was credit under ECOA); *Shaumyan v. Sidetex Co.*, 900 F.2d 16, 18-19 (2nd Cir. 1990) (holding progress payments made "substantially contemporaneous" with completed milestones were not "deferred payment" and not "credit" under the Equal Credit Opportunity Act).

[34] *See Haymount Urgent Care PC v. GoFund Advance, LLC*, 609 F. Supp. 3d 237, 247 (S.D.N.Y. 2022), *motion to certify appeal denied*, No. 22-CV-124, 2022 WL 3677931 (S.D.N.Y. Aug. 25, 2022); *see also S & H Packing & Sales Co. v. Tanimura Distrib., Inc.*, 883 F.3d 797, 808 (9th Cir. 2018).

[35] *See In re Rezendes*, 324 B.R. 689, 694 (N.D. Ind. 2004) ("Because there is no obligation to repay, this cannot be a loan."); *see also Lend*, Black's Law Dictionary (12th ed. 2024) (defining lend as "provid[ing] (money) temporarily on condition of repayment"); *see also Reed v. Val-Chris Inv., Inc.*, No. 1-cv-371, 2011 WL 6028001, at *2 (S.D. Cal. Dec. 5, 2011) (holding transaction was not a credit transaction subject to TILA where there was no recourse if future payments from third party were less than expected); *Odier v. Hoffmann Sch. of Martial Arts, Inc.*, 619 F. Supp. 2d 571, 577 (N.D. Ind. 2008) (explaining that "the term 'debt' [as used in TILA] likely refers to a legally enforceable obligation to pay money").

[36] 15 U.S.C. § 1602(f).

[37] *See* 15 U.S.C. § 1603.

[38] 15 U.S.C. § 1603(5).

11

## C.    EWA Products Do Not Have "Finance Charges"

The conclusion of the Proposed Rule that optional tips or voluntarily incurred expedited transfer fees are finance charges is equally flawed. The CFPB contends that such tips and fees are "finance charges" because they are purportedly "imposed by" the creditor. Of course, EWA providers are not "creditors" in the context of EWA transactions because they are not credit transactions. However, beyond that, the CFPB reaches for a definition of "imposed" that includes any cost involved in the transaction, even including circumstances in which the provider does not require it and does not have any control over the worker's choice of whether to make a payment of any fee or charge at all. This is contrary to the plain meaning of the words "imposed by."[39] The awkward application of the term "finance charges" to the fees involved in an EWA transaction illustrates how ill-suited TILA and Regulation Z are as vehicles for regulating EWA.

Moreover, expedited transfer fees and convenience fees for expedited payments are charged in all kinds of financial services. For example, when paying a bill, one may choose to pay for a bank wire, instant payment delivery via a real-time payment (RTP) network, a next day expedited check, a two-day expedited check, same day ACH transfer, or even to use a debit card for faster payment of a credit card balance.[40] Even though there may be fees associated with those forms of expedited payments, none of them is regulated as a finance charge. These are just a handful of voluntarily incurred expedited transfers that highlight why a categorical rule that any and all tips and expedited transfer fees are finance charges would be misguided and inconsistent with existing law and regulation.[41] The CFPB cannot deem all tips and fees "finance charges" without any connection to actual facts.

---

[39] *See O'Brien v. J.I. Kislak Mortg. Corp.*, 934 F. Supp. 1348, 1357 (S.D. Fla. 1996) (stating that the court "must examine the facts surrounding the imposition of that fee to determine whether the creditor either directly or indirectly *required that fee* so as to come under the definition of a finance charge") (emphasis added)); *see also* 82 Fed. Reg. 54547 ("Some [EWA providers] are providing advances of funds and are doing so without charging any fees or finance charges, for instance by relying on voluntary tips."); 15 U.S.C. § 1605 (noting that "finance charge[s] shall not include fees and amounts" charged by third-party agents "if the creditor does not *require* the imposition of the charges") (emphasis added).

[40] Some state credit services laws recognize this distinction. *E.g.*, Ind. I.C. § 24-4.5-2-202, *available at* https://iga.in.gov/laws/2023/ic/titles/24#24-4.5. The February 2010 final rule from the Board of Governors of the Federal Reserve System, implementing the Credit Card Accountability Responsibility and Disclosure Act (Credit CARD Act) generally prohibited card issuers from imposing a separate fee to allow a consumer to repay an extension of credit or pay a finance charge, unless the payment involves an expedited service by a customer service representative. Section 226.10(e) implemented this requirement and defined "expedited payment" as crediting a payment to the account on the same day or, if the payment is received after the creditor's cutoff time, the next business day. The CFPB previously recognized this example. *See Can My Credit Card Company Charge a Fee Based on How I Paid My Bill, Such as for Making a Payment Over the Phone?*, CFPB (Aug. 27, 2020), https://www.consumerfinance.gov/ask-cfpb/can-my-credit-card-company-charge-a-fee-based-on-how-i-paid-my-bill-such-as-for-making-a-payment-over-the-phone-en-60/.

[41] Whether tips or expedited transfer fees are finance charges is at best a fact-specific determination, dependent on the details of a product that are not discussed in the Proposed Rule.

D.    *Disclosures Under TILA Will Mislead Consumers*

The goal of the TILA disclosure regime is to inform consumers, not mislead them. However, forcing EWA providers to make disclosures to consumers as if they are loans will actually be misleading and confusing to consumers. Pursuit of disclosures in the manner required by the Proposed Rule is also antithetical to the principles underpinning the Unfair, Deceptive, or Abusive Acts or Practices (UDAAP) provisions enforced under CFPB's authority, because the disclosures would confuse consumers, erode consumer confidence, and undermine the financial marketplace.

Applying a TILA framework to EWA products would lead to significant confusion. As described above, consumers know the difference between lending products and EWA products, and they choose EWA products so as not to partake of the features of loans. Thus, if TILA were to apply as a result of new CFPB guidance, any required disclosures would actually mislead users into mistakenly believing use of the product involves interest, including fees would increase based on the time between disbursement of the earned wages and payment by the employer, or that it imposes on the user an obligation to repay. Forcing EWA products into the TILA regime will burden consumers with misleading disclosures and indicate to them that all the features they were intending to avoid would now be in play.

Further, there is no reason to impose the TILA disclosure regime on the EWA product category. EWA providers already disclose relevant optional fees and/or tips, and consumers therefore already know what the potential costs of EWA are before they make any payments. Many EWA providers have no fees or fees so low as to be exempt in any event. Forcing EWA to alter their disclosures to fit into an inapplicable lending disclosure regime would not serve consumers and would not solve any existing problem in the marketplace. It would instead merely cause confusion.

## III.    The CFPB Misclassifies the Proposed Rule as Interpretive

In addition to these fatal substantive defects, fundamental procedural defects further invalidate the Proposed Rule. The CFPB has purported to issue an "interpretive rule" that merely advises on the agency's interpretation of preexisting law or regulation. But contrary to the CFPB's categorization, the Proposed Rule is a legislative rule, not an interpretive rule. The Proposed Rule would effectively enact new legislation through which an entire product category, EWA, is transformed into a lending product subject to TILA's regulatory regime. The practical effect of the CFPB's purportedly "interpretive" rule is that providers of EWA products will have to comply with a burdensome regulatory regime that did not previously apply to them—the hallmark of a legislative rule. Thus, even assuming the CFPB had the statutory authority to classify EWA as "credit"— which, as explained above, it does not—the Proposed Rule would still be procedurally infirm because of the CFPB's inaccurate categorization of the rule as "interpretive."

A.    *The Proposed Rule is Legislative, Not Interpretive*

The Administrative Procedure Act (APA) distinguishes between legislative and interpretive rules. Legislative rules "impose legally binding obligations or prohibitions on regulated parties," and, as a result, can "be the basis for an enforcement action for violations of those obligations or

13

requirements." [42] By contrast, interpretive rules merely "advise the public of the agency's construction of the statutes and rules which it administers."[43] Courts regularly vacate rules on the ground that the agency erroneously characterized the rule as interpretive rather than legislative. [44] Here, the Proposed Rule is legislative because it "create[s] new legal obligations" on parties subject to the Rule.[45]

Prior to the Proposed Rule, EWA providers were not subject to TILA disclosure obligations. The 2020 Advisory Opinion was an interpretive rule under the APA.[46] By promulgating an interpretive rule stating that EWA products were *not* "credit" under TILA, the CFPB effectively tied its own hands—the CFPB's interpretive rule made it impossible for the CFPB to bring TILA enforcement actions against EWA providers. The 2020 Advisory Opinion notes: "By operation of TILA section 130(f), no provision of TILA sections 130, 108(b), 108(c), 108(e), or 112 imposing any liability applies to any act done or omitted in good faith in conformity with this interpretive rule, notwithstanding that after such act or omission has occurred, the interpretive rule is amended, rescinded, or determined by judicial or other authority to be invalid for any reason."[47] If the CFPB had brought an enforcement action against an EWA provider while the prior interpretive rule was still in effect, such an action would have been dismissed, either because the interpretive rule was binding on the agency under § 1640(f) and the 2020 Advisory Opinion's plain terms, or because the enforcement action violated EWA providers' due process right to fair notice.[48] Thus, under the prior regime, EWA providers were effectively under no legal obligation to follow TILA's disclosure requirements.

If the CFPB promulgates its new "interpretive" rule, that safe harbor would be gone. By reclassifying EWA products as consumer credit, CFPB would mandate new TILA disclosure obligations for EWA providers. Moreover, the Proposed Rule effectively imposes a suite of additional requirements, including subjecting EWA providers to usury limits, requiring credit risk assessments, and subjecting EWA customers to debt collection. By declaring that certain EWA

---

[42] *See Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 251 (D.C. Cir. 2014).

[43] *See Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 97 (2015).

[44] *See, e.g.*, *Flight Training Int'l, Inc. v. Fed. Aviation Admin.*, 58 F.4th 234, 243-44 (5th Cir. 2023) (rule that amended prior legislative rule was legislative, not interpretive); *Child.'s Hosp, of the King's Daughters, Inc. v. Azar*, 896 F.3d 615, 620-21 (4th Cir. 2018) (FAQ that set forth policies that did not appear in pre-existing rule was legislative, not interpretive); *Child.'s Health Care v. Ctrs. of Medicare and Medicaid Servs.*, 900 F.3d 1022, 1026 (8th Cir. 2018) (same).

[45] *Chem. Waste Mgmt., Inc. v. U.S. Env't Prot. Agency*, 869 F.2d 1526, 1534 (D.C. Cir. 1989); *see also Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1051 (D.C. Cir. 1987) (noting a rule that creates "new burdens," among other new requirements, "would surely require notice and comment, as well as close scrutiny to insure that it was consistent with the agency's statutory mandate").

[46] *See* Advisory Opinion, 85 Fed. Reg. at 79408 ("This advisory opinion is an interpretive rule issued under the Bureau's authority to interpret TILA and Regulation Z").

[47] *Id.*; *see* 15 U.S.C. § 1640(f).

[48] *See Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 567-68 (1980) (Section 1640(f) "signals an unmistakable congressional decision to treat administrative rulemaking and interpretation under TILA as authoritative"); *cf. Metro. Sch. Dist. v. Davila*, 969 F.2d 485, 493 (7th Cir. 1992) ("All rules which interpret the underlying statute must be binding because they set forth what the agency believes is congressional intent. Could an agency announce, 'We think Congress intended this when it enacted this statute, but you don't have to do it.'?").

products trigger obligations under TILA—which they previously did not—the CFPB has promulgated a rule with the force of law, not merely "put[] the public on notice of *pre-existing* legal obligations or rights."[49]

The CFPB's own actions and statements also demonstrate that the Proposed Rule is a legislative rule subject to the APA's notice-and-comment requirements. The CFPB published the Proposed Rule in the Federal Register. "By statute, publication in the Code of Federal Regulations is limited to rules 'having general applicability and *legal effect*.'"[50] The CFPB "explicitly invoked its general legislative authority" in the Proposed Rule,[51] noting it was "issued under the CFPB's authority to interpret TILA and Regulation Z, including under section 1022(b)(1) of the Consumer Financial Protection Act of 2010."[52] Critically, "the rule will produce significant effects on private interests," namely businesses that relied on the prior guidance.[53] These characteristics make clear that the CFPB's Proposed Rule is legislative in nature.

As discussed above, EWA businesses, including AFC members, substantially relied on the 2020 guidance, arranging their affairs around the conclusion that their products were not credit and therefore not subject to disclosure requirements. Each of these factors is alone sufficient,[54] but taken together they demonstrate that the Proposed Rule is legislative.

### B.    Allowing for Informal Notice and Comment Does Not Salvage the Proposed Rule

Under the APA, legislative rules require notice-and-comment rulemaking, while interpretive rules do not.[55] The CFPB has classified the Proposed Rule as an "interpretive rule" but has nonetheless provided that it "is soliciting comments on the proposal and *may* make revisions when it issues a final interpretive rule as appropriate in light of feedback received."[56] Notably, the Proposed Rule asserts that it is "not required under the APA" to follow formal notice-and-comment procedures.[57]

The CFPB's erroneous classification of the Proposed Rule as interpretive is a fundamental procedural defect, and the CFPB's purportedly voluntary decision to provide for notice-and-comment rulemaking does not cure that defect. First, the CFPB's mischaracterization of this rule demonstrates that it does not understand—or at least, refuses to admit—the stakes of what it is doing. By overturning a safe harbor on which EWA providers have reasonably relied, the CFPB is unsettling a legal regime and undermining reliance interests. Yet by classifying the new rule as "interpretive," the CFPB is suggesting that it is merely clarifying what the law always was, rather than imposing new burdens that did not previously exist. It is not clear whether the CFPB does not

---

[49] *Nat. Res. Def. Couns. v. Wheeler*, 955 F.3d 68, 83 (D.C. Cir. 2020).

[50] *Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1, 19 (D.C. Cir. 2019) (quoting 44 U.S.C. § 1510(a)).

[51] *Id.* (quoting *Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1112 (D.C. Cir. 1993).

[52] Proposed Rule, 89 Fed. Reg. at 61363.

[53] *Mock v. Garland*, 75 F.4th 563, 580 (5th Cir. 2023) (quoting *Cargill v. Barr*, 502 F. Supp. 3d 1163, 1184 (W.D. Tex. 2020)).

[54] *See Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1112 (D.C. Cir. 1993) ("If the answer to any of these questions is affirmative, we have a legislative, not an interpretive rule.").

[55] 5 U.S.C. § 553(b)(A).

[56] Proposed Rule, 89 Fed. Reg. at 61363.

[57] *Id.*

realize it is changing the law or does realize it but nonetheless believes that inaccurately characterizing the Proposed Rule as interpretive is more convenient. Either way, an agency that changes prior law without acknowledging what it is doing is definitionally engaging in arbitrary and capricious agency action, regardless of whether it solicits comments.[58]

Second, by openly declaring that the notice-and-comment rulemaking process is unnecessary, the agency is preemptively declaring that it does not need to carefully consider the comments it receives—a lackadaisical approach to the rulemaking process that may make the Rule vulnerable in court. Notice-and-comment rulemaking requires not only that the agency issue a notice in the Federal Register and solicit comments, but also that it "consider and respond to significant comments received during the period for public comment."[59] AFC hopes that the CFPB will meaningfully consider the comments it receives.

Finally, the CFPB's erroneous classification of the Proposed Rule as interpretive will result in a violation of the Regulatory Flexibility Act (RFA), as amended by the Small Business Regulatory Enforcement Fairness Act (SBREFA).[60] Under the RFA and SBREFA, an agency must generally conduct an initial and final regulatory flexibility analysis of any rule subject to notice-and-comment rulemaking.[61] The CFPB must also, among other things, convene a panel to consult with small business representatives prior to publishing the initial regulatory flexibility analysis.[62] The CFPB is exempt from these requirements if it certifies that the rule will not have a significant economic impact on a substantial number of small entities[63]—but the CFPB never provided such a certification, nor would such a certification be possible given that many EWA providers, who would be harmed by the Proposed Rule if it is finalized, are small businesses. The CFPB apparently believes that it is exempt from the RFA because the Proposed Rule is an interpretive rule for which notice-and-comment rulemaking is not required.[64] As explained above, that belief is wrong. The Proposed Rule is legislative, and compliance with the RFA and SBREFA is therefore mandatory. The CFPB's failure to comply with the RFA and SBREFA will result in the Proposed Rule being vacated by a reviewing court.

### C.    The CFPB's Explanation for the Proposed Rule Is Inadequate

Even assuming the new rule is properly classified as interpretive, which it is not, it is still arbitrary and capricious under the APA and violates the procedural requirements of the Dodd-Frank Act.[65]

---

[58] *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) ("[T]he requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it *is* changing position").

[59] *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015).

[60] *See* 5 U.S.C. § 601 *et seq.*

[61] *See id.* §§ 603, 604, 609.

[62] *Id.* § 609(b).

[63] *See id.* § 605(b).

[64] *See id.* § 603(a) (noting that compliance with RFA is required only when, as relevant here, "an agency is required by section 553 of this title, or any other law, to publish general notice of proposed rulemaking for any proposed rule").

[65] *See Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 106 (2015) (noting that "an agency's decision to issue an interpretive rule" is subject to "the arbitrary and capricious standard"); *Mock v. Garland*, 75 F.4th 563,

In general, "[t]he touchstone of arbitrary-and-capricious review is reasoned decision making."[66] Where, as here, an agency has engaged in a "new interpretive approach,"[67] and "its prior policy has engendered serious reliance interests," [68] the agency must provide a "more substantial justification" for its change in policy.[69]

As the CFPB previously explained in the 2020 Advisory Opinion, the definition of "credit" turns on the meaning of "debt," which is not defined by Regulation Z or by TILA. The CFPB provided that "[t]he common meaning of the term debt is a '[l]iability on a claim; a specific sum of money due by agreement or otherwise.'"[70] The CFPB "determined that no such liability of the employee arises in the context of a Covered EWA Program" because "a Covered EWA Program facilitates employees' access to wages they have already earned, and to which they are already entitled, and thus functionally operates like an employer that pays its employees earlier than the scheduled payday."[71] Accordingly, as the Proposed Rule notes, the 2020 Advisory Opinion provided:

> [A]n earned wage product is not TILA or Regulation Z credit if it meets all of several identified conditions, including: providing the consumer with no more than the amount of accrued wages earned; provision by a third party fully integrated with the employer; no consumer payment, voluntary or otherwise, beyond recovery of paid amounts via a payroll deduction from the next paycheck, and no other recourse or collection activity of any kind; and no underwriting or credit reporting.[72]

The Proposed Rule asserts a novel and "broad reading of 'debt' under TILA and Regulation Z."[73] The Proposed Rule claims that the "ordinary usage" of debt "means simply 'something owed,' without any obvious limitation."[74]

The Proposed Rule does not adequately justify this 180-degree change in course. Further, the Proposed Rule bears all the hallmarks of arbitrary and capricious agency decision-making by being rushed, cursory, and internally inconsistent. For example, the CFPB states that the Proposed Rule "is informed by the CFPB's extensive study of this market, including data collection, continuous monitoring, investigation, coordination with states, and engagement with market participants."[75] Yet there is nothing in the Proposed Rule to reflect the actual features of EWA products that would substantiate that this "careful study" actually informed the CFPB's abrupt regulatory shift. There

---

579 n.38 (5th Cir. 2023) ("Even if the Final Rule is properly considered interpretive and not legislative, the Rule could have still been tested for procedural regularity and challenged as arbitrary and capricious.").

[66] *Pharm. Rsch. & Mfrs. of Am. v. F.T.C.*, 790 F.3d 198, 209 ) (alteration in original) (quoting Harry T. Edwards et al., *Federal Standards of Review* 203 (2d ed. 2013)).

[67] *Hall v. Baker*, 867 F.2d 693, 696 (D.C. Cir. 1989).

[68] *Perez*, 575 U.S. at 106.

[69] *Id.*

[70] Advisory Opinion, 85 Fed. Reg. at 79406 & n.23 (quoting *Debt*, Black's Law Dictionary (11th ed. 2019)).

[71] *Id.* at 79406.

[72] Proposed Rule, 89 Fed. Reg. at 61359.

[73] *Id.* at 61360.

[74] *Id.* (quoting Debt, Merriam-Webster, *at* https://www.merriam-webster.com/dictionary/debt (last updated Jan. 30, 2024)).

[75] *Id.*

is no market or product information, no engagement with the distinct features of EWA products, no concrete examples of why this shift is actually necessary, and no explanation of why the CFPB feels the need to expand its authority other than to regulate for the sake of regulating.

Although the Proposed Rule faults the CFPB's 2020 guidance for covering a "narrow type of earned wage products,"[76] it fails to explain what, if anything, has changed to necessitate replacement of that approach. The Proposed Rule asserts, for example, that the term "liability" "is not used in all dictionary definitions of the term 'debt,'"[77] but it does not address why its original use of Black's Law Dictionary was inappropriate beyond noting that the agency could have looked to other "definitions in common legal usage when reaching its narrow conclusion."[78] The Proposed Rule also notes preexisting guidance did not address "new offerings on the market."[79] The 2020 Advisory Opinion, however, explicitly covered only certain types of EWA products, expressly providing that "products that meet some but not all of the [aforementioned] characteristics may be credit under Regulation Z."[80] The Proposed Rule fails to explain why the presence of new market entrants requires a complete change in policy such that EWA products will all be considered credit. The CFPB's failure to explain its change of heart renders its decision arbitrary and capricious.[81]

Further, the Proposed Rule also completely fails to consider the "serious reliance interests" engendered by the 2020 Advisory Opinion.[82] The Proposed Rule highlights "emerging business models" for whom it seeks to provide more guidance, but wholly fails to discuss the significant reliance already engendered by the prior approach.[83] For the last several years, particularly to meet the needs of consumers in the wake of the global coronavirus pandemic, market participants, including AFC members, have structured their product offerings in accordance with the existing legal regime. Many EWA providers are not organized to manage the significant compliance requirements that will be necessary should a final rule be promulgated. Failure to consider these and other reliance interests renders the Proposed Rule arbitrary and capricious.

Federal law also requires additional procedures beyond the APA's requirements that the CFPB has not observed with its Proposed Rule. Under the Dodd-Frank Act, when exercising its rulemaking authority under 12 U.S.C. § 5512(b)(1), as the agency notes it is exercising in the Proposed Rule,[84] the CFPB must "consider the potential benefits and costs" of a regulation to both consumers and "covered persons"[85] and, in conducting this analysis, account for (1) "the potential reduction of access by consumers to consumer financial products or services resulting from such rule"; (2) the

---

[76] *Id.* at 61361.

[77] *Id.* at 61361 n.28.

[78] *Id.* at 61361.

[79] *Id.*

[80] Advisory Opinion, 85 Fed. Reg. at 79405 n.11.

[81] *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009) (noting that "a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy").

[82] *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 106 (2015).

[83] *See* Proposed Rule, 89 Fed. Reg. at 61359.

[84] *Id.* at 61363.

[85] Covered person is defined as "(1) an insured depository institution with total assets of $10,000,000,000 or less; or (2) an insured credit union with total assets of $10,000,000,000 or less." 12 U.S.C.§ 5516(a)(1)-(2).

impact on "covered persons"; and (3) "the impact on consumers in rural areas."[86] Here, the Proposed Rule does not even attempt to observe these procedural requirements of the Dodd-Frank Act. For example, the CFPB has clearly not considered the impact of the Proposed Rule on rural consumers, who are currently equally able to benefit from EWA products as other consumers because all AFC EWA providers have online or app-based financial services, and they are thus not disadvantaged by the lack of brick-and-mortar alternatives in rural areas. The Rule could transform and reduce the market for EWA products, reducing a crucial source of short-term liquidity for consumers in rural areas. The CFPB's failure to comply with the Dodd-Frank Act by considering the aforementioned factors is apparent on its face, rendering the Rule arbitrary and capricious.[87]

Further, it is the CFPB's obligation to adopt the *best* interpretation of TILA—not merely an interpretation that the CFPB perceives as reasonable in view of its policy goals. Under *Loper Bright Enterprises v. Raimondo*,[88] the CFPB's interpretation of TILA will be reviewed de novo by a reviewing court, and a court will not defer to the CFPB merely based on the CFPB's representation that the statute is ambiguous. In light of the well-known meanings of "credit" and "debt," EWA products do not fall within TILA, and the CFPB's new policy position that regulation would be useful is an insufficient basis to stretch TILA beyond its ordinary meaning.

### D.     Under TILA, the Proposed Rule's Effective Date Must Be Delayed

Under Section 105(d) of TILA,[89] "[a]ny regulation of the Bureau, or any amendment or interpretation thereof, requiring any disclosure which differs from the disclosures previously required by this part, part D, or part E or by any regulation of the Bureau promulgated thereunder shall have an effective date of that October 1 which follows by at least six months the date of promulgation." If the Proposed Rule stands or any subsequent final rule requires disclosures under TILA, that provision would apply, because the Proposed Rule requires "disclosure[s] which differ[] from disclosures previously required."[90] Under the 2020 Advisory Opinion, EWA providers faced no enforcement risk if they failed to comply with TILA's disclosure requirements. Under the Proposed Rule, however, EWA providers will face such enforcement risk. As such, the Proposed Rule "require[s]" a "disclosure which differs from the disclosures previously required," and the effective date must therefore be delayed.

Not only does the CFPB's new rule require new disclosures, but the content of those disclosures is uncertain. Because EWA products look nothing like the products ordinarily characterized as loans, EWA providers will have no idea how to fit EWA products' square pegs into TILA's round hole. For example, when an employee receives a portion of her salary that she has earned a few days early, what is the APR? Adding to the confusion, it is not clear how the new disclosure requirements fit in with state law. If a state elects *not* to treat EWA products as loans, are applicable state laws preempted? How should EWA providers disclose that a product is and is not a loan simultaneously. Although the CFPB asserts that the 2020 Advisory Opinion created "regulatory

---

[86] 12 U.S.C. § 5512(b)(2)(A).

[87] *Nat'l Cmty. Reinvestment Coal. v. CFPB*, No. 20-cv-02074, 2022 WL 4447293, at *21 (D.D.C. Sept. 23, 2022).

[88] 144 S. Ct. 2244 (2024).

[89] 15 U.S.C. § 1604(d).

[90] *Id.*

uncertainty," the Proposed Rule will make any uncertainty much worse—and that uncertainty will be exacerbated if EWA providers are stripped of the delayed effective date that TILA mandates.

If the CFPB imposes the Proposed Rule without delaying the effective date, EWA Providers may unfairly face the risk of private liability. Consumers bringing TILA suits have one year to bring a lawsuit.[91] If consumers are given a one-year grace period before they lose their right to sue, providers should be given a similarly substantial grace period before being subject to liability.

The CFPB's notice says nothing about the effective date. To the extent the CFPB believes that Section 105(d) does not apply to interpretive rules, it is mistaken. Section 105(d) applies not only to a "regulation of the Bureau," but also an "interpretation thereof"—*i.e.*, an interpretive rule. Section 105(d) therefore expressly contemplates that a new interpretation of an existing rule can create new disclosure requirements within the meaning of Section 105(d). In any event, as explained above, the Proposed Rule is a legislative rule that imposes new disclosure requirements. Section 105(d) therefore applies.

## IV.    The Proposed Rule Will Harm Consumers, Employers, and EWA Companies

The CFPB's proposed rule misclassifying EWA products as loans under TILA will harm consumers, employers, and EWA companies. The Proposed Rule would effectively lead to the transformation of EWA products into loan products, thereby eliminating their key features that consumers recognize and rely on, including their non-recourse nature and absence of credit underwriting, as discussed above in Section II. Consumers recognize EWA products as distinct from lending products, and the interpretive rule will lead to a reduction in consumer choice, needless customer confusion, the elimination of fair competition and innovation, higher costs and less financial freedom for consumers, and the likely shuttering of smaller providers.

### A.    The Proposed Rule Will Harm Consumers

The Proposed Rule will not eliminate consumer need for EWA products and will not eliminate EWA products. However, it will needlessly create significant consumer confusion, reduce consumer choice, and harm the most financially vulnerable consumers.

The Proposed Rule will drive consumer confusion. Consumers do not consider EWA products to be loans. Rather, they view EWA products as giving them access to "wages they had already earned, which was fundamentally different from borrowing against future earnings."[92] Consumers agree that EWA products are "payment for work already performed" and "money already earned." One consumer said, "I believe [EWA] is different from a loan. A loan gives me access to something I need to earn in the future. EWA gives me access to something I've already earned." Consumers will inevitably be confused about whether EWA products remain non-recourse, are subject to usury limits, require credit risk assessment, or are subject to debt collection. By contrast, these questions currently do not arise because consumers understand that EWA products are not loans.

---

[91] *Id.* § 1640(e).

[92] Lisa Berdie & Riya Patil, *Exploring Earned Wage Access as a Liquidity Solution*, Financial Health Network, at 5 (Nov. 2023), https://finhealthnetwork.org/wp-content/uploads/2023/12/EWA-Users-Report-2023.pdf.

The Proposed Rule will also eliminate an important consumer choice. Consumers correctly view EWA products as an *alternative* to other short-term credit options—such as payday loans, credit card debt, overdraft, and pawn loans—and choose them because they do not entail incurring late fees or overdraft fees, or borrowing money from friends and family.[93] One consumer said that using EWA "changed [their] life for the better," including because "[p]ayday loans have incredibly high interest rates and the overdrafts and late fees build up."[94] By recharacterizing EWA, the Proposed Rule will likely push consumers into higher-cost short-term credit products that expose them to negative credit reporting, debt collection, and rollovers.[95] One study on customers of EWA products showed that without these services, 44% would consider not paying certain bills on time, 38% would consider going into overdraft, 35% would consider using a payday loan, and 30% would consider taking a second job or working overtime.[96] The studies show that consumers *choose* to use EWA over other forms of access to short-term liquidity. Treating all short-term liquidity options as the same despite their significant—and not just technical—differences eliminates the choice that consumers have today.

Moreover, the Proposed Rule would particularly harm the most financially vulnerable consumers by reducing low-cost, non-loan options. Surveys conducted by EWA providers show that most EWA customers, often consumers who are excluded from many forms of financial services, turn to EWA services to gain liquidity to pay for food, transportation, and utilities. Individuals without access to credit are particularly benefitted by EWA programs, and removing such access will impact them disproportionately. Currently, because EWA products do not involve credit checks, even consumers with no or low credit can participate. Since the Proposed Rule will improperly classify EWA products as loans, consumers will become subject to credit underwriting, and fewer consumers will qualify for borrowing. As a result, the Rule will generally decrease the number of individuals who qualify for EWA. In one survey of over 1,000 consumers who fall under federal poverty guidelines, over 40% of the respondents said they use EWA once a week. Half of EWA users are non-white (51%), while a clear majority are women (63%). Nearly three-quarters of the customers of one EWA provider in AFC said access to EWA improved their overall financial well-being and financial stress. The consolidation of EWA products with credit products as a category will disproportionately affect low-income, financially underserved consumers who are currently excluded from many forms of financial services, including credit cards and loans. One such consumer wrote: "I fear that workers like myself will be forced to resort to more costly alternatives, especially those of us with lower credit ratings." With the Proposed Rule, the CFPB misses an opportunity to cement consumer protections into regulation by ensuring EWA products will never involve traditional credit features like recourse and credit underwriting.

The Rule may also result in creating new taxable events for consumers if the EWA is not repaid, as loans that are forgiven, cancelled, or written off may have to be included in income for tax

---

[93] *Id.* at 4-5.

[94] This information was provided in a confidential survey commissioned by an EWA provider member.

[95] Marshall Lux & Cherie Chung, *Earned Wage Access: An Innovation in Financial Inclusion?*, at 21 (Harvard Kennedy Sch. Mossavar-Rahmani Center for Bus. & Gov't, Working Paper No. 214, June 2023).

[96] This information was provided in a confidential survey commissioned by an EWA provider member.

purposes—and it may cause the EWA provider added harm in that lenders are usually required to report the amount of the canceled debt to the IRS on a Form 1099-C, Cancellation of Debt.[97]

### B.    The Proposed Rule Will Harm Employers

Employers have come to rely on EWA as part of a suite of benefits available to attract and retain talent. Pushing EWA companies and consumers away from a non-credit option will harm employers by eliminating that option. Thirty percent of job candidates reported that availability of an EWA program would impact their decision to accept a position.[98] According to one survey, 89% of workers said they were willing to work longer for an employer who offered EWA, and 79% of workers were more willing to switch to an employer who already offered EWA.[99] A Harvard Business School study on Minu, a Mexican Fintech firm, found that EWA users on average have about 12% lower probability of leaving the company in the next pay cycle.[100] In short, this rule will drive the loss of an important benefit to attract and retain employees.

### C.    The Proposed Rule Will Harm EWA Companies

The Proposed Rule will needlessly increase costs on EWA providers and reduce competition and innovation.

Treating EWA products as loans will subject EWA companies to heightened regulatory requirements. These compliance costs, which include but are not limited to building or securing third-party technology to comply with new TILA requirements, additional compliance staff, and additional resources to determine the applicability of licensure and other potentially relevant statutes, are significant and could make continuing to offer EWA services financially unviable for many providers. Some companies will be forced to overhaul their products with an uncertain outcome. Smaller EWA companies, many of whom qualify as small businesses, may be unable to bear these additional costs. And, of course, these added costs do not take into account the opportunity cost of diverted resources.

Further, the increased regulatory burden may drive some EWA providers out of the market, or prohibit new providers from entering the market, reducing the availability of these services. This could stifle innovation in financial products designed to help consumers manage their finances more effectively. The departure of EWA companies from the market would limit consumer choices and potentially lead to a monopolization by a few large providers, reducing competitive pressure to improve services and lower costs.

Employers may be less likely to partner with certain EWA providers, due to increased uncertainty and confusion, or to avoid an association with short-term lenders. This could limit competition.

---

[97] *See* IRS, *What If My Debt Is Forgiven?*, https://www.irs.gov/newsroom/what-if-my-debt-is-forgiven (last updated Jan. 30, 2024).

[98] KPMG, *Attention Payroll Leaders: Covid-19 Spurs Surge of Earned Wage Access Programs*, at 1 (Dec. 2020), https://kpmg.com/kpmg-us/content/dam/kpmg/pdf/2021/earned-wage-access-offers.pdf.

[99] *Id.*; *see also Visa Direct Powers Real-Time Payroll for Frontline Workers*, PYMNTS.com (May 14, 2020), https://www.pymnts.com/visa/2020/visa-why-real-time-payroll-now-necessity-not-luxury/.

[100] Jose Murillo, Boris Vallee, & Dolly Yu, *Fintech to the Worker Rescue: Earned Wage Access and Employee Retention*" (Mar. 27, 2022) (Harvard Bus. Sch. Working Paper).

And providers may introduce features that are more typical of traditional credit transactions to ensure compliance, which may not be advantageous to consumers.

* * *

AFC welcomes responsible, pragmatic regulation of EWA products that recognizes and reflects the important features of EWA products that make them distinct from loans and beneficial to consumers. Throughout the states and in Congress, lawmakers are busy engaging with relevant stakeholders about the unique features of EWA products and working to design legislative solutions that properly take into account those features. The CFPB should not usurp the legislative process by imposing a rule that would harm consumers, employers, and EWA providers. AFC looks forward to the opportunity to engage with the CFPB further about these important matters.

Sincerely,

Ian P. Moloney
Head of Policy and Regulatory Affairs
American Fintech Council